# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 18-cv-1845-WJM-KLM

BENJAMIN RAMSEY,
KARLA RAMSEY, as guardian and next friend of Benjamin Ramsey,[1]

      Plaintiff,

v.

SOUTHWEST CORRECTIONAL MEDICAL GROUP, INC.;
PORTERCARE ADVENTIST HEALTH SYSTEM, d/b/a CENTURA HEALTH-PARKER
ADVENTIST HOSPITAL;
DOUGLAS COUNTY SHERIFF'S OFFICE;
DOUGLAS COUNTY SHERIFF TONY G. SPURLOCK, in his individual and official
capacity;
BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF DOUGLAS,
COLORADO;
SOUTHWEST CORRECTIONAL MEDICAL GROUP, PLLC;
CORRECTIONAL MEDICAL GROUP COMPANIES, INC.;
SOUTHWEST CORRECTIONAL MEDICAL GROUP, LLC;
COLORADO CORRECTIONAL MEDICAL GROUP, PLLC;
OFFICER NATHAN FINLEY, in his individual and official capacity;
SERGEANT PAUL D'AMBRA, in his individual and official capacity;
DETECTIVE JACOB SCHUSTER, in his individual and official capacity;
COMMANDER JIM PRIOR, in his individual and official capacity;
OFFICER TYLER HERMAN, in his individual and official capacity;
CAPTAIN JIM TSURAPAS, in his individual and official capacity;
OFFICER KRISTOPHER BRYANT, in his individual and official capacity;
NURSE PATRICIA GIVENS, in her individual and official capacity;
DR. MARGIE KUBOWICZ, in her individual and official capacity;
NURSE ERIK BATEMAN, in his individual and official capacity;
NURSE DANA WADE, in her individual and official capacity;
LINDA GANZ, in her individual and official capacity;
NURSE SUSAN L/N/U, in her individual and official capacity;
NURSE JENNIFER TRIMBLE, in her individual and official capacity;
NURSE DEIMYS VIGIL, LPN, in her individual and official capacity;

---

[1] As will become clear below, Karla Ramsey asserts no claims of her own and appears
before the Court solely in her role as guardian and next friend of Benjamin Ramsey. (*See* ECF
No. 122 at 4.) At the conclusion of this Order, the Court will order the parties to reform their
captions, and among the changes the Court will order will be to realign Karla Ramsey to show
her true role.

TIMOTHY G. MOSER, M.D., in his individual and official capacity;
DEPUTY ROBIN PETTIT-BEIGLER, in her individual and official capacity;
EMILY BARRON, RN, in her individual and official capacity;
LINDSEY GEIGER, RN, in her individual and official capacity;
SOPHIA HELENE NIX, LPN, in her individual and official capacity;
TINA L/N/U, RN, in her individual and official capacities;
KAT L/N/U, LPN, in her individual and official capacities;
JOAN M. CUNNINGHAM, RN, in her individual and official capacities;
SHAURI N. KRON, LPN, in her individual and official capacities;
DAISHA WADE, LPN, in her individual and official capacities;
NURSE JANE DOE ONE, in their individual and official capacities;
DOCTOR JANE DOE ONE, in their individual and official capacities;
DEPUTY JOHN DOE ONE, in his individual and official capacity,

        Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS
TO DISMISS, AND ORDERING PLAINTIFF'S COUNSEL TO SHOW CAUSE WHY
SHE SHOULD NOT BE SANCTIONED FOR MISREPRESENTING THE COMPLAINT**

---

Plaintiff Benjamin Ramsey ("Ramsey"), appearing through his mother in her role
as legal guardian and next friend, alleges that the acts and omissions of numerous
parties (collectively, "Defendants") led to him being denied necessary medications while
in pretrial detention at the Douglas County Jail, in turn leading to seizures and
permanent brain damage. He alleges violations of his constitutional rights (by way of 42
U.S.C. § 1983), of other federal statutes, and of Colorado common law.

Presently before the Court are six motions to dismiss filed by the various
Defendants. (*See* ECF Nos. 96, 99, 102, 104, 106, 107.) For the reasons explained
below, these motions are granted in part and denied in part. The upshot is that this
case will proceed against Nurse Lindsey Geiger on Ramsey's claim of an
unconstitutional denial of medical care; against the various "Correctional Medical"
entities and Douglas County on Ramsey's claim of an unconstitutional policy, practice,

custom, or failure to train; and against the various "Correctional Medical" entities and their employees on Ramsey's claim of medical negligence under Colorado common law.

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  The 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II. BACKGROUND

The Court assumes the following to be true for purposes of resolving the various motions to dismiss.

**A.    Ramsey's Preexisting Medical Condition**

Ramsey was born in 1989.  (¶ 65.)[2]  In 2012, he sustained a traumatic brain injury in a motorcycle accident.  (¶ 66.)  Part of treating that injury was implantation of a ventriculoperitoneal ("VP") shunt in his skull, which allows excess cerebral fluid to drain.  (¶¶ 67–68.)  Ramsey nonetheless continued to suffer from intellectual disabilities, inability to control his emotions, and other mental illnesses caused by his traumatic brain injury.  (¶ 74.)

Apparently Ramsey was living in Texas when he received his injury and initial treatment, because the State of Texas declared him incapacitated in April 2013, and appointed his mother, Dr. Karla Ramsey, as his legal guardian.  (¶¶ 69, 73.)  His mother is a pediatrician.  (¶ 69.)

As of 2016, Ramsey was living in a rehabilitation center in Colorado and operated at the mental capacity of "a younger person."  (¶¶ 72, 74.)  He was nonetheless able to communicate effectively, feed himself, use the bathroom without assistance, exercise, and engage in recreational activities such as fishing and hiking.  (¶ 76.)

As of 2016, Ramsey's mother lived in Texas (and continues to live in Texas to this day), but visited Ramsey regularly.  (¶ 70.)

**B.    The Parker Adventist Hospitalization**

1.    <u>Corrective Surgery and Incident with Schildt</u>

On July 3, 2016, doctors at Parker Adventist Hospital discovered that Ramsey's VP shunt had been malfunctioning for several months.  (¶ 79.)  The next day, Ramsey

---

[2] All "¶" citations in this Order, without more, refer to the Second Amended Complaint, ECF No. 92.

underwent corrective surgery at Parker Adventist. (¶ 80.) As of July 13, 2016, Ramsey was still recovering at Parker Adventist, and on numerous medications. (¶¶ 81–82.) Ramsey's mother informed hospital staff that day that Ramsey's medications "needed regulation," and that "Ramsey needed attention to his mental health and emotional needs and might want to leave his hospital room at some point in time." (¶¶ 82–83.)

On July 16, 2016, Ramsey attempted to leave his hospital room. (¶ 84.) A security guard named Robert Schildt (not a defendant here) "attempt[ed] to physically restrain" Ramsey, and Ramsey "bit him on the left forearm." (*Id.*)

### 2. Officer Dorrell's Investigation

Parker Police Officer Ronnie Dorrell (not a defendant here) came to the hospital to investigate the altercation between Ramsey and Schildt. (¶ 86.) Officer Dorrell specifically investigated whether Ramsey had committed third-degree assault. (¶ 88.) Dorrell interviewed Schildt, who reported that Ramsey "suffered from a traumatic brain injury," "was bipolar," and "doesn't know what planet he's on." (¶¶ 89–90 (internal quotation marks omitted).)

Dorrell then interviewed Ramsey, noting that he "did not follow a consistent thought process and changed topics randomly." (¶ 92.) Dorrell concluded that Ramsey "did not meet in the culpable state of mind for third degree assault." (¶ 91.)

### 3. The Mental Health Hold

On the evening of July 17, 2016, "Ramsey was placed on an M1 Hold [at the hospital] for Emergency Mental Illness." (¶ 93.)[3] Ramsey does not say who initiated

---

[3] Ramsey refers to the Colorado statutory procedure through which police officers, medical professionals, and certain other licensed professionals can have a person committed for up to 72 hours based on probable cause that a mental health disorder puts the person or others in imminent danger. *See* Colo. Rev. Stat. § 27-65-105.

this hold, nor whether it was related to the Schildt altercation.

Defendant Erik Bateman, a nurse assigned to Ramsey after the Schildt altercation, gave Ramsey a copy of his statutory rights under the emergency mental hold procedure but "Ramsey allegedly refused to sign" the document. (¶¶ 95–96, 105.)

      4.   <u>Detective Schuster's Investigation</u>

On July 19, 2016, Defendant Jacob Schuster, a Parker Police Detective, came to the hospital to investigate the Schildt incident. (¶ 97.) Ramsey does not say why Detective Schuster thought there was a need to continue investigating, nor why Officer Dorrell did not continue the investigation. Ramsey does not say what Schuster knew about Dorrell's investigation.

Detective Schuster first spoke with Defendant Margie Kubowicz, a physician who identified herself as "the on-duty physician during the [Schildt] incident" three days earlier. (*Id.*) It is not clear what Detective Schuster asked Dr. Kubowicz, but he learned from her that she was not Ramsey's treating physician and could not speak to Ramsey's medical conditions or medications; "from what she observed [Ramsey] did not have SBI";[4] she had spoken with Ramsey's "long-term physiologist,"[5] from whom she learned that "Ramsey needed high level and long-term mental health care"; and Ramsey was, at that moment, still on the mental health hold. (¶¶ 99–103.)

Detective Schuster also interviewed Nurse Bateman. (¶ 104.) Bateman reported overhearing a telephone conversation between Ramsey and Ramsey's mother during which Ramsey said something that Bateman interpreted to mean that "Ramsey was

---

[4] Ramsey does not define "SBI." This may be a typo for "TBI," *i.e.*, traumatic brain injury.

[5] "Physiologist" is almost certainly a typo for "psychologist." (*See* ECF No. 119 at 6 (Ramsey's paraphrase of this portion of the complaint, using the word "psychologist").)

sorry for what he did and knew it was wrong." (¶¶ 106–07.)  Bateman also reported that

Ramsey would become aggravated for about ten percent of Bateman's twelve-hour

shifts, but he (Bateman) was not fearful of Ramsey; Ramsey was able to feed himself

and use the restroom without assistance; and that he (Bateman) had been a nurse for

less than a year and had no advanced training in mental health care other than a few

rotations during nursing school.  (¶¶ 108–12.)

Detective Schuster next interviewed Defendant Dana Wade, a nurse.  (¶ 113.)

Nurse Wade reported that, prior to the Schildt incident, Ramsey had been upset about

not being able to leave his room.  (¶ 114.)  She also claimed that Ramsey "had stood in

the doorway of his room and shouted obscene phrases at her."  (¶ 116.)  But, she said,

her interactions with Ramsey led her to believe that he knew right from wrong, "tried to

manipulate the situation by telling people he was crazy," and "knew how to play the

system."  (¶ 117 (internal quotation marks omitted).)

At some point in his investigation, Detective Schuster also interviewed Patricia

Givens, the director of human resources and chief nursing officer at the hospital.  (¶ 98.)

Ramsey does not say what Schuster learned, if anything, from Nurse Givens.

5.    Ramsey's Arrest by Officer Finley

Later that same day (July 19, 2016), Defendant Nathan Finley, a Parker Police

Officer, came to the hospital to report that Detective Schuster "had developed probable

cause to arrest [Ramsey] on assault and harassment charges."  (¶¶ 120–21.)  Ramsey

does not say where Detective Schuster was at this time, nor whether Officer Finley

came to the hospital with the express purpose of arresting Ramsey based on Schuster's

findings.

Regardless, Officer Finley soon decided to arrest Ramsey.  While carrying out

the arrest, he received from Nurse Givens the discharge paperwork showing that Ramsey had been "released from his mental health hold and was medically cleared for jail." (¶ 124.) Dr. Kubowicz had authored that paperwork (when is unclear), and specified that Ramsey could have a regular diet and no activity restrictions. (¶¶ 118, 125.)

Nurse Givens also provided Officer Finley with at least some of Ramsey's prescription medications (how many is unclear, as described below), along with a list of those medications. (¶¶ 127, 140.) The list showed twenty-one prescriptions, including dosage and how often each should be administered. (¶ 140.)

Hospital staff informed Officer Finley that Ramsey had been medicated to keep him calm. (¶ 128.) Ramsey "was cooperative as he was placed into custody." (*Id.*)

## C.  Medical Deterioration at the Douglas County Jail

### 1.  Booking

Officer Finley transported Ramsey to the Douglas County Jail. (¶ 129.) He gave all of the hospital discharge paperwork, including the list of prescriptions, to an intake nurse, Defendant Lindsey Geiger. (¶¶ 130–31.) Nurse Geiger, like all of the doctors and nurses who worked at the Douglas County Jail, was an employee of one or more of the "Correctional Medical" entity defendants. (¶¶ 47, 55.)

Nurse Geiger performed a "Mental Health Intake Screening" and an "Intake Triage Screening." (¶¶ 164–65.) She filled out forms noting that "Ramsey needed an Urgent Mental Health Referral and Special Population Housing," and wrote "see list from hospital" on a portion of the form asking her to specify the inmate's medications. (*Id.*) Nurse Geiger did not contact "the on-call doctor or medical director" about Ramsey. (¶ 214.)

Apparently after Nurse Geiger's examination, Ramsey was released to two intake deputies, Defendants Robin Pettit-Beigler and John Doe One. (¶ 134.) Ramsey does not allege what these deputies did or failed to do, but he alleges that various intake forms reflect at least portions of Ramsey's medical needs. The jail's "Initial Property Questionnaire" was marked "YES" for "Medications?", but the only medication listed was "Latuda 40mg (20 Tabs)." (¶ 133.)[6] The jail's "Pre-Book Questionnaire" was marked "YES" for "Does the inmate report any medical conditions?" (¶ 136.) The form elaborated that the medical condition was "Traumatic Brain Injury." (*Id.*) And the "Arrestee Transportation Information Questionnaire" noted that Ramsey had been "transported from Hospital" after being "medically cleared [for] booking." (¶ 137.)

    2.   <u>Ramsey's Mother Learns of His Arrest</u>

On the evening of the same day (July 19, 2016), Ramsey's mother "was called by a doctor to inform her that Security Guard Schildt had pressed charges against [Ramsey]." (¶ 176.) Ramsey's mother was in Texas at the time. (¶ 177.) She then called "an unnamed officer and was told that a plan"—not otherwise described—"had been worked out between the Police Department and the hospital administration without advising her as [Ramsey's] legal guardian." (¶ 178.) It is not clear if Ramsey means to allege that this plan, whatever it was, had been worked out specifically to keep Ramsey's mother in the dark, or if the Parker Police and Parker Adventist Hospital simply created a plan that happened not to include the step of informing Ramsey's mother. Regardless, Ramsey's mother made plans to return to Colorado quickly. (¶ 179.)

---

[6] Latuda is the brand name for lurasidone. Ramsey took lurasidone as an antipsychotic. (¶ 152.)

3. <u>First Two Days in Jail (July 19 & 20, 2016)</u>

The July 19, 2016 "Night Shift Report," which apparently covers the night of July 19 into the early morning of July 20, shows that "Nurse Lindsey" (presumably Nurse Geiger) was on duty, as was "Nurse Sophia" (presumably Defendant Sophia Nix). (¶ 166.) That report also records that requests for "med info/records" were sent to Parker Adventist Hospital and "Aurora Residential/Alternatives" (presumably Ramsey's rehabilitation center). (¶ 167.) The Night Shift Report also contains this remark: "TBI x2yrs.ago MVA/bit nurse." (¶ 168.) The report does not say anything about Ramsey's recent brain surgery, does not record any examination or assessment of Ramsey by Nurse Geiger or Nurse Nix, and does not record any administration of medications. (¶¶ 169–70.)

The July 20, 2016 "Day Shift Report" states that Defendants Tina (Last Name Unknown) and Kat (Last Name Unknown) were the nurses on duty, with Nurse Kat assigned to the "Med Cart." (¶ 171.) The report does not record any examination or assessment of Ramsey by either nurse, nor any administration of medications. (¶ 172.)

The July 20, 2016 "Night Shift Report" lists "RN Joan" (presumably Defendant Joan Cunningham) and "LPN Daisha" (presumably Defendant Daisha Wade) as the nurses on duty. (¶ 173.) That report does not record anything about Ramsey. (¶¶ 174–75.)

4. <u>Third Day in Jail (July 21, 2016)</u>

Ramsey's mother arrived in Colorado on July 21, 2016, and visited her son in the Douglas County Jail. (¶¶ 179–80.) She observed "an acute change in mental status following brain surgery with acute onset of almost continual complex partial seizures." (¶ 182.) Apparently attributing this to lack of medication, Ramsey's mother asked jail

personnel what medications Ramsey had received, but no one could answer her questions. (¶¶ 183, 195.)  At some point that day, another nurse, Defendant Jennifer Trimble, spoke with Ramsey's mother on the phone. (¶¶ 184–85.)  Ramsey's mother described the seizure activity she had observed to Nurse Trimble. (¶ 194.)  Nurse Trimble said that Ramsey's "medications would be restarted and moved towards what had been successful in the past." (¶ 186.)  Nurse Trimble explained that Ramsey "had not received any medication because the medications had not been verified." (¶ 187.)

The July 21, 2016 "Day Shift Report" listed "RN Deimys" (presumably Defendant Deimys Vigil) and "LPN Shauri" (presumably Defendant Shauri Kron) as the nurses on duty. (¶ 188.)  With regard to Ramsey, this report reads, "several medical issues. TBT,[7] recent brain surgery, 7/4/16.  Mom called attorney b/c [patient] has been here since 7/19/16[.]  Mom is a doctor[.]  All meds verified[.]  Neuro checks and Benzo protocol also." (¶ 190.)

At about 5:30 PM that day, Defendant Southwest Correctional Medical Group sent a fax to an 800 number (Ramsey does not clarify to whom this number belonged) asking the recipient to "Please send the Tnleptal,[8] Desmopressin,[9] Donezepil,[10] Latuda.[11]" (¶ 197.)  Walmart Pharmacy records from that day also show that Defendant Timothy Moser, a physician employed by Southwest Correctional Medical

---

[7] Perhaps a typo for "TBI," *i.e.*, traumatic brain injury.

[8] Probably a typo for Trileptal, the brand name of oxcarbazepine, which Ramsey took to prevent seizures. (¶ 156.)

[9] A medication Ramsey took to treat cranial diabetes insipidus. (¶ 144.)

[10] A typo for donepezil, "used to treat [Ramsey] for Alzheimer symptoms." (¶ 145.)

[11] *See* n.6, above.

Group, called in prescriptions for these same four drugs.  (¶ 198.)

At 6:41 PM, Nurse Trimble called Ramsey's mother again to report that Ramsey "was in stable condition . . . under nursing observation."  (¶ 199.)  However, at 6:45 PM, Defendant Emily Barron, another nurse, wrote in a progress note that Ramsey had a pulse of 73, respiration of 16, and blood pressure of 143/100.  (¶ 200.)  She also wrote that Ramsey was "minimally verbally responsive" and that Ramsey would "be sent out to hospital for assessment.  Dr. Moser notified."  (*Id.*)

Two Douglas County deputy sheriffs transported Ramsey to "CRAH" (presumably Castle Rock Adventist Hospital) in a squad car.  (¶¶ 200, 208.)  The deputies carried him to the squad car because he was unable to walk.  (¶ 207–08.)  He was also unable to communicate.  (¶ 209.)

At 7:15 PM, Nurse Trimble called Ramsey's mother to report Ramsey's transfer to the emergency room.  (¶ 201.)

## D.     Treatment at Castle Rock Adventist Hospital

At the emergency room, Ramsey received a dose of Ativan and immediately woke up and became responsive and talkative.  (¶ 210.)  Ramsey's mother arrived to show a video of Ramsey's "baseline mental status to the hospital staff, and they concurred [that an] acute change in mental status [had occurred]."  (¶ 211.)  Ramsey was therefore admitted to the hospital, but soon became unresponsive again.  (¶¶ 212–13.)  A neurologist diagnosed ongoing seizures, and the hospital started anti-seizure medication by IV.  (¶ 213.)

Apparently this treatment was too late to avoid irreversible damage.  Ramsey now has a "significantly worse brain injury" and exhibits "the cognitive level of a young child."  (¶¶ 225–26.)  "He struggles to care for himself, and now requires a more

intensive long term care plan." (¶ 226.)

## III. PROCEDURAL HISTORY & SUMMARY OF CLAIMS

Ramsey, through his mother, filed this lawsuit on July 19, 2018. (ECF No. 1.)
He amended his complaint a month later (ECF No. 11), and filed the Second Amended
Complaint on November 14, 2018 (ECF No. 79). The Second Amended Complaint is
the currently operative complaint. For simplicity, the Court will refer to it as "the
Complaint" for the remainder of this order, unless the context requires otherwise.

### A.  Defendant Groupings

Ramsey breaks the many defendants into four categories:

*First*, the "Parker Adventist Hospital Defendants" include the hospital itself,
Dr. Kubowicz, Nurse Givens, Nurse Bateman, Nurse Wade, and Linda Ganz (alleged to
be a human resources department employee at the hospital, *see* ¶ 37, but not otherwise
mentioned in the Complaint). (¶ 60.) However, Dr. Kubowicz is separately represented
in this lawsuit, suggesting she is not an employee of Parker Adventist Hospital. For
purposes of this order, the Court will refer to Parker Adventist Hospital, Nurse Givens,
Nurse Bateman, Nurse Wade, and Linda Ganz as the "<u>Hospital Defendants</u>."[12] The
Court will refer to Dr. Kubowicz separately. At times the Court will also refer separately
to Parker Adventist Hospital as "the Hospital."

*Second*, the "Parker Police Department Defendants" include Detective Schuster,
Officer Finley, Sergeant Paul D'Ambra (alleged to be a sergeant in the Parker Police
Department, ¶ 30, but not otherwise mentioned), Commander Jim Prior (alleged to be

---

[12] Ramsey does not sue Castle Rock Adventist Hospital or anyone associated with it, so
"Hospital Defendants" may appropriately refer only to Parker Adventist Hospital and its
employees.

the commander of the Parker Police Department, ¶ 32, but not otherwise mentioned), Officer Tyler Herman (alleged to be an officer with the Parker Police Department, ¶ 33, but not otherwise mentioned), Captain Jim Tsurapas (alleged to be a captain in the Parker Police Department, ¶ 34, but not otherwise mentioned), and Officer Kristopher Bryant (alleged to be an officer with the Parker Police Department, ¶ 35, but not otherwise mentioned). (¶ 61.) Ramsey sues all of these persons in both their individual and official capacities. Naming them in their official capacities means he is, in effect, suing the Town of Parker as well. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." (internal quotation marks omitted)). The Court will refer to all of the Parker Police officials, along with the Town of Parker, as the "Parker Defendants." Sometimes the Court will refer to the Town of Parker solely as "Parker."

*Third*, the "Douglas County Defendants" include the Douglas County Sheriff's Office, the Board of County Commissioners, Deputy Pettit-Beigler, and Deputy John Doe One. (¶ 62.) For no apparent reason, Ramsey did not include Defendant Tony G. Spurlock, Douglas County Sheriff, within this group. When the Court refers to the "Douglas County Defendants," that reference includes Sheriff Spurlock. Sometimes the Court will refer to the Board of County Commissioners separately as "Douglas County."

*Fourth*, the "Southwest Correctional Defendants" include Southwest Correctional Medical Group, Inc., Southwest Correctional Medical Group, PLLC, Correctional Medical Group Companies, Inc., Southwest Correctional Medical Group, LLLC, Colorado Correctional Medical Group, PLLC, Nurse Susan (Last Name Unknown)

(never mentioned in the complaint other than as a Southwest Correctional employee, ¶ 42), Nurse Trimble, Nurse Vigil, Dr. Moser, Nurse Barron, Nurse Geiger, Nurse Nix, Nurse Tina (Last Name Unknown), Nurse Kat (Last Name Unknown), Nurse Cunningham, Nurse Kron, Nurse Wade, Nurse Jane Doe One, and Doctor Jane Doe One. (¶ 63.) The Court will adopt Ramsey's group moniker and refer to these Defendants collectively as the "Southwest Correctional Defendants." But at times the Court will refer separately to the entities with "Correctional Medical" in their title as the "Southwest Correctional Entity Defendants" (on occasion shortened to just "Entity Defendants").

**B.    Claims Asserted**

The Complaint asserts eight claims for relief:

- Claim 1: violation of the Fourteenth Amendment (42 U.S.C. § 1983) for failure to provide medical care in pretrial detention, asserted against the Parker Defendants, Douglas County Defendants, and Southwest Correctional Defendants;

- Claim 2: violation of the Fourteenth Amendment (42 U.S.C. § 1983) based on a municipal policy or custom that caused Ramsey's injuries, *see Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), asserted against Sheriff Spurlock in his official capacity and the Southwest Correctional Entity Defendants;

- Claim 3: conspiracy to interfere with civil rights (42 U.S.C. § 1985(3)), asserted against the Hospital Defendants, Dr. Kubowicz, the Parker Defendants, and Douglas County Defendants;

- <u>Claim 4</u>: violation of Title II of the Americans with Disabilities Act ("ADA") (42 U.S.C. §§ 12132 *et seq.*) for failure to reasonably accommodate Ramsey's disability, asserted against all Defendants;

- <u>Claim 5</u>: common-law medical negligence against the Southwest Correctional Defendants and Douglas County;

- <u>Claim 6</u>: common-law medical negligence against the Hospital Defendants and Dr. Kubowicz;

- <u>Claim 7</u>: common-law basic negligence against all Defendants, essentially arguing that they had a duty of care not to do all of the things that led to Ramsey's injuries; and

- <u>Claim 8</u>: violation of the Fourth Amendment (42 U.S.C. § 1983) based on an alleged lack of probable cause to arrest Ramsey, asserted against the Hospital Defendants, Dr. Kubowicz, the Parker Defendants, and the Douglas County Defendants.

## IV.  QUALIFIED IMMUNITY STANDARD

Some natural-person defendants (as distinct from government entities or businesses) argue that they are qualifiedly immune from suit on the allegations presented.  Rather than restate the qualified immunity standard each time it arises below, the Court will set forth the standard once, and then apply it in the "Analysis" section below (Part V) as appropriate.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the

challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Once the defendant raises a qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the law was clearly established at the relevant time. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014); *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000). "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas*, 765 F.3d at 1194 (internal quotation marks omitted). Nonetheless, the clearly established prong

> involves more than a scavenger hunt for prior cases with precisely the same facts. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation. The Supreme Court has cautioned [lower] courts not to define clearly established law at a high level of generality, but to focus on whether the violative nature of particular conduct is clearly established.

*Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and citations omitted).

## V. ANALYSIS

### A. Claim 1: Violation of the Fourteenth Amendment for Failure to Provide Adequate Medical Care in Pretrial Detention

Ramsey's Claim 1 alleges that various defendants denied him his constitutional right to adequate medical care while in law enforcement custody. (¶¶ 232–48.) State

officials violate a pretrial detainee's Fourteenth Amendment Due Process rights "when they are deliberately indifferent to an inmate's [objectively] serious medical needs." *Lopez v. LeMaster*, 172 F.3d 756, 764 (10th Cir. 1999) (internal quotation marks omitted).[13]  Objectively serious medical needs are those that have "been diagnosed by a physician as mandating treatment or [are] so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Al-Turki v. Robinson*, 762 F.3d 1188, 1192–93 (10th Cir. 2014) (internal quotation marks omitted).  And a law enforcement officer is deliberately indifferent to such a need when the officer "knows of and disregards [the medical need]; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

    1.   <u>Parker Defendants</u>

The Parker Defendants argue that, as to most of them, the Complaint fails to allege any participation in any decision remotely connected to Ramsey's medical care while in law enforcement custody; and, as to Officer Finley, he could properly rely on Dr. Kubowicz's discharge paperwork to conclude that there was nothing, medically speaking, he needed to do when transporting Ramsey to the Douglas County Jail.

---

[13] The Tenth Circuit applies the same test for deliberate indifference to serious medical needs to both Eighth Amendment claims brought by prisoners and Fourteenth Amendment claims brought by pretrial detainees. *See, e.g.*, *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009); *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).  In *Estate of Vallina v. County of Teller Sheriff's Office*, 757 F. App'x 643, 646–47 (10th Cir. 2018), the Tenth Circuit noted a developing circuit split regarding whether a recent Supreme Court decision abrogating the subjective component in a pretrial detention use-of-force claim also calls for abrogating the subjective component in a pretrial detention denial-of-medical-care claim.  *See Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015).  But the plaintiff in *Estate of Vallina* did not argue for such abrogation, so the Tenth Circuit continued to follow its prior precedent.  *See* 757 F. App'x at 647.  Likewise, Ramsey does not argue for such abrogation, so the Court will continue to apply the Eighth Amendment standard.

(ECF No. 99 at 5–7.)

       a.    *Officer Finley & Detective Schuster*

Concerning Officer Finley, Ramsey's theory is, apparently, that both he and Detective Schuster should have known that Ramsey should not have been arrested or transported to a jail given his medical condition. The argument rests on the following premises:

- "Defendant Kubowicz admitted and communicated to Defendant Schuster that Mr. Ramsey was still on an active mental health hold." (ECF No. 122 at 8.) Such an allegation exists in the Complaint. (¶ 103.)

- "Defendant Bateman admitted to Defendant Schuster that he had only been a nurse for less than a month, and had no advanced training in mental health care." (ECF No. 122 at 8.) The allegation in the Complaint, however, is that Nurse Bateman told Detective Schuster that "he had been a nurse for less than a year," not less than a month. (¶ 112.)

- "Defendant Kubowicz admitted to Defendant Schuster and Defendant Finley that she could not speak to Mr. Ramsey's medical conditions or medications, and that she was only concerned for the safety of the facility and the public. Defendant Kubowicz also reported to Defendant Finley and Defendant Schuster that she spoke to Mr. Ramsey's longterm physiologist[14] who stated Mr. Ramsey needed high level and long term mental health care." (ECF No. 122 at 8–9.) In support, Ramsey cites paragraphs 100 and 101 of the Complaint, but those paragraphs describe

---

[14] *See* n.5, above.

Dr. Kubowicz's conversation with Detective Schuster. They nowhere mention Officer Finley, whom Ramsey alleges to have shown up *after* Detective Schuster finished his investigation. (¶¶ 120–22.)

- "Defendant Schuster and Defendant Finley both knew they had directly picked up Mr. Ramsey from his hospital room while still recovering from brain surgery, and they knew of his lengthy list of medications he was currently taking." (ECF No. 122 at 8.) In support, Ramsey cites paragraphs 103, 122, and 124 of the Complaint, all of which describe things that either Detective Schuster or Officer Finley learned, but nothing that they learned together. Moreover, the assertion that Detective Schuster was present at the arrest is new—it does not appear in the Complaint.

In other words, Ramsey attempts to avoid dismissal partly through allegations appearing nowhere in the Complaint, *but see Smith v. Pizza Hut, Inc.*, 694 F. Supp. 2d 1227, 1230 (D. Colo. 2010) (plaintiff may not attempt to "amend" the complaint through a response to a motion to dismiss), or misrepresentations of allegations that *do* appear in the Complaint.

But even assuming Ramsey could amend to properly allege these new facts, Ramsey fails in his burden to show that Officer Finley or Detective Schuster, acting individually or together, violated a clearly established right. Ramsey alleges that Dr. Kubowicz "authored [the] discharge instructions and reported [that] Plaintiff Ramsey was medically cleared for jail." (¶ 118.) Officer Finley—and, for purposes of argument, Detective Schuster—received that paperwork from Nurse Givens, along with

prescription medications and a list of prescriptions. (¶¶ 124, 127, 140.) They then transported Ramsey to the Douglas County Jail and transferred him to jail intake personnel, apparently without incident. (¶¶ 128–32, 134.) Thus, Ramsey experienced no medical need *while he was in Parker Police custody* to which Officer Finley or Detective Schuster could have been deliberately indifferent.[15]

To the extent Ramsey believes that Officer Finley or Detective Schuster should have decided, contrary to Dr. Kubowicz's discharge instructions, that Ramsey should have been taken "to a different facility, such as another hospital or a mental health facility that could have supported his serious medical condition" (ECF No. 122 at 9), Ramsey cites no decision clearly establishing Finley's or Schuster's duty either to (a) second-guess a medical doctor's discharge instructions, or (b) question whether the Douglas County Jail could adequately care for Ramsey. Thus, Finley and Schuster are entitled to qualified immunity on this claim.

Ramsey's Claim 1 will be dismissed as against Finley and Schuster. This dismissal is with prejudice for two reasons. First, Ramsey's inappropriate attempt to amend the Complaint (the *Second Amended* Complaint) by way of a response brief still fails to show a viable claim. *See, e.g.*, *Sheldon v. Vermonty*, 269 F.3d 1202, 1207 n.5 (10th Cir. 2001). Second, Ramsey chose not to provide the Court with case law showing that his rights were clearly established. *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1342 (10th Cir. 2000) (when dismissing on qualified immunity grounds, district court has discretion to dismiss with or without

---

[15] For this reason, Ramsey's offhand allegation that "Defendants could have asked for an ambulance [to] transport [Ramsey] to the Douglas County Jail" (ECF No. 122 at 9) has no bearing on the deliberate indifference question.

prejudice).  In other words, through his silence on this point, Ramsey has effectively confessed Finley's and Schuster's motion to dismiss Claim 1.  In the Court's view this is a sufficient ground for it to exercise its discretion in favor of dismissal of this claim with prejudice.

      b.   *Other Parker Defendants*

As for the remaining Parker Defendants—Commander Prior, Captain Tsurapas, Sergeant D'Ambra, Officer Herman, and Officer Bryant—they are correct that the Complaint alleges nothing about their participation in the alleged denial of medical care. In response, Ramsey says nothing about Officers Herman or Officer Bryant, and so he is deemed to concede the Parker Defendants' argument that Herman and Bryant are entitled to dismissal for lack of personal participation.  Regarding Commander Prior and Captain Tsurapas, however, Ramsey asserts that they

> failed to properly supervise Defendant Finley and Defendant Schuster in this incident and thus are liable.  After Officer Ronnie Dorrell did not arrest Mr. Ramsey, an inference could be made (coupled with Plaintiffs' Conspiracy Claim for Relief [*i.e.*, Claim 3]) that the Officers, Commanders, and Captains up the line at the Parker Police Department at the least had a lack of supervision or at worst had control or direction over their subordinates['] actions and omissions.

(ECF No. 122 at 9.)  Ramsey nowhere pleads this in the Complaint.  Regardless, Ramsey's allegations against Finley and Schuster fail to show a constitutional violation, so there is no sense in which Commander Prior's and Captain Tsurapas's failure to supervise could have caused a constitutional violation.

Ramsey further asserts, apparently under the same supervisory liability theory, that Sergeant D'Ambra "was the approving officer for Mr. Ramsey's arrest and detention."  (*Id.*)  This allegation does not appear in the Complaint, and otherwise fails

because, again, there is no sense in which Sergeant D'Ambra's alleged failure to supervise caused a constitutional violation.

Finally, Ramsey argues that, "according to Defendant Schuster's interview with Defendant Givens, Defendant Kubowicz and Defendant Givens had met with Defendant Prior and the 'Deputy Chief' believed to be Defendant Tsurapas [citing ¶ 290], and Defendant Finley was present for the interviews with the Parker Adventist Hospital Defendants." (*Id.* at 9–10.)  These allegations are entirely new.  Moreover, paragraph 290 says only that the Hospital Defendants "conspired with" the Parker Defendants "to discharge Plaintiff Ramsey and arrest him at the same time."  It says nothing about the content of any interview between Detective Schuster and Nurse Givens.  Again, a plaintiff cannot avoid dismissal by adding new allegations in a response brief, and certainly not by misrepresenting the existing allegations in his operative complaint.

Ramsey's Claim 1 will be dismissed as against Commander Prior, Captain Tsurapas, Sergeant D'Ambra, Officer Herman, and Officer Bryant.  This dismissal is with prejudice as to Herman and Bryant, given Ramsey's effective concession of the motion in that respect by failing to argue anything.  This dismissal is without prejudice as to Prior, Tsurapas, and D'Ambra.  Without prejudging the matter or suggesting what a viable claim might look like, the Court is not convinced that Ramsey could never allege a viable claim against them under the circumstances.

       2.    Southwest Correctional Defendants

          a.    *Natural-Person Defendants*

The doctors and nurses among the Southwest Correctional Defendants argue that Ramsey has failed to adequately allege their personal participation in any violation

of his constitutional rights. (ECF No. 102 at 5–6.)[16] This would be beyond dispute as to Nurse Susan (Last Name Unknown), about whom the Complaint alleges nothing other than her identity. But the Southwest Correctional Defendants do not move on her behalf. (*See* ECF No. 102 at 1.) The Court will address her separately in Part V.I.

Concerning Nurse Geiger, the Complaint alleges that: she examined Ramsey at intake; she received from Officer Finley the hospital discharge paperwork, including the list of prescriptions; she filled out forms noting that "Ramsey needed an Urgent Mental Health Referral and Special Population Housing," and wrote "see list from hospital" on a portion of the form asking her to specify the inmate's medications; she was on duty during Ramsey's first night in jail, during which time someone wrote on the Night Shift Report that requests for "med info/records" were sent to Parker Adventist Hospital and "Aurora Residential/Alternatives," and that Ramsey had "TBI x2yrs.ago MVA/bit nurse"; the Night Shift Report contains no mention of Ramsey's recent brain surgery, nor any examination or assessment of Ramsey, nor any administration of medications; and she did not contact "the on-call doctor or medical director" about Ramsey. (¶¶ 130–31, 164–70, 214.)

The Court further notes the allegation that Ramsey received no medications for the next two days. (¶¶ 183, 191.) These allegations, without more, would probably be insufficient to survive summary judgment. But, for purposes of surviving a motion to dismiss, the Court finds that these allegations sufficiently raise a plausible inference that

---

[16] They do not assert a qualified immunity defense. The Court accordingly need not decide whether employees of private companies providing medical services to inmates may assert that defense. *Cf. Estate of Grubbs v. Weld Cnty. Sheriff's Office*, 2017 WL 951149, at *5–6 (D. Colo. Mar. 8, 2017) (surveying the law on this question and concluding that qualified immunity is unavailable).

Nurse Geiger learned of Ramsey's condition, his recent surgery, and his medications, but deliberately chose not to take the actions needed to ensure that others were adequately informed, or that he would otherwise be properly treated.

Concerning Nurse Nix, the Complaint alleges that: she was on duty during first Ramsey's first night in jail, during which time someone wrote on the Night Shift Report that requests for "med info/records" were sent to Parker Adventist Hospital and "Aurora Residential/Alternatives," and that Ramsey had "TBI x2yrs.ago MVA/bit nurse"; and the Night Shift Report contains no mention of Ramsey's recent brain surgery, nor any examination or assessment of Ramsey, nor any administration of medications. (¶¶ 166–70.) The Court finds that these allegations are not sufficient to raise a plausible inference that Nurse Nix was deliberately indifferent to Ramsey's medical needs because it is unclear what she knew about Ramsey's immediate medical needs. Ramsey does not allege, for example, that he displayed behaviors that night from which Nix could not have failed to see some sort of problem needing medical attention. *Cf. Estate of Walter v. Corr. Healthcare Companies, Inc.*, 232 F. Supp. 3d 1157, 1160–61 (D. Colo. 2017) (erratically behaving inmate was visible to everyone working at the jail). Ramsey's Claim 1 will be dismissed as against Nurse Nix without prejudice.

Concerning Nurses Tina (Last Name Unknown) and Kat (Last Name Unknown),[17] the Complaint alleges only that they were on duty during the day shift of July 20, 2016 (Ramsey's first full day in the Douglas County Jail) and that the day shift report does not record any examination or assessment of Ramsey by either of them, nor any administration of medications. (¶¶ 171–72.) For the same reasons that Ramsey

---

[17] The Southwest Correctional Defendants say that these nurses' proper names are Tina Holland and Kathryn Davidson. (ECF No. 102 at 1.)

has not stated a claim against Nurse Nix, he fails to plausibly state a claim against these nurses.  Ramsey's Claim 1 will be dismissed as against them without prejudice.

Concerning Nurses Cunningham and Daisha Wade, the Complaint alleges only that they were on duty during Ramsey's second night in jail (July 20–21), but that the shift report says nothing about Ramsey.  (¶¶ 173–75.)  These allegations, without more, again fail to state a plausible claim.  Ramsey's Claim 1 will be dismissed as against Nurses Cunningham and Daisha Wade without prejudice.

Concerning Nurse Trimble, the Complaint alleges that she spoke with Ramsey's mother on the phone on July 21, learned of Ramsey's medical status, committed to restart his medications, and then (in a later conversation that same day) told Ramsey's mother that Ramsey was in stable condition under nursing observation.  (¶¶ 184–87, 194, 199.)  However, minutes later, another nurse assessed Ramsey as in need of evaluation at the hospital.  (¶ 200.)  It is not obvious what Ramsey means to make of these allegations, and so the Court finds that they fail to state a plausible claim.  Claim 1 will be dismissed as against Nurse Trimble without prejudice.

Concerning Nurses Vigil and Kron, the Complaint alleges they were on duty during the July 21 day shift, during which time someone wrote a shift report noting Ramsey's "several medical issues.  TBT, recent brain surgery, 7/4/16.  Mom called attorney b/c [patient] has been here since 7/19/16[.]  Mom is a doctor[.]  All meds verified[.]  Neuro checks and Benzo protocol also." (¶¶ 188–90.)  Again, it is unclear what Ramsey means to make of these allegations.  He thus fails to state a plausible claim, and Claim 1 will be dismissed as against Nurses Vigil and Kron without prejudice.

Concerning Nurse Barron, the Complaint alleges that she encountered Ramsey

on the evening of July 21, noticed he was in distress, and that Ramsey was soon sent to the hospital. (¶ 200.) These allegations suggest concern for Ramsey's medical needs, not deliberate indifference. Regardless, they fail to state a plausible claim. Ramsey's Claim 1 will be dismissed as against Nurse Barron without prejudice.

Concerning Dr. Moser, the Complaint alleges that: he did *not* receive word from Nurse Geiger about Ramsey upon intake; he called in a prescription for Ramsey sometime on July 21; and he was notified when Ramsey was sent to the hospital that evening. (¶¶ 198, 200, 214.) Also, although a plaintiff may not attempt to amend the complaint through a response brief, the Court finds significant Ramsey's assertion in his response brief that he "was never seen by" Dr. Moser. (ECF No. 129 at 2.) These allegations imply that Dr. Moser had no role in Ramsey's mistreatment, and so fail to plausibly plead his potential liability. Ramsey's Claim 1 will be dismissed as against Dr. Moser without prejudice.

### b. *Individual vs. Official Capacity*

The Southwest Correctional Defendants further argue that it is redundant to name the doctors and nurses among them in both their individual and official capacities, because an official-capacity suit is a suit against the entity employing them, and those entities are already defendants. (ECF No. 102 at 5.) *See also Lyall v. City of Denver*, 319 F.R.D. 558, 569 (D. Colo. 2017) ("individuals sued in their official capacities are redundant if the governmental entity for whom they work is also a defendant").

Ramsey responds as follows: "Defendants [later] argue that 'vicarious liability is not a basis for a § 1983 claim against a corporate defendant,['] thus even under [their] logic, Plaintiff[']s allegations against the Defendants as stated is [*sic*] not redundant." (ECF No. 129 at 6.)

Ramsey's response is incoherent, and the Southwest Correctional Defendants' argument is otherwise well-taken. Thus, the only remaining natural-person defendant among the Southwest Correctional Defendants—Nurse Geiger—will be dismissed with prejudice to the extent she is sued in her official capacity under Claim 1.

c.    *Entity Defendants*

The Southwest Correctional *Entity* Defendants argue that Claim 1 should be dismissed as against them because it essentially seeks to hold them vicariously liable for their employees' actions, which is not permitted in a § 1983 claim. (ECF No. 102 at 6.) But the only hint in the Complaint that Ramsey is directing Claim 1 at the Entity Defendants is Claim 1's heading, which lists "Southwest Correctional Defendants" as among those he is accusing. The allegations themselves are focused entirely on acts of individuals, with no hint of any sort of entity liability other than indiscriminate use of terms such as "SWCMG Defendants" (an undefined abbreviation). (¶¶ 232–48.) Moreover, Claim 2 explicitly alleges *Monell* liability against the Entity Defendants. (¶¶ 249–83; *see also* Part V.B, below.) Accordingly, because Claim 1 does not allege entity liability, the Entity Defendants' argument that Claim 1 should be dismissed as against them is denied as moot.

3.    <u>Douglas County Defendants</u>

a.    *Individual Capacity*

Sheriff Spurlock and Deputy Pettit-Beigler are the only individuals within the Douglas County Sheriff's Office whom Ramsey has sued, apart from Deputy John Doe One (whom the Court will address separately in Part V.I). Spurlock and Pettit-Beigler argue that Ramsey has not alleged any action they took that plausibly suggests deliberate indifference to his serious medical needs, and they are, at a minimum,

entitled to qualified immunity.  (ECF No. 104 at 4–6.)  Ramsey responds by citing broad swathes of the Complaint that have no obvious relevance, and are sometimes obviously directed at defendants other than Spurlock and Pettit-Beigler.  (*See* ECF No. 124 at 6.) Ramsey thus effectively concedes that he cannot point to where in the Complaint he adequately alleges facts that tend to show their liability.

At times Ramsey suggests that at least Deputy Pettit-Beigler, the intake officer, could have decided not to accept Ramsey as an inmate on account of his need for medical care.  (*Id.* at 6–7; *see also id.* at 15.)  If this is Ramsey's theory, the analysis is similar to Officer Finley.  (*See* Part V.A.1.a, above.)  Ramsey does not even attempt to show that Pettit-Beigler had a clearly established duty to second-guess the hospital discharge paperwork, or to presume that the Douglas County Jail could not adequately treat Ramsey.  Pettit-Beigler is therefore at least entitled to qualified immunity.

Ramsey's Claim 1 will be dismissed as against Sheriff Spurlock and Deputy Pettit-Beigler in their individual capacities.  However, this dismissal is without prejudice.

### b.    *Official Capacity*

Spurlock and Pettit-Beigler are also named in their official capacities.  But the Douglas County Sheriff's Office is a party as well.  Whether the Sheriff's Office is an entity subject to suit separate from the Board of County Commissioners is a question the Court will address in Part V.B.2.a, below.  For present purposes, it is enough to note that naming Spurlock and Pettit-Beigler in their official capacities is redundant when the Sheriff's Office is already a defendant.  *See Lyall*, 319 F.R.D. at 569.  Moreover, Ramsey's Claim 1 is not asserted as an entity-liability claim.  Ramsey's Claim 1 will therefore be dismissed, with prejudice, as against Sheriff Spurlock and Deputy Pettit-Beigler in their official capacities.

**B.    Claim 2: Violation of the Fourteenth Amendment Based on a Municipal Policy or Custom that Caused Ramsey's Injuries**

Ramsey's Claim 2 alleges *Monell* liability (a.k.a. municipal liability or entity liability) against Douglas County and the Southwest Correctional Entity Defendants. Under *Monell*, a municipality can be liable under 42 U.S.C. § 1983 for damages when the municipality's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury."  436 U.S. at 694.  *Monell* liability can also extend to a municipality's failure to train its employees "if a violation of federal rights is a highly predictable or plainly obvious consequence of" that lack of training.  *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998).  And entities working on a municipality's behalf to perform one of the municipality's functions (such as the Southwest Correctional Entity Defendants providing medical care in the Douglas County Jail) can be liable for the same types of *Monell* violations.  *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003); *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 945–46 (10th Cir. 2005).

Both Douglas County and the Entity Defendants argue that Claim 2 should be dismissed as against them for failure to plausibly plead a claim, and for certain other reasons.  (ECF No.  102 at 6–11; ECF No. 104 at 4–9.)  The Court will first address the Entity Defendants' arguments, and then Douglas County's arguments.

1.    Southwest Correctional Entity Defendants

Ramsey's Claim 2 is mostly a casserole of entity-liability jargon—"unofficial policy that [was] the moving force," "deliberately indifferent customs," "failures to train/supervise"—unsupported by specific factual claims.  Ramsey appears to be operating from the common but erroneous pleading tactic that can be summarized as,

30

"Because it happened to me, it must be a systemic failure."  But a plaintiff "cannot state a plausible claim of municipal liability by identifying a single incident of alleged violations and then, without any further factual substantiation, contending that such actions were consistent with and caused by a municipal policy, procedure, or failure to train."  *Salazar v. Castillo*, 2013 WL 69154, at *6 (D. Colo. Jan. 7, 2013).

Nonetheless, Ramsey does provide one specific accusation against the Entity Defendants, namely, "knowingly not having the necessary medications in order to treat the medical conditions of the inmates," and, closely related, "not hav[ing] a system to stock the medications needed to treat the inmate[s] in order to cut costs."  (¶¶ 257, 259.) The Entity Defendants instead "simply wrote down the names of the medications that were needed on a white board when [those medications] were out [of stock]."  (¶ 260.) This appears to be supported by the allegations that Dr. Moser, and perhaps another employee of the Entity Defendants, called in prescriptions after Ramsey's mother intervened.  (¶¶ 197–98.)

For pleading purposes, this states a sufficiently plausible claim of a policy or custom that caused a constitutional injury.  From a causation perspective, of course, the question is whether the Entity Defendants failed to stock the specific medications that would have prevented Ramsey's injuries.  And in that light, the Court can imagine numerous reasons, constitutionally appropriate or otherwise, why the Entity Defendants did not stock those medications.  But on this record, Ramsey has stated a minimally plausible claim worthy of exploration through discovery.[18]

---

[18] Although the Court does not currently find a plausible failure to train claim, the Court assumes Ramsey will depose Nurse Geiger and the various other nurses on duty while Ramsey was at the Douglas County Jail.  Inquiry as to their training is a legitimate purpose of a deposition and could lead to a basis to re-plead a failure to train claim.  *See Hinman v. Joyce*,

2. <u>Douglas County Defendants</u>

a. *Sheriff's Office as a Party*

The Douglas County Defendants argue that the Douglas County Sheriff's Office is not a separate legal entity subject to suit. (ECF No. 104 at 4.) Ramsey concedes as much as to Claim 2 (ECF No. 124 at 5) and has voluntarily dismissed Claim 2 as against the Sheriff's Office (ECF No. 127).

b. *Non-Delegable Duty*

Douglas County itself argues that the Complaint fails to allege any factual basis for its repeated accusations of an unconstitutional policy or custom, or failure to train. (ECF No. 104 at 6–8.) As with the Southwest Correctional Entity Defendants, the Court mostly agrees. The only exception is a series of allegations about limitations on transporting jail inmates for off-site care (such as transporting them to the emergency room). (¶¶ 273–75.) The Complaint alleges that the Entity Defendants had a policy that their chief medical officer needed to review all off-site transports, apparently linked to a Douglas County policy of not reimbursing the Entity Defendants for emergency room transfers. (*Id.*) These policies supposedly encourage constitutionally substandard medical care. However, the Complaint's allegations in this regard are irrelevant because there is no allegation that there was any delay in transporting Ramsey to the Castle Rock Adventist Hospital emergency room, once nurses at the Douglas County Jail realized the need to do so.

There is also an allegation, stated "[u]pon belief" and without further elaboration, that Douglas County had a policy of not reimbursing the Entity Defendants for

2015 WL 6437950, at *3 n.1 (D. Colo. Oct. 23, 2015).

"prescribed medications." (¶ 274.) The Court need not decide whether this allegation, by itself, is enough to support a plausible claim. It has obvious overlap with the alleged unconstitutional policy that will go forward as to the Entity Defendants, regarding failure to stock necessary medications, and Douglas County may be liable for the Entity Defendants' failure in that regard under the "non-delegable duty doctrine," which holds that the government cannot avoid § 1983 liability by contracting out its constitutional duties to a third party. *See Estate of Walter v. Corr. Healthcare Companies, Inc.*, 323 F. Supp. 3d 1199, 1215–16 (D. Colo. 2018) (adopting non-delegable duty doctrine). Accordingly, because the claim regarding prescription medications will go forward against the Entity Defendants, and because Douglas County can be liable for that alleged unconstitutional policy anyway, the scope of discovery would be substantially unchanged whether or not Ramsey has sufficiently alleged that Douglas County has a policy of not reimbursing for prescription medications.

For these reasons, Douglas County's motion is denied as to Claim 2.

## C.    Claim 3: Conspiracy to Interfere with Civil Rights

Ramsey sues the Hospital Defendants, the Douglas County Defendants, the Parker Defendants, and Dr. Kubowicz under 42 U.S.C. § 1985(3), which permits an action for damages "[i]f two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." All of the Defendants against whom this claim is directed have moved to dismiss it on roughly the same grounds, namely, that disability discrimination is not redressable under § 1985(3). (*See* ECF No. 96 at 6–10; ECF No. 99 at 7–8; ECF No. 104 at 9–10; ECF No. 106 at 4–6.)

The most important case in this regard is *Wilhelm v. Continental Title Co.*, 720 F.2d 1173 (10th Cir. 1983), which held that "a class of 'handicapped persons' was not in the contemplation of Congress in 1871, and was not included as a class in what is now § 1985(3)." *Id.* at 1177. Some circuits have disagreed with *Wilhelm*, either on the specific issue of disability discrimination or on *Wilhelm*'s originalist approach to construing § 1985(3). *See, e.g.*, *Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1339 (11th Cir. 1999); *Lake v. Arnold*, 112 F.3d 682, 686 (3d Cir. 1997).

Ramsey encourages this Court to follow the lead of those circuits that disagree with *Wilhelm*. (ECF No. 122 at 17–18.) But the Tenth Circuit has never revisited it and there is no intervening authority from the United States Supreme Court that casts any direct doubt on it. Accordingly, this Court is bound to follow it. *See United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990) ("A district court must follow the precedent of this circuit, regardless of its views concerning the advantages of the precedent of our sister circuits."). For this reason, Ramsey's Claim 3 must be dismissed in its entirety, with prejudice.

## D. Claim 4: Violation of the ADA by for Failing to Reasonably Accommodate Ramsey's Disability

Ramsey sues all defendants under Title II of the ADA, 42 U.S.C. §§ 12131–65. (¶¶ 309–28.) Title II prohibits "a public entity" from discriminating against the disabled with respect to that entity's "services, programs, or activities." 42 U.S.C. § 12132. For various and mostly overlapping reasons, all Defendants move to dismiss this claim as applied to them. (ECF No. 96 at 10–12; ECF No. 99 at 13–14; ECF No. 102 at 11–15; ECF No. 104 at 11–12; ECF No. 106 at 6–8.)

The Court will first discuss certain general principles applicable to all

Defendants—including that natural persons may not be sued under Title II. Then the

Court will separately address the arguments of the non-natural-person defendants,

beginning with the healthcare providers (the Hospital and the Southwest Correctional

Entity Defendants), followed by the arguments of the law enforcement agencies (the

Parker Police Department, Douglas County, and the Douglas County Sheriff's Office).

1.    Elements & Prohibition on Individual Liability

"To state a claim under Title II, the plaintiff must allege that (1) he is a qualified

individual with a disability, (2) who was excluded from participation in or denied the

benefits of a public entity's services, programs, or activities, and (3) such exclusion,

denial of benefits, or discrimination was by reason of a disability." *Robertson v. Las*

*Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007).

"Only public entities are subject to Title II . . . ." *City & Cnty. of San Francisco v.*

*Sheehan*, 135 S. Ct. 1765, 1773 (2015); *cf. Butler v. City of Prairie Vill., Kan.*, 172 F.3d

736, 744 (10th Cir. 1999) (holding, under the portion of the ADA applicable to employer-

employee relationships, that "the ADA precludes personal capacity suits against

individuals who do not otherwise qualify as employers under the statutory definition").

Accordingly, Ramsey's Claim 4 is dismissed with prejudice as against every natural-

person defendant.

2.    Medical Providers (Hospital & Southwest Correctional)

Both the Southwest Correctional Entity Defendants and the Hospital argue that

they cannot be liable under Title II of the ADA because they are not "public entities."

(ECF No. 102 at 13; ECF No. 106 at 8.) This is difficult to dispute as to the Hospital, a

private entity.[19]  As to the Entity Defendants, the Tenth Circuit has announced in a non-precedential decision that it "join[s] . . . the overwhelming majority of other courts that have spoken directly on the issue, and hold[s] that Title II of the ADA does not generally apply to private corporations that operate prisons."  *Phillips v. Tiona*, 508 F. App'x 737, 754 (10th Cir. 2013).  The Entity Defendants argue that, by extension, private medical providers in public prisons should not be deemed "public entities."  (ECF No. 102 at 13.) The Court need not address this argument because, even if the Entity Defendants (or the Hospital) may be sued under Title II, Ramsey still fails to state a claim.

No party disputes that Ramsey is a "qualified individual with a disability." *Robertson*, 500 F.3d at 1193.  So the question becomes, in what way was he "excluded from participation" in the Entity Defendants' or the Hospital's services or programs, and was that exclusion on account of his disability?  *Id.*

Here, the thrust of Ramsey's ADA claim against the Hospital is that it discharged him into law enforcement custody before he was ready, "instead of accommodating [his] mental health condition."  (¶¶ 315–16.)  And the thrust of his ADA claim against the Entity Defendants is that he was not given the medications he needed to manage his disabilities, and so the Entity Defendants "failed to reasonably accommodate his disabilities."  (¶ 314.)  In other words, Ramsey is attempting to cram a Fourteenth Amendment inadequate medical care claim, or a medical negligence claim, into an ADA mold.  But the ADA is not meant to redress allegedly substandard medical care.  *See*

---

[19] Ramsey's only response is to simply declare, without citation, that the Hospital "is a public entity for purposes of the ADA," and then to note that "[p]rivate hospitals or medical offices are covered by Title III of the ADA."  (ECF No. 136 at 13.)  Title III is nowhere mentioned in Ramsey's Complaint, and attempting to amend by way of a response brief is not permitted. *See Smith*, 694 F. Supp. 2d at 1230.

*Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143–44 (10th Cir. 2005).  To make this claim sound anything like an ADA claim, Ramsey would need to allege that the Hospital or the Entity Defendants failed to treat him *on account of his need for treatment.*  He nowhere alleges as much, nor any basis to plausibly infer as much.

Accordingly, Claim 4 will be dismissed without prejudice as to the Hospital and Entity Defendants.

 3. Law Enforcement Agencies (Town of Parker & Douglas County)

As for the Town of Parker, Douglas County, and the Douglas County Sheriff's Office, Ramsey's ADA claim is either missing allegations or is wholly conclusory.  The Town of Parker and its police officers go unmentioned in this claim.  (¶¶ 309–28.)[20] Douglas County, by contrast, is specifically named, but only alongside the bare language of the elements of a claim.  (*See* ¶¶ 310, 313–14, 327.)  Ramsey nowhere explains what Douglas County or its Sheriff's Office did to discriminate against him on the basis of his disability, nor is the theory obvious from other allegations.  To the extent Ramsey again means to allege lack of adequate medical care, the claim fails for the same reasons just discussed in the context of the Southwest Correctional Entity Defendants and the Hospital.[21]

---

[20] Again, if there is an ADA claim related to the Parker Defendants, it must be against the Town of Parker itself.  *See Everson v. Leis*, 556 F.3d 484, 501 (6th Cir. 2009) ("the proper defendant under a Title II claim is the public entity or an official acting in his official capacity").

[21] Ramsey announces in his response brief, without citation, that he has "alleged that [his] disabilities were a determining factor in the Parker Defendants' acts and omissions that resulted in [the] denial of . . . the medical care he needed, and Defendant's decision to patient dump him into the hands of the county law enforcement instead of taking him to a facility that could better meet his needs for his disabilities."  (ECF No. 122 at 22.)  This is false.  No such allegation, nor anything approaching it, appears in the Complaint.  In any event, the Court has already rejected the denial-of-medical-care claim in the ADA context.

a.    *Town of Parker*

However, the parties' briefing explores a different theory.  Citing *Gohier v.*

*Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999), and *J.H. v. Bernalillo County*, 806 F.3d

1255, 1260–62 (10th Cir. 2015), the Town of Parker argues that the Tenth Circuit

generally limits ADA claims to two forms:

> The Tenth Circuit has identified two types of Title II ADA
> claims arising in the context of arrests—(1) a claim of police
> wrongfully arresting someone with a disability because they
> misperceived the effects of that disability as a criminal
> activity; (2) police failed to reasonably accommodate the
> person's disability in the course of investigation or arrest,
> causing the person to suffer greater injury or indignity in that
> process than other arrestees.

(ECF No. 99 at 13.)  Parker further argues that "no facts support the application of either

theory . . . . Simply put, Mr. Ramsey was arrested not due to his disability, but because

probable cause existed [that] he had committed a crime."  (*Id.* at 14.)

Taking Parker's cue, Ramsey makes assertions that appear nowhere in the

Complaint, namely, that Parker police officers misperceived the effects of Ramsey's

disabilities, "such as yelling out improper language or biting someone who unexpectedly

grabs him from behind," as criminal activities.  (ECF No. 122 at 23.)  Thus, "Defendant

Finley, Defendant Herman, and Defendant D'Ambra" all acted to violate his ADA rights.

(*Id.*)  These allegations against Herman and D'Ambra are new.  They are also a

departure from his failure-to-accommodate theory.

It is perhaps accurate to say (as Parker does) that the Tenth Circuit has

"identified" the "two types of Title II ADA claims" quoted above.  But it is inaccurate to

suggest that the Tenth Circuit has endorsed either theory.  Rather, the court has

avoided making a decision.  *See Clark v. Colbert*, 895 F.3d 1258, 1265 (10th Cir. 2018)

("we have never squarely held the ADA applies to arrests"). When faced with the question, the court has found that the facts or allegations did not satisfy either theory, and so the court chose not to decide whether to adopt one or both theories. *See J.H.*, 806 F.3d at 1260–62; *Gohier*, 186 F.3d at 1220–22.

This Court similarly need not hold that the ADA provides a cause of action when police officers misperceive the manifestations of a disability as criminal conduct. Assuming the claim exists, it fails if, after taking into account the disability as a relevant personal characteristic, the police officer would still have objective probable cause to arrest. *See, e.g.*, *J.H.*, 806 F.3d at 1260; *Bates ex rel. Johns v. Chesterfield Cnty.*, 216 F.3d 367, 373 (4th Cir. 2000); *Buchanan ex rel. Estate of Buchanan v. Maine*, 417 F. Supp. 2d 45, 72–73 (D. Me. 2006), *aff'd*, 469 F.3d 158 (1st Cir. 2006). As explained in the context of Ramsey's Fourth Amendment claim (*see* Part V.H.2.b, below), probable cause existed to arrest Ramsey. Because the Court dismisses that Fourth Amendment claim without prejudice, the Court must likewise dismiss this ADA claim without prejudice as to the Parker Defendants.

b. *Douglas County*

As for Douglas County, Ramsey's response brief explores the second type of potential ADA claim in the arrest context, namely, failure to provide some reasonable accommodation while carrying out an arrest. (ECF No. 124 at 15.) Or at least Ramsey identifies the claim as falling into that category. His elaboration shows that it is really somewhat different:

> Plaintiffs have alleged that Mr. Ramsey's disabilities were a determining factor in Douglas County Defendants acts and omissions that resulted in denial of Mr. Ramsey being given the medical care he needed, and Defendant Pet[t]it-Beigler's decision to intake him as a pretrial detainee instead of taking

> him to a facility that could better meet his needs for his
> disabilities.
>
> . . . Mr. Ramsey had mental and physical disabilities that
> [the] Douglas County Defendants, particularly Defendant
> Pet[t]it-Beigler, failed to reasonably accommodate in the
> course of his arrest, causing him to suffer greater injury.

(ECF No. 124 at 15–16 (citations omitted).)

Apart from the novelty of the theory, this is the first time that Ramsey has described any action by Defendant Pettit-Beigler, whom the Complaint identifies only as one of the intake officers at the Douglas County Jail to whom Officer Finley released Ramsey.  (¶ 134.)  There is no description of anything Pettit-Beigler did or did not do. The Complaint certainly does not allege that Pettit-Beigler, or anyone else at the Douglas County Jail, could make a choice during the intake process between admitting Ramsey as a pretrial detainee or sending him "to a facility that could better meet his needs for his disabilities."  (ECF No. 124 at 15.)  Nor does the Complaint allege that Pettit-Beigler, or anyone else, decided not to send Ramsey to such a facility *because of* his disabilities.

For these reasons, Ramsey's ADA claim is dismissed without prejudice as against Douglas County.

**E.      Claim 5: Medical Negligence at the Douglas County Jail**

Ramsey's Claim 5 is for medical negligence under Colorado common law based on his treatment at the Douglas County Jail.  Douglas County argues that it cannot be liable for the Southwest Correctional Defendants' alleged negligence, and that it is otherwise immune from suit on this basis.  (ECF No. 104 at 13–15.)

The heading to Ramsey's Claim 5 says that it is asserted "[a]gainst Douglas County and Southwest Correctional Defendants."  (ECF No. 92 at 50.)  However, the

allegations themselves focus exclusively on the actions of "Defendants," defined to be "private corporations that contract with Douglas County to provide medical care and health services to inmates at the [Douglas County Jail]. . . . [¶] Defendants are private individuals, and not public officials or employees." (¶¶ 330–31.) No other allegation in Claim 5 mentions Douglas County, and no allegation states or even implies Douglas County's liability for medical negligence. (*See* ¶¶ 329–62.)

In this light, despite Claim 5's heading, Ramsey has not pleaded medical negligence against Douglas County. Douglas County's request that the Court dismiss Claim 5 as against it is denied as moot.[22]

## F.     Claim 6: Medical Negligence at the Hospital

Claim 6, also a medical negligence claim, asserts that the Hospital Defendants "conspired with [the Parker Defendants] to discharge Plaintiff Ramsey without regard to [his] medical condition and/or care plan." (¶ 369.)

### 1.     The Hospital Defendants

The Hospital Defendants present several arguments for dismissal of Claim 6 as against them, namely:

- the Complaint alleges that Dr. Kubowicz made the discharge decision (¶¶ 118, 125);

- under the "corporate practice of medicine doctrine," a hospital may not

---

[22] The Southwest Correctional Defendants do not move to dismiss Claim 5. For the first time in their reply brief, however, they argue that it should be dismissed for failure "to plead any facts demonstrating that any act by them directly or proximately caused Mr. Ramsey's injuries." (ECF No. 140 at 4 n.2.) This argument is forfeited in the present posture for untimeliness, but would fail in any event. Although the Complaint shows serious causation problems as to other Defendants (*see* n.25 and accompanying text, below), the causal connection between the Southwest Correctional Defendants' alleged failure to administer Ramsey's medications and his subsequent injuries is more than adequately pleaded.

interfere with a physician's judgment and likewise may not be vicariously liable for the physician's negligent acts, *see Estate of Harper ex rel. Al-Hamim v. Denver Health & Hosp. Auth.*, 140 P.3d 273, 275–76 (Colo. App. 2006); and

- although the corporate practice of medicine doctrine does not prevent vicarious liability for nurses in a hospital's employ, and obviously does not prevent those nurses' direct liability, the Complaint does not allege any circumstance in which Nurses Givens, Bateman, or Dana Wade exercised their medical judgment in a way that fell below the appropriate standard of care.

(ECF No. 106 at 8–11.)

Ramsey's entire response is as follows:

> Defendant Wade, Defendant Bateman, Defendant Givens as nurses and medical professionals, and under the Sixth Claim for Relief of Medical Negligence, are subject to the standard of care of medical professionals and breached their duty by failing to meet the generally accepted standards for nursing and not doing what a reasonable, ordinary licensed practical nurse would do in treating Mr. Ramsey.

(ECF No. 136 at 14.)  This is effectively no response at all.  In particular, Ramsey fails even to acknowledge the potential application of the corporate practice of medicine doctrine.  Accordingly, the Court deems Ramsey to concede the Hospital Defendants' arguments, thereby confessing the Hospital Defendants' Motion as it pertains to Claim 6.  Claim 6 will be dismissed as against the Hospital Defendants with prejudice.

2. Dr. Kubowicz

Dr. Kubowicz argues that Ramsey's medical malpractice claim fails because Ramsey has not filed a timely and proper certificate of review.  (ECF No. 107 at 3–9.)

The certificate of review requirement comes from Colorado Revised Statutes § 13-20-602(1)(a), which provides in relevant part:

> In every action for damages . . . based upon the alleged professional negligence of . . . a licensed professional, the plaintiff's . . . attorney shall file with the court a certificate of review for each . . . licensed professional named as a party . . . within sixty days after the service of the complaint, counterclaim, or cross claim against such person unless the court determines that a longer period is necessary for good cause shown.

"The failure to file a certificate of review in accordance with this section shall result in the dismissal of the complaint, counterclaim, or cross claim." *Id.* § 13-20-602(4).

Here, Ramsey filed his original complaint on July 19, 2018. (ECF No. 1.) It contains a medical malpractice claim alleging that Dr. Kubowicz and others discharged Ramsey against good medical judgment. (*Id.* ¶¶ 281–89.) Ramsey then amended the complaint as of right on August 19, 2018. (ECF No. 11.) This first amended complaint contains an expanded medical malpractice claim, but it was still rooted in the notion that Dr. Kubowicz and others discharged Ramsey against good medical judgment. (*Id.* ¶¶ 329–46.) On January 10, 2019, Ramsey was granted leave to file a second amended complaint (ECF No. 90), which he did the following day (ECF No. 92). That is the document to which this Court has generally referred as "the Complaint." Claim 6 of the Complaint is a verbatim reproduction of the medical malpractice claim from the first amended complaint. (¶¶ 363–80.) On January 16, 2019—almost six months after filing the original complaint—Ramsey filed a four-paragraph certificate of review essentially parroting the required statutory language, *see* Colo. Rev. Stat. § 13-20-602(3)(A)(I)–(II), and stating, in relevant part, that "the medical professionals [that Ramsey's counsel consulted] have concluded that the filing of the claims against Defendants does not lack

substantial justification." (ECF No. 97 ¶ 3.)

Dr. Kubowicz argues that the certificate of review is inexcusably late, and that it is inadequate regardless because the statute does not permit a generic certificate of review asserted against all professional negligence defendants. (ECF No. 107 at 3–9.) Although Ramsey does not raise it, there is a question whether Dr. Kubowicz has waived one or both arguments. Dr. Kubowicz filed a motion to dismiss on January 16, 2019, and that motion does *not* seek dismissal of Claim 6. (ECF No. 96.) Several hours later that same day, Ramsey filed his certificate of review. (ECF No. 97.) Thirteen days after that, Dr. Kubowicz filed a second motion to dismiss, raising her challenges to the certificate of review. (ECF No. 107.)

Nothing in the Federal Rules of Civil Procedure authorizes multiple Rule 12(b) motions by the same defendant against the same complaint. Moreover, objections regarding the certificate of service are waivable if not timely raised. *See Miller v. Rowtech, LLC*, 3 P.3d 492, 494–95 (Colo. App. 2000). Accordingly, the Court could hold that any objection based on the lateness of the certificate of service was waived. After all, it is Dr. Kubowicz's position in this second motion to dismiss that the certificate of review was due on November 23, 2018. (ECF No. 107 at 3.)[23] By the time she moved to dismiss on January 16, 2019, therefore, the certificate of service was almost two months late. Dr. Kubowicz does not explain why she did not raise a timeliness argument in her first motion to dismiss.

In these circumstances, however, the Court need not decide whether

---

[23] November 23, 2018 is sixty days from September 24, 2018, which is the day Dr. Kubowicz claims to have been served with process. (*Id.*) The docket shows that she was served with process on August 21, 2018. (ECF No. 40.) This discrepancy turns out to be immaterial to the Court's disposition.

Dr. Kubowicz waived her timeliness argument. The second motion to dismiss contains arguments that she could not have brought without seeing the certificate of review, and she could not have seen the certificate of review until after she filed the first motion to dismiss. Those arguments turn out to be meritorious. Accordingly, although the Court does not condone Dr. Kubowicz's filing of the second motion to dismiss without leave, the Court will excuse that failing in these circumstances, particularly in light of Ramsey's failure to object on that account.

Turning to Dr. Kubowicz's arguments regarding the content of the certificate of review, she notes that the certificate generically addresses all "Defendants" as a group, contrary § 13-20-602(1)(a)'s charge that the plaintiff's attorney "shall file with the court a certificate of review for each . . . licensed professional named as a party." (*See* ECF No. 107 at 2, 5.) Ramsey responds with the bold assertion that he is "not required to file at least nineteen (19) different Certificates of Review." (ECF No. 113 at 6.) But the certificate of review statute was amended in 1989 specifically to insert the "each licensed professional" requirement, and the legislative history demonstrates that the Colorado Legislature intended to prohibit the very sort of generic, undifferentiated certificate of review that Ramsey filed here. *See State v. Nieto*, 993 P.2d 493, 504 (Colo. 2000) (quoting and summarizing relevant legislative history). Accordingly, Ramsey has, in effect, *still* not filed any certificate of review against Dr. Kubowicz.

In these circumstances, § 13-20-602(4) directs that the medical malpractice claim against Dr. Kubowicz "shall" be dismissed. However, one Colorado Court of Appeals decision interprets the Colorado Supreme Court as requiring trial courts to first analyze "whether there is good cause to excuse the late filing" before considering dismissal.

*RMB Servs., Inc. v. Truhlar*, 151 P.3d 673, 676 (Colo. App. 2006) (citing *Martinez v.*

*Badis*, 842 P.2d 245, 251 (Colo. 1992)).  This Court frankly sees no such requirement in

the *Martinez* decision, but, assuming the requirement exists, the Court will weigh the

three factors prescribed in *RMB*:

> To determine whether good cause exists, the trial court must consider (1) whether the neglect causing the late filing was excusable, (2) whether the moving party[24] has alleged a meritorious claim or defense, and (3) whether permitting the late filing would be consistent with equitable considerations, including any prejudice to the nonmoving party.
>
> The trial court may decline to accept a late certificate if the plaintiff fails to satisfy any of these criteria.  However, the court must consider all three criteria because evidence relating to one factor might shed light on another.

*Id.* (citation omitted).

As to whether the neglect was excusable (factor 1), the answer is "no."  In

Ramsey's response brief, his counsel represents that she engaged in the certificate of

review process with a medical professional "well before the filing of the original

pleading."  (ECF No. 113.)  Thus, Ramsey had all the information he needed before the

original complaint, filed in July 2018, to file what he ultimately filed in January 2019.

As to whether Ramsey has alleged a meritorious claim (factor 2), the answer is

"probably not."  When Officer Finley arrested Ramsey, he was discharged from the

hospital with a list of his medications and with some of his prescription drugs.  (*See* Part

II.B.5, above.)  Notably, Ramsey does *not* allege that he would have suffered the same

---

[24] The Colorado Court of Appeals derived these requirements from the case establishing the standard for a motion for relief from judgment, *Hane v. Tubman*, 899 P.2d 332, 335 (Colo. App. 1995).  Hence the "moving party" language.  Here, Ramsey has not moved for an extension of time but *RMB* suggests that the Court nonetheless has a duty to decide whether he deserves one.

injuries *even if* his prescriptions had been timely and regularly administered to him in the Douglas County Jail. Thus, Ramsey appears to face a serious causation problem—it was not Dr. Kubowicz's decision to discharge him that caused his injuries, but his lack of proper medical treatment in jail.[25]

Finally, as to whether permitting the late filing would be consistent with equitable considerations, including any prejudice to the nonmoving party (factor 3), the Court finds the factor to weigh slightly in favor of Ramsey because this case remains in its early stages, given the stay of discovery. (*See* ECF No. 145.)

Nonetheless, weighing the factors together, the Court finds that Ramsey should not be given an opportunity to file, at this late date (as compared to Ramsey's attorney's representations about when she completed the certificate of review process), an adequate certificate of review against Dr. Kubowicz. Claim 6 will therefore be dismissed as against Dr. Kubowicz with prejudice.

## G.     Claim 7: Negligence

Ramsey's Claim 7 alleges general negligence against all Defendants, which he further describes as follows:

> Defendants were negligent in their interactions, care and treatment of Plaintiff Ramsey, including but not limited to: negligently discharging him and medically clearing him for jail, failing to obtain a current medication list of the myriad of medications Plaintiff Ramsey was taking, failing to contact the appropriate medical providers to oversee and supervise Plaintiff Ramsey's care, failing to provide Plaintiff Ramsey with his medications, ignoring signs of Plaintiff Ramsey's seizures, failing to urgently transfer Plaintiff Ramsey to a higher level of care, failing to develop a management plan

---

[25] The Court is dismissing numerous claims without prejudice. Before Ramsey decides to move for leave to amend, Ramsey should carefully consider this causation question as to all claims he might try to re-plead.

> for Plaintiff Ramsey's post-operative care, failing to perform
> an examination within the standard of care Plaintiff Ramsey
> needed, patient dumping from a hospital to a jail, failing to
> recommend policies, procedures, protocols, guidelines, and
> failing to implement and enforce policies, procedures,
> guidelines, that require the appropriate level of care from
> hospital nurses and doctors, jail nurses and doctors and
> officers and deputies.

(¶ 385.)  Apparently to bring Douglas County within the medical portions of these accusations, Ramsey alleges again in this context that "Douglas County had a non-delegable duty to provide medical care within the community standard of care to detainees."  (¶ 383.)

      1.    <u>Dr. Kubowicz, the Hospital Defendants, and the Southwest Correctional Defendants</u>

Dr. Kubowicz, the Hospital Defendants, and the Southwest Correctional Defendants all argue that Claim 7, as it might relate to them, is substantially another medical negligence claim, and therefore duplicates Claim 5 (as to the Southwest Correctional Defendants) and Claim 6 (as to Dr. Kubowicz and the Hospital Defendants).  (ECF No. 96 at 13–14; ECF No. 102 at 15; ECF No. 106 at 8–9.)  Ramsey responds that Claim 7 is directed at them in their "administrative" capacities, rather than their medical capacities.  (ECF No. 119 at 14; ECF No. 129 at 24; ECF No. 136 at 14.)  Concerning the Hospital Defendants, Ramsey particularly calls out Ms. Ganz (about whom the Complaint says nothing) and Nurse Givens (who gave the discharge paperwork to Officer Finley) "in their roles as administrative professionals."  (*Id.*)

This "administrative" negligence theory is not obvious from Claim 7 itself, nor even a natural inference.  Again, Ramsey cannot "amend" his pleadings through response briefs.  *Smith*, 694 F. Supp. 2d at 1230.  There is also a fair question whether

negligence in one's "administrative" capacity implicates professional licensure and therefore the certificate of review requirement previously discussed. Claim 7 will be dismissed without prejudice as against Dr. Kubowicz, the Hospital Defendants, and the Southwest Correctional Defendants.

      2.    <u>Parker Defendants and Douglas County Defendants</u>

The Parker Defendants and Douglas County Defendants invoke the Colorado Governmental Immunity Act ("CGIA"), Colo. Rev. Stat. §§ 24-10-101 *et seq.*, which provides in relevant part:

> A public employee shall be immune from liability in any claim for injury . . . which lies in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by a claimant and which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing such injury was willful and wanton . . . .

Colo. Rev. Stat. § 24-10-118(2)(a). Factual allegations supporting the inference of willful and wanton conduct must be specifically pleaded, *id.* § 24-10-110(5), and, if challenged by the defendant, the trial court should resolve at an early stage whether the plaintiff has adequately pleaded willful and wanton conduct, *id.* § 24-10-118(2.5); *Martinez v. Estate of Bleck*, 379 P.3d 315, 321–22 (Colo. 2016).[26] The statute does not define "willful and wanton," but the Colorado Supreme Court holds that it at least involves "a conscious disregard of the danger [that caused the injury]." *Id.* at 323.

The Parker Defendants and Douglas County Defendants argue that Ramsey has not pleaded any facts suggesting that he could prove willful and wanton conduct. (ECF

---

[26] Ramsey cites *Gallagher v. Board of Trustees*, 54 P.3d 386 (Colo. 2002), for the proposition that allegations of willful and wanton conduct are generally only evaluated at trial. (ECF No. 122 at 24.) *Martinez* abrogated *Gallagher* on this matter. *See* 379 P.3d at 322.

No. 99 at 14–15; ECF No 104 at 14–15.)  The Court agrees.  As to the Parker

Defendants, it is not clear that any item within Ramsey's laundry list of allegedly

negligent acts applies to the Parker Defendants.  As to the Douglas County Defendants,

the allegations are entirely conclusory, essentially amounting to an accusation that,

because something bad happened, the Douglas County Defendants failed in their duty

to prevent it.  Ramsey's Claim 7 will be dismissed without prejudice as against the

Parker Defendants and the Douglas County Defendants.

## H.    Claim 8: Violation of the Fourth Amendment Based on Lack of Probable Cause to Arrest Ramsey

By way of 42 U.S.C. § 1983, Ramsey's Claim 8 alleges that he was arrested

without probable cause, in violation of the Fourth Amendment.  All defendants against

whom this claim has been asserted (Dr. Kubowicz, the Hospital Defendants, the Parker

Defendants, and the Douglas County Defendants) move to dismiss.  Dr. Kubowicz and

the Hospital Defendants present materially the same argument and so the Court will first

address that argument.  The Court will then turn to the Parker Defendants' arguments,

followed by the Douglas County Defendants' arguments.

### 1.    Medical Providers (Hospital Defendants and Dr. Kubowicz)

Ramsey's theory of Fourth Amendment liability against Dr. Kubowicz and the

Hospital Defendants is that the arrest warrant was based on statements by

Dr. Kubowicz and the Hospital Defendants—presumably about Ramsey's medical

condition—"that were deficient because they were dishonest."  (¶ 395.)  But a person

may "be subjected to liability under § 1983 only when he [or she violates a federally

protected right] *under color of law*."  *Flagg Bros. v. Brooks*, 436 U.S. 149, 156 (1978)

(emphasis added).  Ramsey specifically alleges that Dr. Kubowicz and the Hospital

Defendants were *not* acting under color of law. (¶¶ 60, 311.) These Defendants point out as much, and that Ramsey has not alleged facts sufficient to satisfy the "joint action" doctrine. (ECF No. 96 at 14–16; ECF No. 106 at 11–12.)

In response, Ramsey says nothing about his explicit disclaimer of "color of law." He says only that "joint action under color of state law" is better resolved at the summary judgment phase. (ECF No. 119 at 15; ECF No. 136 at 15.)

From the foregoing, it is clear that Dr. Kubowicz and the Hospital Defendants are not state actors. But "[e]ven a private party acts under color of state law if that party is a willful participant in joint action with the State or its agents." *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1157 (10th Cir. 2016) (internal quotation marks omitted). However, "furnishing information to law enforcement officers, without more, does not constitute joint action under color of state law. Rather, joint action arises only when an officer's decision to initiate an arrest or a prosecution was not independent of a private party's influence." *Id.* (citation omitted). While lying to police officers to persuade them to make an arrest may be the basis of other claims, such as common-law malicious prosecution, it is not "joint action" with the police. *See id.* at 1155, 1157–58 (parking officials, who were not acting under color of law, were also not joint actors when they allegedly provided false information that became part of the basis for a police officer's arrest of the citizen).

Here, Ramsey alleges no basis to believe that Dr. Kubowicz or the Hospital Defendants were somehow working with Detective Schuster to fabricate a basis for probable cause. Accordingly, Ramsey's Claim 8 must be dismissed without prejudice against Dr. Kubowicz and the Hospital Defendants.

2.      Parker Defendants

Broadly speaking, Ramsey alleges that the Parker Defendants arrested Ramsey, knowing they did not have probable cause to do so.  (¶¶ 391–94.)  Ramsey particularly emphasizes Officer Dorrell's conclusion that Ramsey did not have the mental capacity to form the necessary *mens rea*.  (¶ 394.)

a.      *Personal Participation*

The Parker Defendants first argue that Ramsey has failed to allege the personal participation of all but Officer Finley.  (ECF No. 99 at 10.)  *Cf. Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011) ("Personal liability under § 1983 must be based on personal involvement in the alleged constitutional violation." (internal quotation marks omitted)).  One might wonder about Detective Schuster as well, who investigated and developed what he believed to be probable cause.  But, by definition, an accusation of an arrest without probable cause requires an arrest, and Detective Schuster did not carry out the arrest—Officer Finley did, based on Detective Schuster's findings.  (*See* Part II.B.5, above.)  The Complaint does not allege any Parker Defendant's participation in the arrest besides Officer Finley.  Nor does the Complaint allege that Detective Schuster dispatched Officer Finley to carry out the arrest.

Nonetheless, because it is at least a reasonable inference that Officer Finley came at the request of Detective Schuster, the Court finds that it should analyze Detective Schuster's potential liability alongside Officer Finley's potential liability when deciding whether probable cause existed to arrest, rather than analyzing whether Ramsey has alleged Detective Schuster's personal participation.  Thus, as to the personal participation argument, the question is Ramsey's theory as to Commander Prior, Captain Tsurapas, Sergeant D'Ambra, Officer Herman, and Officer Bryant,

against whom the Complaint alleges nothing but their identities.

In response to the Parker Defendants' personal participation argument, Ramsey ignores Officer Bryant. (*See* ECF No. 122 at 18–21.) Accordingly, the Court deems the argument conceded, and the operative motion confessed, as to him. Ramsey's Claim 8 will be dismissed as to Officer Bryant with prejudice.

As for the others, Ramsey asserts facts nowhere pleaded in the Complaint, and at times misrepresents the Complaint. Specifically, Ramsey asserts:

- Officer Herman (along with Officer Finley) interviewed Dr. Kubowicz, Nurse Wade, Nurse Bateman, and Ms. Ganz, but failed to interview Schildt (the security guard) or Ramsey himself. (ECF No. 122 at 19–20, 21.) In support, Ramsey cites paragraphs 97–117 and 123 of the Complaint. (*Id.* at 20, 21.) These paragraphs address Detective Schuster's investigation. They say nothing about Officer Herman (or Ms. Ganz, for that matter). Paragraph 123 mentions Officer Finley, alleging that he "did not interview Plaintiff Ramsey," but that has nothing to do with whether Officer Herman (or Officer Finley) interviewed anyone at the Hospital.

- Officer Herman (along with Detective Schuster and Officer Finley) "knowingly and recklessly omitted information"—omitted from *what*, and *when*, is not specified—"that would have vitiated probable cause as what happened with Officer Dorrell." (ECF No. 122 at 20.) Ramsey cites nothing in support of this contention. It is nowhere pleaded in the Complaint.

- Officer Herman and Sergeant D'Ambra (along with Detective Schuster and Officer Finley) "presented information"—presented *to whom*, and *when*, is not specified—"that was misleading and unrepresentative of the facts such as Mr. Ramsey's state of being highly medicated at the time of the arrest so he could not speak on his behalf, while when he was not highly medicated and interviewed by Officer Dorrell he did not follow a consistent thought process and change topics randomly." (*Id.*) In support, Ramsey cites paragraphs 91, 92, and 127 of the Complaint. (*Id.*) None of these paragraphs mentions Officer Herman or Sergeant D'Ambra. Paragraphs 91 and 92 describe Officer Dorrell's investigation. Paragraph 127 says only that Officer Finley received Ramsey's prescription medications from Nurse Givens—a fact with no perceptible connection to this assertion.

- Officer Herman (along with Detective Schuster and Officer Finley) "relied on testimony from unqualified Defendants [referring to Dr. Kubowicz and Nurses Bateman and Dana Wade]." (ECF No. 122 at 20.) Ramsey cites nothing in support of this contention. It is nowhere pleaded in the Complaint.

- Sergeant D'Ambra "was the approving officer" of something unspecified, while Commander Prior and Captain Tsurapas "had visited and met with [the Hospital Defendants and Dr. Kubowicz] regarding Mr. Ramsey" at some unspecified time. (*Id.* at 21.) Ramsey cites nothing in support of these allegations. They are nowhere pleaded in the Complaint.

Obviously Ramsey cannot avoid dismissal by misrepresenting the Complaint.

Nor can he avoid dismissal by pleading new allegations in his response brief. *Smith*, 694 F. Supp. 2d at 1230. And those allegations would not have been enough even if properly pleaded because they lack details needed to establish a constitutional claim.

Accordingly, Plaintiff's Claim 8 will be dismissed without prejudice as against Commander Prior, Captain Tsurapas, Sergeant D'Ambra, and Officer Herman, for lack of personal participation.

###### b.    *Probable Cause*

The Parker Defendants argue that "Officer Finley possessed probable cause to arrest Mr. Ramsey." (ECF No. 99 at 10.) However, the Complaint is unclear about how much Officer Finley knew. According to the Complaint, Officer Finley arrived at the hospital and "reported that [Detective Schuster] had developed probable cause to arrest [Ramsey] on assault and harassment charges and [also] reported [that] he had been advised that 'earlier in the week, [Ramsey] had threatened and bitten hospital staff.'" (¶ 121.)

Nonetheless, the Parker Defendants correctly argue that the "fellow officer rule" (a.k.a. the "collective knowledge doctrine") permitted Officer Finley to act on probable cause developed by others. (ECF No. 99 at 12.) *See also United States v. Chavez*, 534 F.3d 1338, 1347 (10th Cir. 2008) (quoting with approval the holding in *United States v. Ramirez*, 473 F.3d 1026, 1037 (9th Cir.2007), that "[w]here one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment"). Thus, if Detective Schuster had probable cause to arrest, then Officer Finley could validly act on that probable cause. The Court

will therefore analyze whether Detective Schuster developed probable cause to arrest Ramsey for assault or harassment, or both.

Probable cause exists where

> the facts and circumstances within the arresting officer's knowledge and of which [the officer] had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to have the belief that an offense has been or is being committed by the person to be arrested. This is an objective standard, and thus the subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive. Whether a reasonable officer would believe that there was probable cause to arrest in a given situation is based on the totality of the circumstances.

*Koch v. City of Del City*, 660 F.3d 1228, 1239 (10th Cir. 2011) (internal quotation marks and citations omitted; alterations incorporated). Probable cause "is a practical, nontechnical conception. In dealing with probable cause, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (citation omitted; internal quotation marks and citation omitted; certain alterations incorporated).

The Parker Defendants assert—and Ramsey does not contest—that the precise crimes for which Ramsey was arrested were third-degree assault in violation of Colorado Revised Statute § 18-3-204, and harassment in violation of Colorado Revised Statute § 18-9-111. (ECF No. 99 at 10 & n.2.) Third-degree assault means, in the present context, that the accused person "knowingly or recklessly cause[d] bodily injury to another person." Colo. Rev. Stat. § 18-3-204(1)(a). And harassment in the present context means the accused person, "[i]n a public place[,] direct[ed] obscene language or ma[de] an obscene gesture to or at another person," if done "with intent to harass,

annoy, or alarm another person." *Id.* § 18-9-111(1)(b).

The only element Ramsey appears to dispute is the *mens rea* element, or, more accurately, his capacity to possess the necessary *mens rea.* (*See* ECF No. 122 at 19–20.) *Cf. J.H.*, 806 F.3d at 1260 ("J.P. was in a special needs class, but no one questions her ability to form the intent necessary to commit a battery by kicking her teacher."). Although Officer Dorrell concluded that Ramsey lacked that capacity, based on interviews with Schildt and Ramsey himself, Ramsey does not allege that Detective Schuster knew about Officer Dorrell's findings. Regardless, Detective Schuster learned at least the following after further investigation:

- Nurse Bateman overheard Ramsey making statements on a phone call with his mother that Nurse Bateman interpreted as an expression of sorrow for biting Schildt, and that Ramsey "knew it was wrong." (¶ 107.)

- Nurse Wade perceived Ramsey as someone who "knew right from wrong, 'tried to manipulate the situation by telling people he was crazy', and 'knew how to "play the system."'" (¶ 117.)

Based on this, Detective Schuster came to a different conclusion than Officer Dorrell.

Ramsey argues that Detective Schuster "did not give any deference to Officer Dorrell's findings." (ECF No. 122 at 19.) But again, Ramsey does not allege that Detective Schuster knew about Officer Dorrell's findings. Nor does Ramsey cite any authority requiring deference to a previous police officer's investigation.

Ramsey further argues that Detective Schuster "omitted material information that would have vitiated the finding of probable cause." (*Id.*) As previously noted, such an allegation does not appear in the Complaint, and Ramsey otherwise does not identify

the document or proceeding from which Schuster allegedly withheld material information.  Regardless, if the claim is that Schuster persuaded a judge to find probable cause through material omissions, there are two problems.  First, such an accusation is really a malicious prosecution claim, which includes elements that Ramsey has never pleaded—particularly the defendant's "malice" and a termination of the prosecution under circumstances that suggest the plaintiff's innocence.  *See Sanchez v. Hartley*, 810 F.3d 750, 754 n.1 (10th Cir. 2016); *Wilkins v. DeReyes*, 528 F.3d 790, 803–04 (10th Cir. 2008).  Second, even material omissions do not necessarily lead to liability.  The question is whether probable cause would still have existed had the omitted information been included, *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996), and Ramsey makes no argument in this regard.

Even if the Court could generously construe Ramsey's Fourth Amendment claim as one for malicious prosecution, despite his failure to plead all of the elements, it would not save his claim.  Notably, Ramsey does *not* claim that Detective Schuster (or any of the other Parker Defendants) failed to inform the reviewing judge about Officer Dorrell's investigation and conclusions (assuming they knew about them).  Rather, the alleged omissions—nowhere mentioned in the Complaint—are highly attenuated or not the relevant type of omission at all.

First, Ramsey claims it was an omission not to interview Ramsey or Schildt.  (ECF No. 122 at 19–20.)  This may be an omission from the *investigation*, but Ramsey does not claim that Detective Schuster misled the reviewing judge about whom he interviewed.  And, again, Ramsey does not claim that Detective Schuster withheld Officer Dorrell's findings and conclusions.

Second, Ramsey alleges that Detective Schuster failed to disclose

"Mr. Ramsey's state of being highly medicated at the time of the arrest so he could not

speak on his behalf, while[,] when he was not highly medicated and interviewed by

Officer Dorrell[,] he did not follow a consistent thought process and changed topics

randomly." (*Id.* at 20.)  Ramsey seems to be accusing Schuster of failing to point out a

contrast between Ramsey's behavior while medicated as opposed to Officer Dorrell's

observations of Ramsey when he was unmedicated.  But there is no indication that

Detective Schuster ever observed Ramsey while medicated (he did not participate in

the arrest), nor that a report of Ramsey's behavior while medicated would have had any

effect on Detective Schuster's judgment of Ramsey's capacity to form the necessary

*mens rea*.

Finally, Ramsey accuses Detective Schuster of relying on testimony "from

unqualified Defendants," specifically Dr. Kubowicz, Nurse Bateman, and Nurse Wade.

(*Id.*)  Ramsey does not plead any statements from Dr. Kubowicz on which Schuster

relied regarding *mens rea*.  As for Bateman, Ramsey points out that Schuster knew that

Bateman was a relatively new nurse with no advanced training in mental health care.  It

is not clear what relevance this has to Bateman's report about the phone conversation

he overheard between Ramsey and his mother.  As for Wade, Ramsey emphasizes that

"she could not recall any of [his] statements during the incident with Mr. Schildt."  (*Id.*

(citing ¶ 115).)  This has very little to do with Wade's general perceptions of Ramsey's

mental capacity after interacting with him.

Evaluating the "totality of the circumstances," *Koch*, 660 F.3d at 1239, the

allegations of the Complaint show that Detective Schuster possessed probable cause,

not that he lacked it.  Indeed, given the Parker Defendants' assertion of qualified

immunity, Detective Schuster only needed "arguable probable cause for an arrest."

*Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012) (internal quotation marks

omitted).  He at least had arguable probable cause, and therefore Officer Finley did as

well, meaning they are entitled to qualified immunity.

Ramsey's Claim 8 will be dismissed against the Parker Defendants.  But

because the Court is not convinced that there is no set of facts Ramsey could allege in

good faith in this regard, this dismissal is without prejudice.

3.    Douglas County Defendants

Ramsey's only allegation implicating the Douglas County Defendants in his

allegedly unlawful arrest was that "it is clearly established [that] Douglas County did not

have to accept Plaintiff Ramsey is an inmate, they could have refused his booking."

(¶ 400.)  The Douglas County Defendants challenge this assertion.  (ECF No. 104

at 12.)  In response, Plaintiff writes the following (reproduced verbatim, including typos

and ellipses):

> Douglas County is not required to accept everyone the
> Parker Police Department brings to its jail.  They can
> determine whether an officer has sufficient, reasonable
> trustworthy information to establish probably cause, the court
> looks to the "totality of the circumstances" … Nevertheless,
> the Fourth Amendment is not offended by mere negligence
> or innocent mistake in the determination whether probable
> cause exists.

(ECF No. 124 at 17.)  Ramsey seems to be saying that jail officials have an

independent duty to evaluate the probable cause basis of the arrests that preceded the

arrestee's presentment for booking into the jail.  The Court has never heard of such a

duty.  In any event, Ramsey fails to demonstrate the existence of any constitutional right

at issue here (the first prong of the qualified immunity analysis), much less to demonstrate that such a duty is clearly established (second prong of qualified immunity). His failure in this regard is effectively a confession of the argument as to the Douglas County Defendants. Ramsey's Claim 8 will be dismissed as against the Douglas County Defendants with prejudice.

## I.      Doe Defendants & Susan (Last Name Unknown)

The Complaint names three "Doe" defendants: Nurse Jane Doe One, Doctor Jane Doe One, and Deputy John Doe One. The Complaint contains a specific allegation about the Deputy Doe, *i.e.*, that he participated with Deputy Pettit-Beigler in the jail intake process. (¶ 134.) Accordingly, the Court presumes that Ramsey knows that this person exists, just not his true name. In that light, and in light of the stay of discovery, the Court will not *sua sponte* dismiss him. Although, of course, there may be statute-of-limitations problems with identifying and serving Deputy Doe now, *see Watson v. Unipress, Inc.*, 733 F.2d 1386, 1389–90 (10th Cir. 1984), the statute of limitations is not jurisdictional, and so the Court sees no impenetrable barrier to the Deputy's eventual participation in this suit.

By contrast, the Complaint contains no specific allegations about Nurse Doe or Doctor Doe, other than to identify them as employees of the Southwest Correctional Entity Defendants. (¶¶ 54, 57, 63.) The Court therefore presumes that Ramsey has no one in particular in mind, and simply hopes to leave a placeholder for persons he might later discover. Even if he later discovered such persons, he could not simply "substitute" them for Nurse Doe or Doctor Doe. Accordingly, Nurse Doe and Doctor Doe are inappropriately pleaded as parties and will be dismissed with prejudice.

Finally, Susan (Last Name Unknown) is specifically named as a Southwest

Correctional employee (¶¶ 42, 63) but the Complaint contains no other allegations about her. She will be dismissed without prejudice.

## VI. ORDER TO SHOW CAUSE TO RAMSEY'S COUNSEL

The Court has identified at least four instances in which Ramsey's counsel, Ms. Paula Bovo, has willfully misrepresented the Complaint, either by making false assertions about the contents of specific paragraphs or by asserting, without citation, that certain things had already been alleged. (See Parts V.D.3 (n.21), V.D.3.b, V.H.2.a.) The Court has previously sanctioned plaintiffs' attorneys in other cases for such conduct by requiring them to pay the defendant's attorneys' fees incurred in filing the reply brief.

The Court has also identified multiple instances in which Ms. Bovo, on behalf of her client, has attempted to plead new facts. The Court has sanctioned plaintiffs' attorneys for defending against a motion to dismiss with this tactic as a violation of the duty to confer in good faith under WJM Revised Practice Standard III.D.1.

Ms. Bovo will be ordered to show cause why she should not be sanctioned, including through monetary sanctions, for defending against the various motions with misrepresentations of the Complaint and allegations not appearing in the Complaint.

## VII. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.   The following motions are GRANTED with prejudice in part and GRANTED without prejudice in part, as stated in ¶ 4, below:

   a.   Dr. Kubowicz's Partial Motion to Dismiss Plaintiff's Second Amended Complaint and Jury Demand (ECF No. 96);

b. the Parker Defendants' Motion to Dismiss (ECF No. 99); and

c. the Hospital Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 106);

2. The following motions are GRANTED with prejudice in part, GRANTED without prejudice in part, and DENIED in part, as stated in ¶ 4, below:

a. the Southwest Correctional Defendants' Motion for Partial Dismissal (ECF No. 102); and

b. the Douglas County Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (ECF No. 104);

3. Dr. Kubowicz's Motion to Dismiss with Prejudice for Plaintiffs' Failure to File an Appropriate Certificate of Review (ECF No. 107) is GRANTED with prejudice;

4. For the reasons explained in this Order, the claims for relief alleged in the Second Amended Complaint (ECF No. 92) are disposed of as follows:

a. Claim 1

i. is DISMISSED WITH PREJUDICE as against any natural-person Defendant in his or her **official** capacity;

ii. is DISMISSED WITH PREJUDICE as against Kristopher Bryant, Nathan Finley, Tyler Herman, Jacob Schuster, Doctor Jane Doe One, and Nurse Jane Doe One in their **individual** capacities;

iii. is DISMISSED WITHOUT PREJUDICE as against Emily Barron, Joan Cunningham, Paul D'Ambra, Shauri Kron, Timothy Moser, Sophia Nix, Robin Pettit-Beigler, Jim Prior, Tony Spurlock, Jennifer Trimble, Jim Tsurapas, Deimys Vigil, Daisha Wade, Kat (Last

Name Unknown), Susan (Last Name Unknown), and Tina (Last Name Unknown) in their **individual** capacities; and

    iv.    SURVIVES as against Lindsey Geiger in her **individual** capacity;

b.    Claim 2

    i.    is DISMISSED WITH PREJUDICE as against Tony Spurlock in his **official** capacity; and

    ii.    SURVIVES as against the Board of County Commissioners for Douglas County, Southwest Correctional Medical Group, Inc., Southwest Correctional Medical Group, PLLC, Correctional Medical Group Companies, Inc., Southwest Correctional Medical Group, LLC, and Colorado Correctional Medical Group, PLLC;

c.    Claim 3 is DISMISSED WITH PREJUDICE in its entirety;

d.    Claim 4

    i.    is DISMISSED WITH PREJUDICE to the extent asserted against any natural-person Defendant in his or her **individual** capacity;

    ii.    is DISMISSED WITH PREJUDICE to the extent asserted against any natural-person Defendant in his or her **official** capacity, save for Jim Prior;

    iii.    is DISMISSED WITHOUT PREJUDICE as against all entity Defendants (including the Town of Parker, sued by way of naming Jim Prior in his official capacity);

e.    Claim 5

    i.    is DISMISSED WITHOUT PREJUDICE as against Susan (Last

Name Unknown); and

ii.     SURVIVES as against the remaining Southwest Correctional

Defendants;

f.     Claim 6 is DISMISSED WITH PREJUDICE in its entirety;

g.     Claim 7 is DISMISSED WITHOUT PREJUDICE in its entirety; and

h.     Claim 8

i.     is DISMISSED WITH PREJUDICE as against any natural-person

Defendant in his or her **official** capacity, save for Jim Prior;

ii.     is DISMISSED WITH PREJUDICE as against Kristopher Bryant in

his **individual** capacity;

iii.     is DISMISSED WITH PREJUDICE as against the Douglas County

Defendants; and

iv.     is DISMISSED WITHOUT PREJUDICE as any other Defendant in

his or her **individual** capacity, or as entities (including the Town of

Parker, sued by way of naming Jim Prior in his official capacity);

5.     **The parties shall reform their captions as follows**:

BENJAMIN RAMSEY, by and through his guardian and next friend, Karla
Ramsey,

         Plaintiff,

v.

SOUTHWEST CORRECTIONAL MEDICAL GROUP, INC.;
BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF DOUGLAS,
COLORADO;
SOUTHWEST CORRECTIONAL MEDICAL GROUP, PLLC;
CORRECTIONAL MEDICAL GROUP COMPANIES, INC.;
SOUTHWEST CORRECTIONAL MEDICAL GROUP, LLC;
COLORADO CORRECTIONAL MEDICAL GROUP, PLLC;

NURSE JENNIFER TRIMBLE, in her individual capacity;
NURSE DEIMYS VIGIL, LPN, in her individual capacity;
TIMOTHY G. MOSER, M.D., in his individual capacity;
LINDSEY GEIGER, RN, in her individual capacity;
EMILY BARRON, RN, in her individual capacity;
SOPHIA HELENE NIX, LPN, in her individual capacity;
TINA HOLLAND, RN, in her individual capacity;
KATHRYN DAVIDSON, LPN, in her individual capacity;
JOAN M. CUNNINGHAM, RN, in her individual capacity;
SHAURI N. KRON, LPN, in her individual capacity;
DAISHA WADE, LPN, in her individual capacity; and
DEPUTY JOHN DOE ONE, in his individual capacity,

      Defendants.

6.     The Clerk shall TERMINATE any Defendant not listed in the revised caption, above;

7.     The stay of discovery (ECF No. 145) is LIFTED and the remaining parties shall jointly contact the chambers of U.S. Magistrate Judge Kristen L. Mix no later than **July 23, 2019** to begin the process of preparing a scheduling order for the remaining parties and claims in this action;

8.     Any motion for leave to amend the complaint to correct deficiencies noted in this Order must be filed no later than **August 19, 2019**, and the proposed amended complaint must include plausible allegations of causation (linking the alleged wrongful conduct to the injuries Plaintiff actually suffered). No further amendments will be permitted without a showing of substantial good cause arising out of truly compelling circumstances; and

9.     Pursuant to Federal Rule of Civil Procedure 11(b) and 11(c)(3), WJM Revised Practice Standard III.D.1, and/or the Court's inherent authority, *see Chambers v. NAASCO, Inc.*, 501 U.S. 32 (1991), Attorney Paula Bovo is ORDERED TO SHOW CAUSE, on or before September 3, 2019, why she should not be

sanctioned, including through monetary sanctions, for defending against Defendants' various motions to dismiss by misrepresenting the Complaint and asserting allegations appearing nowhere in the Complaint.  To the extent Ms. Bovo cannot adequately respond to this Order to Show Cause without divulging information protected by the attorney-client privilege or the work product doctrine, she is granted leave to file, as appropriate, her response, any exhibits, or both, under Restricted Access, Level 2, to be followed by a redacted, public filing no more than one business day later.

Dated this 19th day of July, 2019.

BY THE COURT:

_____
William J. Martinez
United States District Judge