**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-1845-WJM-KLM

BENJAMIN RAMSEY, by and through his guardian and next friend, Karla Ramsey,

      Plaintiff,

v.

SOUTHWEST CORRECTIONAL MEDICAL GROUP, INC.;
BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF DOUGLAS, COLORADO;
SOUTHWEST CORRECTIONAL MEDICAL GROUP, PLLC;
CORRECTIONAL MEDICAL GROUP COMPANIES, INC.;
SOUTHWEST CORRECTIONAL MEDICAL GROUP, LLC;
COLORADO CORRECTIONAL MEDICAL GROUP, PLLC;
NURSE JENNIFER TRIMBLE, in her individual capacity;
NURSE DEIMYS VIGIL, LPN, in her individual capacity;
TIMOTHY G. MOSER, M.D., in his individual capacity;
LINDSEY GYGER, RN, in her individual capacity;[1]
EMILY BARRON, RN, in her individual capacity;
SOPHIA HELENE NIX, LPN, in her individual capacity;
TINA HOLLAND, RN, in her individual capacity;[2]
KATHRYN DAVIDSON, LPN, in her individual capacity;[3]
JOAN M. CUNNINGHAM, RN, in her individual capacity;
SHAURI N. KRON, LPN, in her individual capacity; and
DAISHA WADE, LPN, in her individual capacity,[4]

      Defendants.

---

[1] Originally named as "Lindsey Geiger."

[2] Originally named as "Tina (Last Name Unknown)."

[3] Originally named as "Kat (Last Name Unknown)."

[4] Ramsey originally named "Deputy John Doe One" as a party, but does not list him on the proposed amended complaint at issue in this order. (*See* ECF No. 170-1 at 1–2.) The Court therefore deems Deputy John Doe One dismissed and removes him from the caption.

## ORDER GRANTING IN PART AND DENYING IN PART
## PLAINTIFF'S MOTION TO AMEND

Plaintiff Benjamin Ramsey ("Ramsey"), appearing through his mother in her role as legal guardian and next friend, alleges that the acts and omissions of numerous parties (collectively, "Defendants") led to him being denied necessary medications while in pretrial detention at the Douglas County Detention Center ("Jail"), in turn leading to seizures and permanent brain damage. He alleges, among other things, violations of his Fourteenth Amendment right to adequate medical care in pretrial detention.

By order dated July 19, 2019 ("Prior Order"), the Court dismissed a number of claims from Ramsey's Second Amended Complaint (ECF No. 92), some with prejudice and some without. *See Ramsey v. Sw. Corr. Med. Grp., Inc.*, 2019 WL 3252181 (D. Colo. July 19, 2019) (ECF No. 149). Currently before the Court is Ramsey's "Partially Unopposed Motion for Leave to Amend Second Amended Complaint with Proposed Third Amended Complaint Attached" (ECF No. 170). The motion is "partially unopposed" because Defendant Board of County Commissioners "intends to file a motion to dismiss, but given the liberal standard for amendment and the early stage of this proceeding, [does] not oppose [the] motion for leave to amend." (*Id.* at 1 (internal quotation marks omitted).) The remaining defendants, to which the Court will refer collectively as "Defendants," have filed a response in opposition. (ECF No. 176.)

For the reasons explained below, Ramsey's motion is denied as to Defendant Timothy G. Moser, but is otherwise granted.

## I. BACKGROUND

The Prior Order describes in detail the alleged conduct that, according to Ramsey, caused his injuries. *See Ramsey*, 2019 WL 3252181, at *2–6. For purposes of this order, the Court presumes familiarity with that background.

The Prior Order dismissed, without prejudice, claims against Defendants Trimble, Vigil, Moser, Barron, Nix, Holland, Davidson, Cunningham, Kron, and Wade ("Individual Defendants") for deliberate indifference to Ramsey's medical needs in violation of the Fourteenth Amendment. *Id.* at *11–12, *29. However, each of them remained a Defendant through the Court's supplemental jurisdiction over Ramsey's claim for common-law medical negligence (Moser is a physician and the others are nurses). *See id.* at *19 n.22. Ramsey's proposed third amended complaint seeks to re-plead his Fourteenth Amendment deliberate indifference claim against these Defendants. (*See* ¶¶ 171–78.)[5]

As for the business entity Defendants ("Entity Defendants")—*i.e.*, those with "Correctional Medical" in their name—the Court found in the Prior Order that Ramsey had plausibly pleaded a *Monell* claim, *see Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), based on an alleged policy of failing to stock necessary medications. *Ramsey*, 2019 WL 3252181, at *14. Ramsey's proposed third amended complaint seeks to plead additional theories of *Monell* liability against the Entity Defendants. (*See* ¶¶ 185–86.)

The Court will provide details regarding Ramsey's new allegations as they become relevant below.

---

[5] All "¶" citations, without more, are to the proposed third amended complaint (ECF No. 170-1).

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 15(a), a court should allow a party to amend its pleadings "when justice so requires."  "[T]he grant or denial of an opportunity to amend is within the discretion" of the Court, but an "outright refusal to grant [such] leave without any justifying reason" is an abuse of discretion.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Refusing leave to amend is generally only justified upon a showing of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."  *Id.*

## III.  ANALYSIS

### A.      Undue Prejudice

Defendants first assert undue prejudice.  (ECF No. 176 ¶¶ 15–17.)  "Courts typically find prejudice only when the amendment unfairly affects the defendants in terms of preparing their defense to the amendment.  Most often, this occurs when the amended claims arise out of a subject matter different from what was set forth in the complaint and raise significant new factual issues."  *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1208 (10th Cir. 2006) (internal quotation marks and citation omitted).  If the proposed amendments "track the factual situations set forth in [previous or subsisting claims]," then prejudice is highly unlikely.  *Gillette v. Tansy*, 17 F.3d 308, 313 (10th Cir. 1994).

Here, Defendants' only argument for prejudice is that their counsel "has expended considerable time, effort, and resources in preparing an answer and motion for partial dismissal in response to the Second Amended Complaint," and "it is likely that another motion for partial dismissal will need to be filed in response to the proposed

4

third amended complaint." (ECF No. 176 ¶ 17.)  This is not the sort of prejudice (much less *undue* prejudice) that would prevent amendment at this phase of the case.  The Court therefore rejects Defendants' undue prejudice argument.

## B.    Undue Delay

Defendants next assert undue delay.  (*Id.* ¶¶ 18–21.)  In the Tenth Circuit, the undue delay analysis "focuses primarily on the reasons for the delay. . . .  [D]enial of leave to amend is appropriate when the party filing the motion has no adequate explanation for the delay."  *Minter*, 451 F.3d at 1206.

Ramsey explains in his motion that he seeks "to better frame the issues in accordance with [his] true position[] and reflective of [the Prior Order], as well as [in light of] new facts . . . discovered [since] the filing of the Second Amended Complaint." (ECF No. 170.)  Ramsey's reply in support of his motion elaborates that the new facts include matters learned from a deposition of Defendant Trimble in a different case, the transcript of which was unrestricted only shortly before Ramsey filed the motion currently at issue.  (*See* ECF No. 181 at 4–5.)

The Court need not exhaustively evaluate what Ramsey knew and when he could have pleaded it, as compared to what he pleaded in the Second Amended Complaint and what he proposes to plead in a third amended complaint.  Whatever the outcome of that analysis, his delay was not *undue* in these circumstances.  The Court therefore rejects Defendants' undue delay argument.

## C.    Futility

Finally, Defendants argue that amendment would be futile.  (ECF No. 176 ¶¶ 22–41.)  Proposed amendments are futile when the amended complaint "would be subject to dismissal for any reason."  *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1239–40

(10th Cir. 2001). "The futility question is functionally equivalent to the question whether a complaint may be dismissed for failure to state a claim." *Gohier v. Enright*, 186 F.3d 1216, 1218 (10th Cir. 1999).

1.  Individual Defendants

In the Prior Order, the Court dismissed the Individual Defendants without prejudice because: (i) as to all of the nurses except Trimble, Ramsey had alleged no more than that they were on duty at a time when Ramsey was at the jail, with no allegations that Ramsey, *e.g.*, was visibly in need of medical care; (ii) as to Nurse Trimble, the allegations regarding her involvement were too vague to state a plausible claim; and (iii) as to Dr. Moser, the allegations suggested that he was unaware of Ramsey's condition until near the end of the relevant time frame. *Ramsey*, 2019 WL 3252181, at *11–12. Ramsey's proposed third amended complaint contains additional allegations about each of these Defendants, in hopes of overcoming the deficiencies that previously led to dismissal.

a.  *Nurse Nix*

The allegations against Nurse Nix must be understood in light of the allegations against Defendant Gyger (also a nurse). Nurse Gyger is not one of the moving Defendants here because the Court found in the Prior Order that the Second Amended Complaint stated a plausible claim against her for deliberate indifference. *See id.* at *11. In the proposed third amended complaint, Ramsey elaborates somewhat on Gyger's role.

Ramsey says that Nurse Gyger received the hospital discharge paperwork, including a list of Ramsey's medications, when Ramsey was booked into the Jail on the evening of July 19, 2016. (¶ 65.) Although she received and noted the paperwork

(which showed medications for, among other things, preventing seizures), and although Ramsey displayed a visible surgical scar on the left side of his head, she did no more than send a request for "med info/records" to the hospital and to "Aurora Residential/Alternatives" (presumably where Ramsey had previously been living)—as opposed to starting Ramsey on medications, or at least ordering them.  (¶¶ 97, 170.)

Ramsey alleges that Nurse Nix was the other nurse on duty at the time Ramsey was admitted, and through his first night in the Jail.  (¶ 96.)  In that light, Ramsey now alleges as follows:

> Defendant Nix was working with Defendant Gyger and passing out medications the night Ramsey was admitted to the jail, and she knew that he came from the hospital because that information was passed on to her as well as the new nurses coming on at shift change, as noted in the shift change report.  The list of medications was in Ramsey's chart, and she knew that he had not been provided any of them despite the obvious substantial risk of serious harm because she passed out the medications during that shift.

(¶ 171.)

Defendants allege that this still does not state a plausible claim because Ramsey does not allege that Nurse Nix saw him in any visible distress.  (ECF No. 176 ¶¶ 25–26.)  Visible distress, however, was simply one example of something the Court did not see in the Second Amended Complaint that might have changed the analysis as to Nurse Nix.  *See Ramsey*, 2019 WL 3252181, at *11 ("The Court finds that these allegations are not sufficient to raise a plausible inference that Nurse Nix was deliberately indifferent to Ramsey's medical needs because it is unclear what she knew about Ramsey's immediate medical needs.  Ramsey does not allege, *for example*, that he displayed behaviors that night from which Nix could not have failed to see some sort of problem needing medical attention." (emphasis added)).  The Court did not say that

visible distress was the only allegation Ramsey might present to plead a plausible claim against Nurse Nix.

In his proposed third amended complaint, Ramsey specifically alleges that Nurse Nix knew what Nurse Gyger knew—that Ramsey had numerous prescriptions, and that he was not being given any of them. At the pleading phase, this is sufficiently plausible to state a claim against Nurse Nix.[6]

       b.    *Nurses Holland and Davidson*

Nurses Holland and Davidson were the day shift nurses that took over from Nurses Gyger and Nix in the morning of July 20, 2016. (¶ 98.) The proposed third amended complaint alleges that, during the shift change,

> they learned of Ramsey's condition and the [information request] allegedly sent [by Nurse Gyger], and thus knew of a substantial risk of serious harm from not providing the list of medications contained in Ramsey's chart, knowing he had suffered a traumatic brain injury (TBI), and had been transferred to jail directly from the hospital with a long list of prescribed medications . . . . They knew Ben Ramsey was not receiving any of his medications despite the substantial risk of serious harm posed by discontinuing medications following hospitalization, including medications that are indicated for a seizure disorder, as expected following a TBI. They failed to perform any assessment of Plaintiff Ramsey, contact a physician, or provide Ramsey any of his doctor-ordered medications.

(¶ 98.)

Taking these non-conclusory allegations as true, as the Court must in this posture, Ramsey has stated a sufficiently plausible claim against Nurses Holland and

---

[6] An interesting question for discovery would be whether Nurse Nix had the power to do anything more. Defendants do not argue—either as to Nurse Nix or any other Individual Defendant—that Ramsey fails to plead a plausible claim because he fails to plead that they had power, *e.g.*, to ensure that Ramsey was started on the medications that would have prevented his seizures. The Court therefore need not address whether he should be required to plead as much.

Davidson because they allegedly knew of the risk he faced if he did not receive his medications, they knew he was not receiving his medications, and they took no action. The Court therefore rejects Defendants' argument as to Nurses Holland and Davidson.

      c.    *Nurses Cunningham, Wade, Vigil, and Kron*

Nurses Cunningham and Wade were the night shift nurses that took over from Nurses Holland and Davidson on the evening of July 20, 2016. (¶ 101.) Nurses Vigil and Kron were the day shift nurses took over from Cunningham and Wade in the morning of July 21, 2016. (¶ 174.)

Ramsey alleges that all of these nurses, like the nurses that preceded them, learned at shift change of Ramsey's need for medications, and that he was not receiving them, yet took no action. For the same reasons given as to Nurses Holland and Davidson, the Court finds that Ramsey has plausibly pleaded a claim against Nurses Cunningham, Wade, Vigil, and Kron.[7]

      d.    *Nurses Trimble and Barron*

Nurse Trimble was a medical supervisor at the Jail on July 21, 2016, when Ramsey's mother (who is herself a physician) visited him and saw that he appeared to be in status epilepticus—a state of continuous seizures, "which is a medical emergency requiring a 911 call within 5 minutes. Permanent and irreversible brain damage can occur after 20 minutes . . . ." (¶¶ 10, 106.) Nurse Trimble directed Nurse Vigil to meet with Ramsey's mother, and Nurse Vigil reported back about his mother's "concerns about her son's condition and that he was not receiving his prescribed medications."

---

[7] Ramsey alleges significantly more about Nurse Vigil. (*See* ¶¶ 107–13.) However, under the circumstances, the Court finds that the allegations summarized above are enough to state a plausible claim.

(¶¶ 107–08.)  Knowing of the seriousness of status epilepticus, Nurse Trimble only directed Nurse Vigil "to 'verify' Ben Ramsey's medication list from the hospital."  (¶ 110.) Nurse Trimble departed the jail sometime between 4:00 and 6:00 PM, doing nothing more for Ramsey than ordering the "verification"—which is otherwise unexplained. (¶ 114.)

Eventually Ramsey's mother spoke directly with a jail captain, who called Nurse Trimble about the situation, in turn prompting Nurse Trimble to call Ramsey's mother. (¶ 118.)  Ramsey's mother reported her diagnosis of status epilepticus, and Nurse Trimble then called Nurse Barron, who was one of the night shift nurses that evening. (¶¶ 120–21.)  Nurse Barron, at Nurse Trimble's direction, performed a neurological check at 6:45 PM and reported back to Nurse Trimble that she was seeing the same signs of status epilepticus pointed out by Ramsey's mother.  (¶¶ 123–24.)  Nurse Trimble ordered Nurse Barron to have Ramsey transported to a nearby emergency room.  (¶ 125.)  But "she did not direct [Nurse Barron] to follow a seizure protocol or to call 911, despite the substantial risk of serious harm from the delay in treatment."  (*Id.*)

Ramsey went to the emergency room in the back of a patrol car, although he could not sit up or walk.  (¶ 126.)  The paperwork that went with him—which Nurse Barron filled out—did not disclose his status epilepticus, but said "that he was sent to the hospital for a blood pressure of 143/100, which is not a hypertensive emergency." (¶¶ 125, 127–28.)  This, says Ramsey, was a deliberate omission, "to justify decisions not to provide access to medical treatment."  (¶¶ 123–25.)  When Ramsey got to the emergency room, "[t]he hospital was forced to try to figure out what happened and provide treatment based on misinformation."  (¶ 154.)

The theory against Nurse Trimble is that she knew, through reports from Nurse Vigil, about Ramsey's mother's diagnosis of status epilepticus, but took no action for many hours despite the need for quick action on someone in status epilepticus. Then, when she did order Nurse Barron to send Ramsey to the emergency room, she did not ensure that he was sent by ambulance. "Had [an ambulance] been called, Ramsey would have received treatment, including either IV or intramuscular medications" sooner than he did. (¶ 176.) For pleading purposes, the Court finds that this states a plausible claim.

As for Nurse Barron, there is no allegation that she knew of Ramsey's status before coming on-shift sometime on the evening of July 21 (the precise time is not specified). There is also no allegation that, once directed by Nurse Trimble, she delayed in performing a neurological exam, or that she delayed and reporting the results back to Nurse Trimble, or that she delayed in carrying out Nurse Trimble's order to send Ramsey to the emergency room. Ramsey instead accuses Nurse Barron of failing to call an ambulance, thus delaying necessary treatment, and of sending intentionally incomplete paperwork with him to the hospital, thus delaying the hospital's ability to properly diagnose and treat him. (¶ 175.) The Court finds that this states a claim that is plausible enough to survive a pleading challenge.[8]

---

[8] As to Nurses Trimble and Barron, and perhaps as to others, an important question will be the extent (if any) to which the delays allegedly caused by their acts or omissions in turn caused harm to Ramsey. In other words, by the time these nurses had an opportunity to intervene, was Ramsey already too far gone? If not, was some amount of his current injury already irreversible, such that these Defendants can only be held liable for a subset of the injury that could have been prevented through earlier action by them? Defendants do not presently raise these issues (*see* ECF No. 176 ¶¶ 30–35), so the Court need not explore them at this phase.

### e. *Dr. Moser*

Dr. Moser was the "on-site medical director at the [J]ail." (¶ 177.) The allegations against him are sparse. Sometime on July 21, 2016, he called in four of Ramsey's twenty-one prescriptions to a Walmart pharmacy. (¶¶ 71, 131.) Nurse Barron also "notified" Dr. Moser (at an unspecified time, in an unspecified way) about Nurse Trimble's decision to have Ramsey sent to the emergency room. (¶¶ 125, 127.)

Based on this, Ramsey further alleges, "on information and belief, [that] Dr. Moser knew that Ben Ramsey had not received any medications for his seizure disorder and was suffering continuous seizures, but did not order his immediate transport to the ER via [ambulance]." (¶ 131.) Ramsey additionally states, without elaboration, that Dr. Moser "either directed or acquiesced in the unconstitutional practices of the nurses." (¶ 177.) Finally, also "[b]ased on information and belief," Ramsey alleges that Dr. Moser "knew that Ben Ramsey came from the hospital following brain surgery with a list of medications that had never been provided to him, and that he was suffering continuous seizures, and yet Defendant Moser neither came to the jail to evaluate Ramsey nor order[] that [an ambulance] be contacted immediately." (*Id.*)

The Court need not explore the proper extent to which a party may plead on information and belief because Ramsey subverts his own pleadings in this regard. Ramsey elsewhere alleges that the nurses *failed* to "contact a physician." (¶¶ 98, 112–13, 124, 142, 178, 216.) Ramsey also alleges that Nurse Gyger *failed* to contact the "medical director," *i.e.*, Dr. Moser, when Ramsey was booked into the jail. (¶ 140.) And, as just noted, Ramsey alleges that Dr. Moser did not "c[o]me to the jail to evaluate Ramsey." (¶ 177.) The single indication that Dr. Moser knew anything about Ramsey (before he was sent to the emergency room) is that, at some unknown time on July 21,

2016, he called in four of Ramsey's prescriptions.[9]

In this light, Ramsey has failed to plead any more than he pleaded as to Dr. Moser in the Second Amended Complaint. The Court found in the Prior Order that those allegations were insufficient to state a plausible claim against Dr. Moser, *see Ramsey*, 2019 WL 3252181, at *12, and they remain equally implausible now. It is further apparent that Ramsey's attempt to plead this claim against Dr. Moser is futile, and so it will be dismissed as against Dr. Moser with prejudice. Dr. Moser nonetheless remains a defendant as to Ramsey's common-law medical malpractice claim.

### 2. Entity Defendants

The Court previously ruled that Ramsey's claim may go forward against the Entity Defendants on the theory that they had an unconstitutional policy of failing to stock required medications. *Ramsey*, 2019 WL 3252181, at *14. Ramsey now additionally alleges that the Entity Defendants had a policy or widespread custom of

- denying medications to pretrial detainees, despite the seriousness of their conditions (¶ 185);

- "'verifying' medications . . . over and over without ever providing any medications" (*id.*); and

---

[9] In Ramsey's reply in support of his motion to amend, he asserts that "Dr. Moser called in [the] prescriptions to a local pharmacy while [Ramsey's mother] was informing [the] nurses that Ben Ramsey was suffering continuous seizures." (ECF No. 181 at 10.) Thus, says Ramsey, "it could be inferred that he knew Ben Ramsey was suffering continuous seizures." (*Id.*) The allegation regarding the timing of the call is not in the proposed third amended complaint, and the Court previously warned Ms. Bovo (the attorney who signed the reply brief— and who has since withdrawn) that this tactic of inserting new allegations through briefing is sanctionable. *See Ramsey*, 2019 WL 3252181, at *29. But even if the Court were to consider the allegation, it would not help. The proposed third amended complaint asserts that Ramsey's mother was the first to bring Ramsey's status epilepticus to the attention of Jail nurses. If she was conveying that information to Jail nurses while Dr. Moser was simultaneously calling in prescriptions, then it emphasizes that Dr. Moser's actions were coincidental, not caused by any knowledge about Ramsey's status epilepticus.

- "allow[ing] both LPNs and RNs to practice outside the scope of their licenses," meaning they "routinely made medical decisions [that they should not have made] without contacting a doctor" (¶ 186).

Ramsey supports the first accusation (denying medications to pretrial detainees) through facts developed in a since-settled lawsuit presided over by U.S. District Judge R. Brooke Jackson, *Kevin Hartwell et al. v. Southwest Correctional Medical Group, PLLC, et al.*, Civil Action No. 17-cv-2278-RBJ (D. Colo., filed Sept. 20, 2017) ("*Hartwell*"). The facts of *Hartwell* arose four months after Ramsey's stay at the Jail, and involved a man who was also denied prescribed seizure medications and was left in status epilepticus for many hours. (¶ 154.) But, neither Ramsey's injuries nor the *Hartwell* incident prompted the Jail to change any of its policies. (¶¶ 156–58.)

The Court finds that the first accusation plausibly states a *Monell* claim, and the second accusation is virtually indistinguishable. As to the third accusation, the Court finds it imprudent to evaluate it for plausible pleading. Ramsey's case will already be going forward on two *Monell* theories (failing to stock medications, and otherwise denying medications), and his other theory significantly overlaps. Moreover, the case will be going forward against nearly all of the Individual Defendants, who will be subject to deposition and other discovery, and who would be the most likely to know about these policies or practices, if they exist. If the Court were to attempt to finely parse Ramsey's *Monell* theories, it would practically invite discovery disputes over whether a particular deposition question, a particular interrogatory, etc., is within the scope of the current *Monell* claims.

Instead, the Court will allow the case to go forward on all of the *Monell* theories

Ramsey proposes in his third amended complaint. However, to focus summary judgment briefing (or trial, if no party elects to file a summary judgment motion), the Court will require Ramsey to file a statement 28 days before the dispositive motion deadline explaining precisely which of these *Monell* theories he continues, at that stage of the litigation, to pursue.

## D.    Official Capacity

In the Prior Order, the Court held that an individual should not be named as a defendant in his or her "official" capacity if his or her employer is named as a *Monell* defendant. *See Ramsey*, 2019 WL 3252181, at *12–13. Plaintiff has ignored this directive, and his proposed third amended complaint continues to name the Individual Defendants in both their individual and official capacities. (*See* ECF No. 170-1 at 1–2.) In his reply in support of his motion to amend, Ramsey appears to acknowledge that this was a mistake, stating that he "will remove the 'official capacity' language from the caption of the Third Amended Complaint, if accepted." (ECF No. 181 at 1–2.) The Court will therefore order him to do so.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Ramsey's "Partially Unopposed Motion for Leave to Amend Second Amended Complaint with Proposed Third Amended Complaint Attached" (ECF No. 170) is GRANTED IN PART and DENIED IN PART as follows:

   a.    The motion is GRANTED as to the new claims Ramsey seeks to plead against the Entity Defendants, and against the Individual Defendants (except Dr. Moser);

   b.    The motion is DENIED with prejudice as to the new claims Ramsey seeks

to plead against Dr. Moser;

2.    Ramsey's shall file his Third Amended Complaint, consistent in all respects with the terms of this Order, no later than **March 31, 2020**; and

3.    No later than 28 days before the dispositive motion deadline (currently set for November 20, 2020), Ramsey shall file with the Court a "Notice of *Monell* Theories," stating each theory he asserts in succinct, concrete terms, making clear the pre-existing policy or custom and the causal relationship between the policy or custom and a Defendant's alleged acts or omissions (*e.g.*, "For at least [*amount of time*] before [*date of injury*], [*name of entity*] had a custom of _____, which caused [*name of individual actor*] to _____ instead of _____ on [*date of injury*], in turn causing injury Ramsey because _____.").  For each theory so stated, Ramsey shall support it with a concise summary of evidence developed during discovery to support that theory. If desired, Ramsey may also provide brief legal argument.  Ramsey need not attach supporting materials.

Dated this 25th day of March, 2020.

BY THE COURT:

William J. Martinez
United States District Judge