IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-01845-WJM-KLM

BENJAMIN RAMSEY, by and through his guardian and next friend, Karla Ramsey MD,

Plaintiff,

v.

SOUTHWEST CORRECTIONAL MEDICAL GROUP, INC.;
BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF DOUGLAS, COLORADO;
SOUTHWEST CORRECTIONAL MEDICAL GROUP, PLLC;
CORRECTIONAL MEDICAL GROUP COMPANIES, INC.;
SOUTHWEST CORRECTIONAL MEDICAL GROUP, LLC;
COLORADO CORRECTIONAL MEDICAL GROUP, PLLC;
JENNIFER TRIMBLE, formerly GLENN, RN, HSA, in her individual capacity;
NURSE DEIMYS VIGIL, RN, in her individual capacity;
TIMOTHY G. MOSER, M.D., in his individual capacity;
EMILY BARRON, RN, in her individual capacity;
LINDSEY GYGER, RN, in her individual capacity;
SOPHIA HELENE NIX, LPN, in her individual capacity;
TINA HOLLAND, RN, in her individual capacity;
KATHRYN DAVIDSON, LPN, in her individual capacity;
JOAN M. CUNNINGHAM, RN, in her individual capacity;
SHAURI N. KRON, LPN, in her individual capacity;
DAISHA WADE, LPN, in her individual capacity;

Defendants.

---

**THIRD AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiff, by and through his attorney Cheryl Trine of Trine Law Firm LLC, alleges and

complains as follows:

# I. INTRODUCTION

1. On July 19, 2016, developmentally disabled Plaintiff Benjamin Ramsey was discharged from Parker Adventist Hospital as he was recovering from brain surgery to correct a malfunctioning shunt.

2. Plaintiff Ramsey was discharged and immediately arrested by the Parker Police Department at the hospital.

3. After arresting Plaintiff Ramsey, the Parker Police Department transferred custody to the Douglas County Sheriff's Department without notifying Plaintiff's legal guardian, his mother Dr. Karla Ramsey.  His medication list from the hospital was transferred with him, but he was never given any of his medications while in the jail.  He arrived with a hospital wrist band and a large scar across his head from his recent brain surgery.

4. On or about that same date, Plaintiff Ramsey became a pre-trial detainee housed in Douglas County Detention Facility ("DCDF"), and suffered seizure after seizure, as he was left unattended by nurses who knew he was suffering.

5. Plaintiff Ramsey's preventable injuries occurred because of Defendants' deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment to the United States Constitution. The denial of medications and medical treatment for his serious medical needs including his seizure disorder was not rationally related to a legitimate governmental objective, and therefore was impermissible punishment under the Fourteenth Amendment.

6. Throughout his time at DCDF, Plaintiff Ramsey demonstrated clear signs of acute neurologic changes, altered consciousness, unresponsiveness, continuous seizures, and other medical conditions.  Because of Defendants' deliberate indifference to his serious

medical needs, Plaintiff Ramsey's condition rapidly deteriorated on July 19, 2016 and into the following days.

7. Though Plaintiff Ramsey's need for immediate medical attention would have been obvious to any nurse and even a lay person, at no time was a doctor consulted or any prescribed medications provided.

8. Plaintiff Ramsey was discharged on twenty-one (21) different medications, including medications to prevent seizures, which were noted in the intake paperwork by Defendant Gyger who failed to order any of the medications despite knowing the substantial risk of serious injury to Ben Ramsey in taking him off medications prescribed by physicians at the hospital following brain surgery.

9. Defendants did not give Plaintiff Ramsey any medications during his detention from July 19 to 21, 2016, including medications to prevent seizures.

10. Because Plaintiff Ramsey was not provided any anti-epileptic seizure medications at the jail, he suffered continuous seizures, called status epilepticus, which is a medical emergency requiring a 911 call within 5 minutes. Permanent and irreversible brain damage occurs after 20 minutes, and that is the reason that all nurses must be trained to immediately call 911 if potential seizure activity continues for 5 minutes. Ben Ramsey suffered in status epilepticus for at least six hours. Despite his mother, a physician, informing medical staff that he was suffering continuous seizures, his status epilepticus was ignored for many additional hours after this notice on the orders of the Health Services Administrator (HSA) Jennifer Trimble, aka Glenn, who further ordered that his medication list that came with him from the hospital be "verified" rather than immediately providing him the medications or access to medical treatment, which further

resulted in a delay in access to medical treatment, a worsening of his condition, and permanent injuries.

## II. JURISDICTION AND VENUE

11.  This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and is brought pursuant to 42 U.S.C. § 1983, and 42 U.S.C. § 1988, and the Fourteenth and Eighth Amendments to the US Constitution.

12.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1343, 1367 and 2201.  Jurisdiction supporting Plaintiff's claims for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

13.  This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

14.  Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

15.  Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

16.  The state law claims in this matter are brought against private corporations and therefore no notice of claims was required under the Colorado Governmental Immunity Act ("CGIA").   Southwest Correctional Medical Group, Inc., Southwest Correctional Medical Group, PLLC, Correctional Medical Group Companies, Inc., Southwest

Correctional Medical Group, LLC, Colorado Correctional Medical Group, PLLC are private corporations, and therefore no notice of the claims against them was required under the CGIA.

## III. PARTIES

### Plaintiff

17. At all times relevant to this action, Plaintiff Benjamin Ramsey, was a citizen of the United Stated of America and a resident of the State of Colorado, a registered patient of Centura Health-Parker Adventist Hospital and/or confined to the Douglas County Detention Facility.  He was a pretrial detainee at all times relevant.

18. At all times relevant to this action, Karla Ramsey, M.D., is Plaintiff Ramsey's mother and his court appointed legal Guardian pursuant to C.R.S. § 15-14-311.

### Defendants

19. At all times relevant to this action, Douglas County Sheriff's Office was operated by Douglas County, a political subdivision of the State of Colorado, established and maintained by the laws and Constitution of the State of Colorado, and as such, operated the sheriff's department by the name of the Douglas County Sheriff's Department. Upon information and belief, the Douglas County Detention Facility is operated and maintained by the Douglas County Sheriff's Office.

20. At all times relevant to this action, Defendant Board of County Commissioners for the County of Douglas is the public entity responsible for Douglas County and the Douglas County Detention Facility ("DCDF").  The Board of County Commissioners for the County of Douglas is the proper entity to be sued under 42 U.S.C. § 1983.

21. At all times relevant to this action, Defendant Southwest Correctional Medical Group, PLLC, (SCMG) is a private, for profit Texas Corporation registered to do business in Colorado, with a principal place of business at 2511 Garden Road, Suite A160, Monterey, CA 93940. Upon information and belief, this company contracts with Douglas County to provide medical services to inmates and detainees at the Douglas County Detention Facility and supervises and implements such care.

22. At all times relevant to this action, Southwest Correctional Medical Group, Inc. was a private, for profit Delaware Corporation registered to do business in Colorado with a principal office street address of 3911 Sorrento Valley Boulevard, Suite 130, San Diego, California, 92130.   Upon information and belief, this company contracts with Douglas County to provide medical services to inmates and detainees at the Douglas County Detention Facility and supervises and implements such care.

23. At all times material, Southwest Correctional Medical Group LLC, (SWCMG) was a private, for profit Delaware Corporation registered to do business in Colorado with the same principal place of business as Southwest Correctional Medical Group, PLLC. Upon information and belief, this company contracts with Douglas County to provide medical services to inmates and detainees at the Douglas County Detention Facility and supervises and implements such care.

24. At all times relevant to this action, Correctional Medical Group Companies Inc. (CMGC), is located in 12220 El Camino Real, Suite 310, San Diego, CA 92130, and is doing business in Colorado as Southwest Correctional Medical Group, LLC and/or as Southwest Correctional Medical Group, PLLC, and as Colorado Correctional Medical Group PLLC (hereinafter CMGC and SWCMG will be referred to as "SWCMG").

CMGC advertises in Colorado as CMGC doing business as SWCMG. CMGC exerts control over SWCMG including control over its daily operations, hiring, training, staffing, and policies and procedures. CMGC decides whether inmates including Plaintiff Ramsey are allowed to go to the ER for medical care. Upon information and belief, this company contracts with Douglas County to provide medical services to inmates and detainees at the Douglas County Detention Facility and supervises and implements such care.

25. Defendant Southwest Correctional Medical Group, Inc., Southwest Correctional Medical Group, PLLC, Defendant Correctional Medical Group Companies Inc., Defendant Southwest Correctional Medical Group LLC, and Defendant Colorado Correctional Medical Group, PLLC are corporate medical providers related to one another, and are collectively referred to "SWCG Entity Defendants."  SWCG Entity Defendants are proper entities to be sued under 42 U.S.C. §1983 for their deliberately indifferent policies, practices, habits, customs, procedures, training, and supervision of staff, including individual Defendants, with respect to the provision of medical care and treatment for inmates with serious emergency medical needs.

26. At all times relevant to this action, Colorado Correctional Medical Group, PLLC (CCMG) was incorporated in Colorado, with a principal place of business at 2511 Garden Road, Suite A160, Monterey, CA 93940.  Upon information and belief, this company contracts with Douglas County to provide medical services to inmates and detainees at the Douglas County Detention Facility and supervises and implements such care.

27. At all relevant times, SWCMG Entity Defendants were acting under the color of state law and performing a central function of the state thus making them liable under § 1983.

28. At all times relevant to this action, Nurse Jennifer Trimble, RN, HSA was a citizen of the United States and a resident of Colorado.  Upon information and belief, Nurse Jennifer Trimble was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

29. At all times relevant to this action, Nurse Deimys Vigil, RN was a citizen of the United States and a resident of Colorado.  Upon information and belief, Nurse Vigil, was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

30. At all times relevant to this action, Timothy G. Moser, M.D. was a citizen of the United States and a resident of Colorado.  Upon information and belief, Dr. Moser, was acting in his capacity as a doctor employed by SWCMG Defendants.

31. At all times relevant to this action, Nurse Emily Barron, RN was a citizen of the United States and a resident of Colorado.  Upon information and belief, Nurse Barron, was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

32. At all times relevant to this action, Nurse Lindsey Gyger, RN was a citizen of the United States and a resident of Colorado.  Upon information and belief, Nurse Gyger, was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

33. At all times relevant to this action, Nurse Tina Holland, RN was a citizen of the United States and a resident of Colorado.  Upon information and belief, Nurse Holland was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

34. At all times relevant to this action, Nurse Sophia Helene Nix, LPN was a citizen of the United States and a resident of Colorado.  Upon information and belief, Nurse Nix, was

acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

35. At all times relevant to this action, Nurse Kathryn Davidson, LPN was a citizen of the United States and a resident of Colorado. Upon information and belief, Nurse Davidson was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

36. At all times relevant to this action, Nurse Joan M. Cunningham, RN was a citizen of the United States and a resident of Colorado. Upon information and belief, Nurse Cunningham, was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

37. At all times relevant to this action, Nurse Shauri N. Kron, LPN was a citizen of the United States and a resident of Colorado. Upon information and belief, Nurse Kron, was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

38. At all times relevant to this action, Nurse Daisha Wade, LPN was a citizen of the United States and a resident of Colorado. Upon information and belief, Nurse Daisha Wade, was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

39. At all times relevant to this action, Defendant Nurses ( Jennifer Trimble, Deimys Vigil, Emily Barron, Lindsey Gyger, Sophia Nix, Tina Holland, Kathryn Davidson, Joan Cunningham, Shauri Kron, Daisha Wade) and Dr. Timothy G. Moser were employees and/or agents of Correctional Medical Group Companies, Inc. d/b/a Southwest

Correctional Medical Group and/or Douglas County, acting within the scope of their employment and acting under color of state law.

40. At all times relevant to this action, Douglas County had a non-delegable duty to provide detainees including Plaintiff Ramsey with necessary medical care and treatment from qualified medical providers that meets a community standard of care.  To the extent Douglas County delegated authority to make decisions to CMGC d/b/a SWCMG, either expressly or by default, the policies and customs of CMGC d/b/a SWCMG become the policies and customs of the county, and the county is liable for their actions if the policy proves unconstitutional.

**Defendant Party Groups**

41. The following defendants will be known as the Douglas County Defendants: Board of County Commissioners of the County of Douglas Colorado.

42. The following defendants will be known as the Southwest Correctional Medical Group ("SWCMG") Defendants: Southwest Correctional Medical Group, Inc., Southwest Correctional Medical Group, PLLC, Correctional Medical Group Companies, Inc., Southwest Correctional Medical group, Inc, Colorado Correctional Medical Group, PLLC, Nurse Jennifer Trimble, Nurse Deimys Vigil, Dr. Timothy G. Moser, Nurse Emily Barron, Nurse Lindsey Gyger, Nurse Sophia Helene Nix, Nurse Tina Holland, Nurse Kathryn Davidson, Nurse Joan M. Cunningham, Nurse Shauri N. Kron, and Nurse Daisha Wade.

## IV.   FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

43. Plaintiff Ramsey was born on February 22, 1989.



44. In 2012 Plaintiff Ramsey was involved in a motorcycle accident in which he sustained a traumatic brain injury. His injury is associated with epilepsy, severe intellectual disability, mental illnesses, and inability to control his emotions.

45. Plaintiff Ramsey had a ventriculoperitoneal (VP) shunt placed in his brain in an effort to treat his brain injury.

46. A VP shunt is a medical device that relieves pressure on the brain caused by fluid accumulation, placed during a surgical procedure.

47. Plaintiff Ramsey's mother, Dr. Karla Ramsey, is a pediatrician, a Fellow of the American Academy of Pediatrics, and Plaintiff's legal guardian.

48. Although Dr. Ramsey lives in Texas, she visited and visits Plaintiff Ramsey regularly.

49. Plaintiff Ramsey suffered and suffers from multiple disabilities and serious medical conditions that require and continue to require specialized care and attention.

50. Plaintiff Ramsey in 2016 operated at the mental capacity of a younger person due to his traumatic brain injury.

51. Plaintiff Ramsey was declared by the State of Texas incapacitated, and Dr. Ramsey was appointed his guardian on April 3, 2013.

52. Plaintiff Ramsey was living in a rehabilitation center in Colorado because of his intellectual disabilities, inability to control his emotions and other mental illnesses caused by the traumatic brain injury.

53. Plaintiff Ramsey took multiple medications for his multiple disabilities.

54.   Plaintiff Ramsey was able to communicate effectively, feed himself, toilet himself, exercise with weights, engage in recreational activities such as fishing and hiking.



55.   In mid-2016 Plaintiff Ramsey began to exhibit more severe behavior, which was ultimately found to have been caused by a malfunction of the VP shunt.

56.   In mid-2016 Plaintiff Ramsey had been hospitalized at Parker Adventist Hospital approximately three (3) times.

57.   On or about July 3, 2016 doctors at Parker Adventist Hospital discovered Plaintiff Ramsey's VP shunt had been malfunctioning for months, possibly since April of 2016.

58.   On or about July 4, 2016 Plaintiff Ramsey underwent corrective surgery at Parker Adventist Hospital to repair the VP shunt malfunction.

59.   Plaintiff Ramsey was recovering from brain surgery at Parker Adventist Hospital and on many medications.

60.   Dr. Ramsey was not notified of Plaintiff Ramsey's discharge from Parker Adventist Hospital.

61.   On July 19, 2016 Officer Nathan Finley of the Parker Police Department reported back to Parker Adventist Hospital to "attempt to contact a suspect in a previously report [sic] assault."

62. Officer Finley reported that he responded to Plaintiff Ramsey's room as he was being released by hospital staff.

63. According to Officer Finley's report, Nurse Givens provided prescription medication for Plaintiff Ramsey that Nurse Givens stated Parker Adventist Hospital had provided.

64. Officer Finley transported Plaintiff Ramsey to the Douglas County Jail.

65. Officer Finley gave Nurse Lindsey Gyger all of the Parker Adventist discharge paperwork, including a list of medications ordered for Plaintiff Ramsey and other care instructions.

66. Officer Finley reported Plaintiff Ramsey's "prescription sent with him from Parker Adventist was also turned over and booked as part of his personal property."

67. According to the Douglas County Sheriff's Office Pre-Book Questionnaire, "5. Does the inmate report any medical conditions? YES 'Traumatic Brain Injury.'" It is foreseeable that a person with a traumatic brain injury would suffer epileptic seizures.

68. According to the Douglas County Sheriff's Office Arrestee Transportation Information Questionnaire "2. Was it necessary to have the arrestee medically cleared before booking? If yes, please explain: Arestee [sic] transported from Hospital."

69. It was foreseeable that if Plaintiff Ramsey did not receive his medications including medications to prevent seizures, he would suffer serious medical side effects, including seizures, and then status epilepticus.  Status epilepticus is defined as a seizure lasting more than five (5) minutes or multiple seizures occurring back-to-back without a full return of consciousness in between, and it is a medical emergency.  The longer the duration of status epilepticus before treatment, the more difficult it is to stop, and the worse is the brain damage.  A significant number of people die.

70.  Based on information and belief, the Intake Nurse Gyger knew or should have known of the substantial risk of serious harm posed by not providing a patient who had undergone brain surgery only fifteen (15) days prior, who was on twenty one (21) different medications, with those medications including medications to prevent seizures.

71.  The written discharge instructions documented Plaintiff Ramsey was on the following medication at time of his discharge from Parker Adventist Hospital:

| | | | |
|---|---|---|---|
| a. | Acetaminophen | 1,000mg | 3 times daily |
| b. | Albuterol | 188 Puff/17gm Puff | every 4 hours |
| c. | Amiloride Hcl | 5mg | 2 times daily |
| d. | Clonazepam | .5mg | 1 time daily |
| e. | Desmopressin | .1mg | 1 time daily |
| f. | Donepezil | 5mg | 1 time daily |
| g. | Fenofibrate | 96mg | 1 time daily |
| h. | Fluticasone | .05% spray | 1 time daily |
| i. | Guanfacine Hcl | 2mg | 1 time daily |
| j. | Haloperidol | 5mg | every 4 hours |
| k. | Ibuprofen | 600mg | 3 times daily |
| l. | Lithium Carbonate | 300mg | 1 time daily |
| m. | Lurasidone | 60mg | 1 time daily |
| n. | Medroxyprogesterone | 400mg | Weekly |
| o. | Metformin. | 500mg | 2 times daily |
| p. | Olanzapine | 10mg | 1 time daily |
| q. | Oxcarbazepine | 600mg | 3 times daily |

| | | | |
|---|---|---|---|
| r. | Pantoprazole | 40mg | 1 time daily |
| s. | Temazepam | 15mg | 1 time daily |
| t. | Triamcinolone | 0.1%/15gm | 3 times daily |
| u. | Levomefolate/Algal | 7.5mg | 1 time daily |

72. Albuterol was used to treat Plaintiff Ramsey's asthma.

73. Amiloride Hcl was used to treat Plaintiff Ramsey's blood pressure and potential extra fluid in the body, which may have been a side effect of the brain surgery to correct the VP shunt malfunction (the malfunction led to collection of fluid in the brain.)

74. Clonazepam was used to treat Plaintiff Ramsey's seizures and panic attacks.

75. Desmopressin was used to treat Plaintiff Ramsey's cranial diabetes insipidus.

76. Donepezil was used to treat Plaintiff Ramsey for Alzheimer symptoms.

77. Fenofibrate was used to treat Plaintiff Ramsey's cholesterol.

78. Fluticasone was sued to treat Plaintiff Ramsey's allergies.

79. Guanfacine was used to treat Plaintiff Ramsey's ADHD, administered one (1) time daily.

80. Ibuprofen was administered three (3) times daily.

81. Haloperidol was used as an antipsychotic, and was to be administered every four (4) hours.

82. Lithium Carbonate was used to treat Plaintiff Ramsey's bipolar disorder.

83. Lurasidone was used as an antipsychotic to treat Plaintiff Ramsey.

84. Medroxyprogesterone was used to treat Plaintiff Ramsey's testosterone levels, to lower them.

85. Metoformin was used to treat Plaintiff Ramsey's diabetes, and was to be administered twice daily.

86. Olanzapine was used as an antipsychotic to treat Plaintiff Ramey's bipolar condition, and was to be administered one (1) time per day.

87. Oxcarbazepine was used to treat Plaintiff Ramsey's seizures, and was to be ingested three (3) times per day. The listed use for this medication is to treat seizures, notably complex partial seizures.

88. Pantoprazole was used to treat Plaintiff Ramsey's gastrointestinal issues.

89. Temazepam was used to treat Plaintiff Ramsey's insomnia.

90. Triamcinolone was used to treat Plaintiff Ramey's skin condition.

91. Levomefolate was used for Plaintiff Ramsey's unique dietary needs.

92. Acetaminophen was used to treat Plaintiff Ramsey's pain.

93. Thus, Plaintiff Ramsey was on at least two (2) medications for seizures.

94. No medications were administered to prevent Plaintiff Ramsey's seizures.

95. Nurse Gyger conducted Plaintiff Ramsey's Intake Triage Screening.  In it, Nurse Gyger noted under "Are you on any medications?" "Yes" and Under "List Medications" she noted: "see list from hospital."

96. On July 19, 2016, Nurse Lindsey Gyger was the RN, and Nurse Sophia Nix was the LPN on duty at the Douglas County Jail.

97. The July 19, 2016 Night Shift Report indicates an "ROI" was sent to Parker Adventist and "Aurora Residential/Alternatives" for "med info/records."  Even though the arresting officer or detention staff handed Nurse Gyger a list of Plaintiff Ramsey's prescribed medications from the hospital, as she noted in his intake paperwork, and even though he had a large surgical wound on his head and hospital bracelet on his wrist, Defendant Gyger did not start any medications and instead sent out a request for information or ROI

despite the substantial risk of serious harm from discontinuing Ramsey's prescribed medications.  It was the custom at the Douglas County Jail for nurses to discontinue prescribed medications in order to save CMGC money, even when the inmate came directly from the hospital following surgery with a list of doctor-ordered medications provided by the hospital.  There is no evidence the ROI was sent.



98. On July 20, 2016, RN Tina Holland and LPN Kathryn Davidson were on duty for the day shift, and LPN Kathryn Davidson was on Med Cart Assignment.  At the beginning of their shift during shift change, they learned of Ramsey's condition and the ROI allegedly sent during shift change, and thus knew of a substantial risk of serious harm from not providing the list of medications contained in Ramsey's chart, knowing he had suffered a traumatic brain injury (TBI), and had been transferred to jail directly from the hospital with a long list of prescribed medications because this information was contained in the shift change report and his chart.  At shift change at the end of the day shift, Tina Holland documented in the shift change report that she had verified Ramsey's medications, and that he had a "TBI x 2 years ago – bit nurse."  Even though Defendant Holland documented for the next shift that she had verified Ramsey's medications, she either deliberately falsified this information or she and Defendant Davidson purposefully refused to provide any medications to Ben Ramsey. By documenting that his medications

were verified and none were ordered for him, they ensured that none would be provided. They knew Ben Ramsey was not receiving any of his medications despite the substantial risk of serious harm posed by discontinuing medications following hospitalization, including medications that are indicated for a seizure disorder, as expected following a TBI. They failed to perform any assessment of Plaintiff Ramsey, contact a physician, or provide Ramsey any of his doctor-ordered medications.

99.   Numerous nurses over many shifts refused to provide Ben Ramsey his prescribed medications even though he came directly from the hospital with a list of medications.  It was the custom at the Douglas County Jail for CMGC staff to cut inmates off their prescribed medications despite the substantial risk of serious harm including death in order to make money.

100.   On July 20, 2016, Dr. Ramsey traveled to Colorado after learning her son had been arrested, but the jail refused to allow her to see him.

101.   On July 20, 2016, RN Joan Cunningham and LPN Daisha Wade were on duty for the night shift. They were informed at shift change that Ramsey's medications had been verified, and they knew that he was not receiving any of the prescribed medications listed in his chart. They were complicit in denying Ben Ramsey all of his prescribed medications including his seizure medications despite the substantial risk of serious harm. Based on information and belief, they knew that it was the custom for CMGC nurses to cut inmates off their prescribed medications, even if the inmate came directly from the hospital with a list of medications following serious surgery despite the obvious substantial risk of serious harm.

102. On the morning of July 21, 2016 Dr. Ramsey was able to see Plaintiff Ramsey in the DCDF. At first, she watched him through a monitor but he lacked the ability to communicate with her and did not understand what was happening. Dr. Ramsey insisted jail staff allow her to communicate with him through a glass divider, where she could clearly see he was no longer communicative and was suffering seizures.  A CMGC staff member accompanied her and was informed of all Dr. Ramsey's observations and concerns.

103. Dr. Ramsey observed her son to be no longer communicative.  She observed almost continual spells of somnolence, fixed eye movements to the right followed by nystagmus. She informed medical personnel of her observations.  She documented these changes on 7/21/16, and her documentation was put into her son's chart by nursing staff.

104. Dr. Ramsey observed Plaintiff Ramsey had an acute change in mental status following brain surgery with acute onset of almost continual complex partial seizures. She informed medical personnel of her observations and that her son was suffering almost continual seizures.  Her documentation of this notification was put into her son's chart.

105. Defendant Trimble HSA was in medical during the day shift when Dr. Karla Ramsey reported her son was experiencing almost continual seizures.

106. Defendant Trimble directed Defendant Deimys Vigil RN to meet with Dr. Ramsey.

107. Defendant Vigil met with Dr. Ramsey.  She could not tell Dr. Ramsey what medications Ben Ramsey was taking in the jail, and she reported back to Defendant Trimble Dr. Ramsey's concerns about her son's condition and that he was not receiving his prescribed medications.

108. Defendants Vigil and Trimble knew of the substantial risk of serious harm in not providing Ben Ramsey with medications for his seizure disorder, and that he was having continuous seizures, which is a medical emergency. They knew of the substantial risk of serious harm in not immediately contacting 911 to provide him access to medical treatment.

109. Rather than contact 911 or a doctor, Defendant Trimble directed Defendant Vigil to "verify" Ben Ramsey's medication list from the hospital. No medications were provided to Ben Ramsey.

110. On July 21, 2016, at 2:00 p.m., after speaking with Dr. Ramsey, Defendant Vigil documented that she contacted a mental health nurse practitioner to start Donepezil, Lithium, Latuda, Metformin, Trileptal (aka Oxcarbazepine for seizures), Ibuprofen, and neurologic checks. However, she deliberately failed to enter any orders for the medications or provide them. The medications, including medications for Ben Ramsey's seizures were deliberately not provided to him despite knowing that he was suffering continuous seizures, and despite the obvious substantial risk of serious harm including death from continuous seizures.

111. Based on information and belief, Defendant Trimble directed Defendant Vigil to get an order from Johnson NP for these medications and neurologic checks because Defendant Vigil reported to her prior to 2:00 p.m. that Ben Ramsey was suffering continuous seizures according to Dr. Ramsey and he had not received any medications, and Defendant Trimble consciously disregarded the substantial risk of serious injury by refusing to contact 911 or even a physician. It was CMGC's custom to document that medications were ordered without actually administering them.

112. Defendant Vigil failed to perform the first neuro check until 4:00 p.m. on July 21, 2016, despite knowing that Dr. Ramsey reported her son was suffering continuous seizures prior to 2:00 p.m., and knowing that he had not received any of his medications including his seizure medications. She documented that he had no verbal response, which is an acute neurologic change consistent with seizures, and yet she deliberately chose not to contact a physician. Based on information and belief, she informed Defendant Trimble.

113. Based on information and belief, Defendant Trimble left the jail between 4:00 and 6:00 p.m., despite knowing that Dr. Ramsey had reported that her son was suffering continuous seizures, which is a life-threatening emergency, that he was not able to speak, and that he had not received any of his prescribed medications.

114. Dr. Ramsey was frantic to save her son's life. She finally was able to speak with the Captain, Kevin Duffy. Because she had her lawyer on the phone with her, Captain Duffy relayed her message to Defendant Trimble.

115. The message was also relayed to Defendant Vigil, who wrote in the shift change report at the end of the dayshift around 6:00 p.m. that "Mom called attorney b/c pt has been here since 7/19/16. Mom is a doctor. All meds verified. Neuro checks and benzo protocol also."

116. Supposedly Ramsey's medications were verified each day, according to the documentation, and yet none were ever provided to Ben Ramsey.

117. Because Captain Duffy contacted her, Defendant Trimble called Dr. Ramsey, who had her lawyer on the phone with them the evening of July 21, 2016.

118. Defendant Trimble reported to Dr. Ramsey that Plaintiff Ramsey had not received any medication because the medications had not been verified.

21

119.  Dr. Ramsey told Defendant Trimble that her son was suffering continuous seizures, which is a medical emergency, and she told her exactly what to look for with his eyes. She explained in detail how complex partial seizures present, and insisted her son was experiencing continuous seizures.

120.  Defendant Trimble contacted Defendant Emily Barron, who was working night shift on July 21, 2016.

121.  On or about 6:41pm on July 21, 2016 Nurse Jennifer called Dr. Ramsey again and reported Plaintiff Ramsey was in stable condition in the DCDF medical area under nursing observation.

122.  No nurses had documented observing him since 4:00 p.m.  However, Nurse Barron then documented a neurologic check at 6:45 p.m. in which she left pertinent information blank. Based on information and belief, she was directed or it was the custom to inaccurately document critical patient information to justify decisions not to provide access to medical treatment.

123.  After Defendant Barron performed the second neurologic check on Ben Ramsey at 6:45 p.m., she reported back to Defendant Trimble that she observed what Dr. Ramsey reported seeing with Ben Ramsey's eyes.  She failed to document these observations. Her documentation created a false picture that Ben Ramsey was not suffering acute neurologic changes and seizures.  She deliberately failed to contact a physician despite the substantial risk of serious harm from continuous seizures.

124.  Defendant Trimble then ordered that Nurse Barron have Ben Ramsey transported to the hospital.  She did not direct her to follow a seizure protocol or to call 911, despite the substantial risk of serious harm from the delay in treatment.  Based on information and

belief, Defendant Trimble ordered that Ben Ramsey's seizures not be documented at all, even though that was the reason for his transport to the hospital. Instead, Defendant Barron documented that he was sent to the hospital for a blood pressure of 143/100, which is not a hypertensive emergency. She documented that she notified Dr. Moser of Trimble's decision to transport Ramsey.

125. Ben Ramsey was transported to the ER in the back of a patrol car even though he could not sit up or walk. CMGC falsified records and covered up what happened to him.

126. On July 21, 2016 at 18:45 RN Emily Barron wrote a progress note that stated in part: "VS P 73, R 16, BP 143/100…minimally verbally responsive...HSA Jennifer notified of pt's VS, including elevated BP. Per HSA pt to be sent out to hospital for assessment. Dr. Moser notified. Pt transported to CRAH via deputy vehicle at 1920. Appropriate paperwork sent with deputy."

127. Defendant Barron filled out a Medical Referral Form, and under reason for referral, she stated: "TBI, VP shunt, HTN 143/100." She failed to document that Ramsey was in status epilepticus, or that he was suffering seizures.

128. On or about 7:15pm on July 21, 2016 Nurse Jennifer called Dr. Ramsey and reported Plaintiff Ramsey was being transported to the Emergency Department.

129. Defendant Trimble reported to Dr. Ramsey that she was sending him to the hospital because other nurses had observed what Dr. Ramsey reported about her son and he had elevated blood pressure. Based on information and belief, it was the custom at Douglas County Jail for CMGC nurses to require more than continuous seizures, such as elevated blood pressure or unstable vital signs, before sending an inmate to the hospital, despite the obvious substantial risk of serious harm and death.

130. Sometime on July 21, 2016 Walmart Pharmacy records show Dr. Timothy G. Moser had called in prescriptions for Plaintiff Ramsey for Latuda, Desmopressin, Donepezil, and Oxcarbazepine only.  Based on information and belief, Dr. Moser knew that Ben Ramsey had not received any medications for his seizure disorder and was suffering continuous seizures, but did not order his immediate transport to the ER via EMS.

131. No ambulance was called for Ben Ramsey.

132. Plaintiff Ramsey was unable to walk.

133. Plaintiff Ramsey had to be carried to the squad car for transportation to the Emergency Department.

134. Plaintiff Ramsey was unable to communicate.

135. In the Emergency Department Plaintiff Ramsey was given a dose of Ativan and immediately woke up and became responsive and talkative.

136. Dr. Ramsey showed a video of Ben's baseline mental status to the hospital staff, and they concurred acute change in mental status.

137. Plaintiff Ramsey was admitted to the hospital.

138. Soon after, Plaintiff Ramsey was again unresponsive.  A neurologist reported to Dr. Ramsey that the seizures continued to be ongoing.  The hospital started IV seizure medications and moved Plaintiff Ramsey to the Intensive Care Unit.

139. No information has been discovered yet that Intake Nurse Gyger contacted the on-call doctor or medical director, even though all of these findings should have been reviewed by the treating clinician.

140. Based on information and belief, Intake Nurse Gyger knew of the substantial risk of serious harm posed by a patient in a post-operative status from brain surgery, on seizure

medications, on diabetes medications, and antipsychotics who is cut off those medications because the risk is obvious, not only to someone with her training, but also to any lay person.

141.  The National Commission on Correctional Health Care's Standards for Health Services in Jails requires that all inmates receive an initial health assessment by a qualified health care professional within fourteen days after admission.  This is supposed to be an in depth assessment to identify any health care problems needing medical management and provides a safety net for any problems that may have been missed during the intake process.  A RN can perform this assessment only when the nurse completes appropriate training approved or provided by the responsible physician.  Based on information available at this time and belief, Intake Nurse Gyger did not receive the appropriate training, supervision, and/or oversight or there was a constitutional policy or custom that required or allowed nurses to perform adequate assessments without contacting a physician.

142.  Plaintiff Ramsey's condition was obviously too complex to be managed by the personnel at DCDF as evidenced by their failure to control his post brain surgery recovery, and he was at substantial risk of intracranial hemorrhage, stroke, status epilepticus, and death.

143.  The Defendants knew Plaintiff Ramsey was having seizures and yet were deliberately indifferent to the substantial risk of serious harm in failing to transfer him to a higher level of care.

144.  Instead of transferring Plaintiff Ramsey to a higher level of medical care, they placed him in their internal medical unit to monitor him.

145. During the time Plaintiff Ramsey underwent status epilepticus without treatment, he remained unresponsive, lost the ability to sit up on his own, and lost major and minor motor skills.

146. Plaintiff Ramsey was released from custody at the hospital.

147. Although Plaintiff Ramsey already had a brain injury prior to his stay at Parker Adventist and subsequent holding at the DCDF, Plaintiff Ramsey now has a significantly worse brain injury, one that has robbed him of his short term and long term memory. His brain injury is permanent.

148. Plaintiff Ramsey has now the cognitive level of a young child. He cannot participate in the activities he once did right before the 2016 incident. He exhibits a circular level of talking and thinking patterns. He cannot enjoy the activities he used to do. He struggles to care for himself, and now requires a more intensive long term care plan. When doctors were able to control his seizures again, he could no longer walk and was forced back into a wheel chair for many months. He had to learn to walk again.

149. The failure to determine which seizure medications Plaintiff Ramsey had been prescribed and provide them to him put him at an obvious substantial risk of serious harm. The denial of medical care and seizure medications caused Plaintiff Ramsey to enter status epilepticus, a life threatening medical emergency, for which he was denied access to medical treatment for a prolonged period of time.

150. Douglas County Jail and SWCMG knowingly maintained a pattern and practice of systemic deficiencies in the care and treatment of serious chronic conditions including Plaintiff Ramsey's life threatening chronic conditions, which violated Plaintiff Ramsey's

Constitutional right to necessary medical treatment from a qualified provider for serious health needs.

151. At all times, Defendants were aware that a successful lawsuit can mean financial consequences as well as public relations and reputational consequences.

152. Douglas County's jail maintains accreditation with the American Correctional Association (ACA) and National Commission on Correctional Health Care (NCCHC). Defendants derive benefit from Douglas County maintaining its accreditation with ACA and NCCHC. Accreditation requires self-reporting of serious medical incidents and emergency room transfers, and accreditation is based upon statistics of safety. Defendants conspired and had a policy and practice of keeping medical incidents such as the one that happened to Plaintiff Ramsey a secret from their accrediting agencies in order to improperly maintain their accreditation.

153. Approximately four months after Ben Ramsey was denied medications including medications for his seizure disorder even after he suffered seizures and then status epilepticus, and after nurses were taught by Dr. Ramsey how to recognize complex partial seizures, another inmate was denied his prescribed seizure medications even after he began suffering seizures. He too was left in status epilepticus for a prolonged period of time, over 7.5 hours. Defendant Trimble directed a LPN to just pull him up on the monitor and so nurses stopped going into his cell despite him being unconscious and seizing continuously for hours. His seizures started before 8:30 p.m., and around 3:35 am the next day, the LPN contacted 911. The LPN told 911 that they found him seizing at 3:30 a.m. and there were no witnesses, which was not true. Defendant Trimble did not provide any paperwork to the hospital until late afternoon, and did not provide the

medication administration record, that showed the man had not been provided any seizure medications, for days.  The hospital was forced to try to figure out what happened and provide treatment based on misinformation.

154. With the inmate denied seizure medications approximately four months after Ramsey, Nurse Vigil "verified" his medications even though he too came from the hospital and knew the name of his treating provider. She cut him off multiple medications including his blood pressure medications, and she cut his long-acting insulin in half even though he was a brittle diabetic who continued to suffer from diabetic and hypertensive emergencies while in the jail.  She documented acute neurologic changes and seizure activity but did not contact a physician. Multiple nurses over a 20-day period documented acute neurologic changes and potential seizures, but did not contact a physician.  RNs including Trimble, Vigil, Barron, and Gyger allowed LPNs to practice outside the scope of their licenses and not contact a doctor for acute neurologic changes and potential seizures. Nurse Gyger was the supervising RN when this man went into status epilepticus about four months after Ramsey, and she failed to perform any assessment, follow nurse protocols, or contact 911.

155. No changes were made to policies or procedures, or to training and supervision after the inmate in November of 2016 was denied seizure medications even after he suffered documented seizures, and even after he entered status epilepticus for over 7.5 hours. This was standard operating procedure both for Ramsey and four months later for this inmate.

156. Douglas County investigated what happened to Ben Ramsey, and interviewed nurses including Defendant Gyger.  No changes were made to policies and procedures, or to

training and supervision after Ben Ramsey was denied medications and access to medical treatment by a qualified medical provider.

157. After Ben Ramsey was injured and his medical care investigated, it continued to be the custom that something in addition to potential seizures that last five minutes was required, such as unstable vital signs, before an inmate suffering in status epilepticus would be provided access to medical treatment despite the obvious substantial risk of serious harm and even death.

158. As a result of his injuries, Plaintiff Ramsey was damaged in the following particulars: (a) Non-economic damages consisting of past and future physical pain, suffering, anxiety, emotional distress, stress, fear, and loss of enjoyment of life; (b) past and future medical, rehabilitation and other health care expenses for his physical injuries; (c) home services expenses; (d) permanent injuries including but not limited to brain damage and ongoing seizures; (d) permanent impairment.

## V.   STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983

### (Against all SWCMG Individual Defendants except for Dr. Mozer)

159. Plaintiffs reallege and incorporate by reference the above paragraphs of this Complaint as is fully set forth therein.

160. At all times relevant to the allegations in this Complaint, Defendants were acting under color of state law.

161. Plaintiff Ramsey was a citizen of the United States and all of the individual Defendants are persons under 42 U.S.C. § 1983.

162. Plaintiff Ramsey was a pretrial detainee, and had a clearly established right under the Fourteenth Amendment to the U.S. Constitution to be free from punishment.  Denying him medical treatment for his serious medical needs was not rationally related to a legitimate governmental objective or was excessive with regards to that purpose.  In addition, each Defendant was deliberately indifferent to a known substantial risk of serious harm as described *Supra*.  The denial of medical treatment caused Plaintiff's injuries and damages as described in ¶ 158, *Supra*.

163. At all times relevant to the allegations in this Complaint, each individual Defendant knew of and disregarded the excessive risks associated with Plaintiff Ramsey's serious and life-threatening medical condition.

164. When Plaintiff Ramsey, and others acting on his behalf, alerted each individual Defendant to Plaintiff Ramsey's need for medical assistance, Defendants acted with deliberate indifference to Plaintiff Ramsey's readily apparent need for medical attention and his constitutional rights by refusing to obtain and provide any medical treatment for him.

165. All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

166. The acts and omissions of each individual Defendant were the legal and proximate cause of Plaintiff Ramsey's injuries and permanent impairment.

167. At all times relevant, Defendants had a legal duty to provide medical care to inmates within the standard of care for the community.  The Defendants violated that duty by

knowingly and purposefully denying Plaintiff Ramsey medical care and treatment by qualified medical providers for his serious medical needs, including seizures, psychosis, diabetes, and high blood pressure.

168. Each of the SWCMG Defendants knew that Plaintiff Ramsey was discharged directly from a hospital, post brain surgery because it is noted in his intake paperwork that was in his chart.  Defendants knew he had been prescribed a long list of medications by doctors at the hospital because that list was provided at intake and was kept in his chart for all the nurses to review.  Multiple nurses documented that they verified his medications, and yet none of the nurses provided Ramsey any of his medications, even when he was suffering from acute neurologic changes.

169. Defendant Gyger was handed Ben Ramsey's list of medications prescribed by doctors at the hospital from which he came following brain surgery. She knew that he came from the hospital with his list of currently ordered medications because she documented it in his intake forms.  She could see the large surgical scar across his head.  Despite the obvious risk of serious harm in denying Ramsey his medications, including medications for his seizure disorder, she failed to order any medications for him, failed to contact a medical provider, and failed to provide him any medications.  As a result of her deliberate indifference, Ramsey suffered seizures and entered status epilepticus, which caused a permanent brain injury.

170.  Defendant Nix was working with Defendant Gyger and passing out medications the night Ramsey was admitted to the jail, and she knew that he came from the hospital because that information was passed on to her as well as the new nurses coming on at shift change, as noted in the shift change report.  The list of medications was in Ramsey's

chart, and she knew that he had not been provided any of them despite the obvious substantial risk of serious harm because she passed out the medications during that shift. As a result of her deliberate indifference, Ramsey suffered seizures and entered status epilepticus, which caused a permanent brain injury.

171. Defendants Holland and Davidson knew that Ramsey came directly from the hospital with a list of medications including medications for his seizure disorder because that information was communicated at shift change, and they documented at shift change at the end of their shift that they verified Ramsey's medications and so they saw the list. Nonetheless, they both knowingly failed to provide any medications to Ramsey or contact a medical provider to get orders different than the orders coming directly from the hospital despite the obvious substantial risk of serious harm in cutting a brain surgery patient off prescribed medications including those to prevent seizures. As a result of their deliberate indifference, Ramsey suffered seizures and entered status epilepticus, which caused a permanent brain injury.

172. Defendants Cunningham and Wade knew that Ramsey had suffered a traumatic brain injury and that he came from the hospital where he bit a nurse because that information was passed on at shift change to them.  They knew that his medications had allegedly been verified because that information was passed on to them at shift change, and the list of medications from the hospital as well as his intake form showing he came directly from the hospital was in his chart.  Nonetheless, they deliberately failed to provide him any of his prescribed medications despite the obvious substantial risk of serious harm in cutting a brain surgery patient off his prescribed medications including medications to

prevent seizures.  As a result of their deliberate indifference, Ramsey suffered seizures and entered status epilepticus, which caused a permanent brain injury.

173.   Defendants Vigil and Kron knew that Dr. Ramsey was reporting to the medical department that her son was suffering continuous seizures because Defendant Vigil met with Dr. Ramsey and reported this information back to Defendant Trimble who ordered her to verify his medications, and they knew that he had not been provided any of his prescribed medications because they "verified" his medications yet again, and they passed on this information at shift change.  Even though Defendant Vigil again "verified" Ramsey's medications, neither nurse provided him any of his medications including his seizure medications or contacted 911 for his continuous seizures.  Defendant Vigil knew that he had suffered an acute neurologic change and could not communicate, and yet she deliberately failed to contact a medical provider or 911.  Because of their actions, Ramsey was left in status epilepticus for a prolonged period of time which caused a worsening of his condition and a permanent injury.

174.   Defendants Barron and Wade knew that Dr. Ramsey was reporting to the medical department that her son was suffering continuous seizures and that his medications had been verified but he had not received any because this information was passed on at shift change to them and is obvious from the records in his chart.  He was supposed to be receiving neurological checks by then and was housed in medical, and yet Barron and Wade failed to document any assessment of him other than at 6:45 p.m. after Defendant Trimble called.  Defendant Barron knowingly provided inaccurate and incomplete documentation and had Ben Ramsey sent to the ER in the back of a patrol car rather than calling EMS, despite the obvious substantial risk that he could die on the way to the

hospital, and that the hospital would not have accurate information needed to save his life.  The decision to send him by patrol car rather than contacting EMS which would have started IV medications to stop the seizures was reckless, and delayed his access to medical treatment, which caused a worsening of his condition and permanent injury.

175. Defendant Trimble was responsible for training and supervising all the nurses in the medical department, and it was her responsibility to make sure that inmates including Ramsey were provided medical treatment for their serious medical needs.  In her supervisory capacity, she either directed or knowingly acquiesced in the unconstitutional practices of her subordinate nurses.  In addition, she directly participated in denying Ramsey access to medical treatment.  She was working in the medical department when Dr. Ramsey met with her son in the presence of a CMGC employee, and reported that her son was suffering continuous seizures.  Defendant Trimble directed Defendant Vigil to meet with Dr. Ramsey, and Defendant Vigil reported back her concerns to Defendant Trimble.  Dr. Ramsey documented her concerns in writing and these are contained in Ben Ramsey's chart. Defendant Trimble directed Nurse Vigil to "verify" his medications even though Ramsey's medication list came from the hospital with him, and even though they had already been verified the day before.  She did this knowing that he had not received any medications and was in status epilepticus.  She knew of the substantial risk of serious harm to Ramsey, and yet she directed or allowed him to be denied access to medical treatment until she was forced to call Dr. Ramsey who had an attorney on the phone and explained to her with a witness on the line that Ben Ramsey was having seizures and exactly how complex partial seizures presented.  It was only then that Defendant Trimble directed that he be sent to the ER, but she either directed or allowed him to be sent to the

ER by patrol car rather than ambulance, despite the substantial risk of serious harm. Had EMS been called, Ramsey would have received treatment, including either IV or intramuscular medications. The decision to send him by patrol car while in status epilepticus was reckless and delayed his access to medical treatment for his life-threatening condition, and caused a worsening of his condition and permanent injury.

176. The Nurse Defendants failed to fulfill their gatekeeper roles by failing to contact 911 or a physician for acute neurologic changes, especially after being informed by Dr. Ramsey that Ben Ramsey was suffering continuous seizures, which is a life-threatening, medical emergency.

177. Each Defendant's conduct was a direct cause of Plaintiff Ramsey's injuries and damages, which are indivisible, resulting in joint and several liability.

<u>**SECOND CLAIM FOR RELIEF**</u>

**42 U.S.C. § 1983**

**Monell Liability**

**(Against Douglas County Defendants and CMGC d/b/a SWCMG)**

178. Plaintiffs reallege and incorporate by reference the above paragraphs of this Complaint as if fully set forth herein.

179. Douglas County Defendants and SWCG Defendants are persons within the meaning of 42 U.S.C. § 1983.

180. At all times relevant to the allegations in this Complaint, Douglas County Defendants were acting under color of state law and had a non-delegable duty to provide constitutionally adequate medical care for inmates.

181. SWCG Defendants' and Douglas County Defendants' deliberately indifferent and unconstitutional policies, customs, and/or practices were the moving force and proximate cause of Plaintiff Ramsey's injuries and permanent impairment.

182. Defendants had unconstitutional policies or a widespread custom of denying pretrial detainee's medications for serious medical needs, even when the detainee came right from the hospital with a list of his medications prescribed by a doctor at the hospital following surgery, and that policy or custom was the moving force behind Plaintiff Ramsey's injuries as described *Supra*.  In addition, based on information and belief, a final policy maker for the County and/or CMGC ratified the unconstitutional conduct that caused Ben Ramsey's injuries and damages.  CMGC had an unconstitutional policy or custom of "verifying" medications even though a list was provided by a doctor over and over without ever providing any medications, including medications for serious, life-threatening illnesses, and then falsifying information to justify the denial of medical treatment even when the falsified information put the inmate at greater risk of serious harm.

183. SWCG Defendants with deliberate indifference failed to properly train and supervise their employees to provide necessary medical care to detainees at DCDF.  RNs supervised LPNs and it was the widespread custom to allow both LPNs and RNs to practice outside the scope of their licenses in order to deny inmates including Ramsey medications and access to medical treatment for serious medical needs in order for CMGC to profit.  Nurses routinely made medical decisions without contacting a doctor, and based on information and belief, the on-site medical director, Dr. Moser, was aware of this practice as was the HSA and CMGC itself.

184.   The County investigated the medical treatment provided to Ramsey and based on information and belief, ratified that treatment.  SWCMG and/or Douglas County ("Defendants") ordered, ratified, or knowingly acquiesced in having nurses, perform constitutionally deficient initial health assessments of inmates, including but not limited to an assessment of Plaintiff Ramsey that, *inter alia*, failed to start him on his prescribed medications and contact a doctor, which poses an obvious substantial risk of serious harm or death.

185.   Upon belief, since Plaintiff Ramsey was not given his proper medications at the outset leading to the initial seizures, either Defendant Nurses did not receive proper training, supervision, and/or oversight, or there was an unconstitutional policy or custom requiring and/or knowingly acquiescing in allowing nurses to conduct constitutionally-inadequate intake examinations that lead to the denial of necessary medical treatment for serious medical needs, and that pose an obvious substantial risk of serious harm.

186.   Upon information and belief, Defendants had a policy or custom of routinely denying detainees, including Plaintiff Ramsey, with access to medical treatment by qualified medical providers, having nurses practice outside the scope of their licenses by failing to fulfill their gatekeeper roles, and denying detainees necessary and life-saving medications.

187.   There are systemic and widespread deficiencies by multiple providers in the medical care and treatment by SWCMG at DCDF which reflect an official policy or custom of deliberate indifference to serious medical needs, and which was the moving force behind Plaintiff Ramsey's injuries.

188. The need for training, supervision, and adequate staffing of the medical department to avoid the risk of serious injury and death from life threatening illnesses, including but not limited to seizures, diabetes, and hypertension was obvious.

189. Based on information and belief, SWCMG and/or Douglas County purposefully failed to adequately staff and/or train and/or supervise staff to provide detainees including Plaintiff Ramsey with access to medical treatment by a qualified medical provider for serious medical needs that posed a substantial risk of serious harm, all of which was the moving force in causing Plaintiff Ramsey's injuries and damages.

190. Upon information and belief, CMGC requires that SWCMG use its management program to reduce unnecessary off-site care by ensuring the Chief Medical Officer for CMGC "reviews all off-site medical transports to enhance care and reduces unnecessary off-site medical transports."  CMGC has many facilities in many states that all have to contact the CMGC Chief Medical Officer prior to transport, no matter how emergent the need for transport.  Douglas County knew and approved of the unconstitutional policy requiring use of a CMGC "management program" that require approval of the CMO prior to transport.  Douglas County knew SWCMG would operate under this model when it signed a contract with SWCMG, and it was deliberately indifferent to the obvious risk of serious harm to its inmates including Plaintiff Ramsey.

191. Upon belief, Douglas County maintained a policy that it would not reimburse SWCMG for prescribed medications, and which put a cap on the amount of money that would be paid for medical care including hospitalizations, which CMGC had to initially pay. These policies systematically discouraged Emergency Room transfers and consistent medication administration, and this was foreseeable to Douglas County.  Douglas County

purposefully ignored the obvious risk that SWCMG would avoid costs itself and shareholders – including costs associated with prophylactic administration of medications or emergency transfers and would instead be incentivized to gamble with citizens' lives by internalizing the profit associated with noncore, while externalizing the risks.

192. The Defendants maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied an unconstitutional policy or custom of denying detainees, including Plaintiff Ramsey's access to medical care and treatment by a qualified medical provider for serious medical needs. The deficiencies were so widespread and ubiquitous as to affect all inmates with serious medical needs at DCDF.

193. Access to medical care for serious medical needs constitutes a usual and recurring situation with which officers and medical staff must deal, and for which it is necessary they receive training, supervision, and oversight. The need for more or different training, discipline, and supervision was so obvious and the inadequacy so likely to result in a violation of constitutional rights, that the policy makers of Douglas County and SWCMG, can reasonably be said to have been deliberately indifferent to the need.

194. The inadequate training, inadequate discipline and inadequate supervision, demonstrated a deliberate indifference on the part of the Defendants towards detainees and prisoners.

195. The Defendants had a policy, custom, and practice of allowing or requiring nurses and/or medical providers to purposefully and deliberately deny detainees including Plaintiff Ramsey medications and access to a qualified medical provider for necessary medical care and treatment for serious medical conditions, thereby creating an atmosphere where such behavior was accepted, approved, and ratified, in reckless disregard and deliberate

indifference to the health and welfare of persons taken into custody, including Plaintiff Ramsey.

196. Douglas County had a non-delegable duty to provide detainees including Plaintiff Ramsey with necessary medical care and treatment from qualified medical providers that meets a community standard of care. To the extent Douglas County delegated authority to make decisions to SWCMG, either expressly or by default, the policies and customs of SWCMG become the policies and customs of the county, and county is liable for their actions if the policy proves unconstitutional.

197. There was a direct causal link between the constitutional deprivations listed above and the inadequate training, inadequate discipline and inadequate supervision and/or unconstitutional policies or customs of the Defendants.

198. Each Defendant's conduct was a direct cause of Plaintiff's injuries and damages, which are indivisible, resulting in joint and several liability.

199. The Defendants' unconstitutional conduct caused Plaintiff's injuries and damages set forth above in ¶ 158 *Supra*, in an amount to be proved at the time of trial.

## **THIRD CLAIM FOR RELIEF**

**(Punitive Damages Against All Defendants Except Moser and Douglas County Defendants)**

200. All of the above allegations are incorporated herein by reference.

201. The actions or omissions of Defendants, as aforesaid, were motivated by evil motive or intent, and/or involved a reckless or callous indifference to the federally protected rights of Mr. Ramsey.

202. Mr. Ramsey is entitled to exemplary damages pursuant to 42 U.S.C. § 1983 in an amount to be proved at the time of trial.

**FOURTH CLAIM FOR RELIEF**

**(Attorney's fees pursuant to 42 U.S.C. § 1988 against all Defendants)**

203. All of the above allegations are incorporated herein by reference.

204. Mr. Ramsey is entitled to reasonable attorney's fees as part of the costs, and expert fees in this proceeding to enforce 42 U.S.C. §1983 and §1988).

**FIFTH CLAIM FOR RELIEF**

**Medical Negligence**

**(Against SWCMG Defendants)**

205. Plaintiffs reallege and incorporate by reference all other paragraphs of this Complaint as if full set forth herein.

206. Defendants are employees or agents of a private corporation that contracted with Douglas County to provide medical care and health services to inmates at the DCDF.

207. SWCMG Defendants and Defendant nurses are not entitled to any immunity under the CGIA or otherwise.

208. At all times relevant to this action, Plaintiff Ramsey was under the medical responsibility, care, and treatment of Southwest Correctional Defendants.

209. Defendant SWCMG Nurses and other care providers had a duty to provide reasonable medical care and treatment to detainees at the DCDF, including Plaintiff Ramsey.

210. Defendants had the duty to exercise reasonable care in the training and supervision of their employees.

211. These duties of care are informed by state law.  For example, under C.R.S. § 16-3-401, "prisoners arrests or in custody shall be treated humanely and provided with adequate

food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory and other legal obligation.

212. Through their actions and omissions, Defendant Nurses and other care providers breached their duty of care when they knowingly failed to assess, monitor, treat and care for Plaintiff Ramsey, despite the fact that he was in obvious need of immediate medical attention. It was foreseeable that he would suffer seizures and then status epilepticus by being denied his seizure medications, and it did cause him to suffer seizures and status epilepticus, which caused permanent brain damage.

213. Defendants had Plaintiff Ramsey's current medication list that was provided by the hospital. They failed to provide him any of his medications at any time.

214. Defendants failed to control Plaintiff Ramsey's seizures.

215. Defendants ignored signs of status epilepticus beginning in Plaintiff Ramsey.

216. Defendants failed to urgently transfer Plaintiff Ramsey to a higher level of care such as an Emergency Department.

217. Defendants failed to develop a management plan to bring Plaintiff Ramsey's seizures and psychosis under control.

218. Southwest Correctional Defendant Nurses failed to contact a physician for acute neurologic changes and seizures, and practiced outside the scope of their licenses.

219. Defendants failed to medicate Plaintiff Ramsey to prevent his seizures.

220. Defendants failed to urgently transfer Plaintiff Ramsey to an Emergency Department.

221. Defendants failed to perform an examination within the standard of care on July 19, 2016 and to provide a comprehensive management plan for Plaintiff Ramsey's post-surgical status and seizures.

222. SWCMG Defendant Doctors failed to monitor and/or develop a medical care plan consist with a physician's standard of care for Plaintiff Ramsey, and failed to provide training, supervision, and oversight of nurses.

223. Defendants failed to recommend policies, procedures, protocols, and/or guidelines and/or failed to implement and enforce policies, procedures, protocols, and/or guidelines that require nurses to contact a doctor or send prisoners to the Emergency Department rather than practice outside of the scope of their licenses.

224. Defendants had nurse-patient and/or doctor-patient relationships with Plaintiff Ramsey at all relevant times and were acting within the scope of their employment throughout the duration of these relationships.

225. With respect to their care and treatment of Plaintiff, Defendants owed him a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations.  Defendants breached that standard of care and were negligent in failing to properly assess, monitor, treat and care for Plaintiff Ramsey.

226. As a direct and proximate result of Defendants having breached their duty to provide reasonable medical care and treatment to Plaintiff Ramsey, he suffered significant physical and mental pain and suffering and other damages, and ultimately permanent impairment.

227. The Defendant CMGC d/b/a SWCMG d/b/a Colorado Correctional Medical Group is vicariously liable for the negligent acts and omissions by their agents and/or employees, including, but not limited to, those named individuals herein and is directly liable for its own negligent failures in training, policies, and practices.

228. Defendant CMGC d/b/a SWCMG is also directly liable as they have breached their duty to exercise reasonable care in the training and supervision of their employees and agent in a manner that provided the detainees under their care with reasonable medical care and treatment.

229. Defendants knew or should have known of the lack of supervision, experience, training among their employees and agents was likely to harm DCDF detainees in need of medical care, including Plaintiff Ramsey.

230. In failing to exercise reasonable care in the training and supervision of their employees and agents, as it relates to their providing reasonable medical care and treatment, Defendants were negligent and proximately caused the Plaintiff Ramsey's permanent injuries.

231. Defendants' negligence, in whole, or in part, was the proximate cause of Plaintiff's injuries and damages.  "But for" the denial of necessary medications and medical care by qualified medical providers, Plaintiff Ramsey would not have been injured and damaged as set forth herein.

232. As a result of the complained of negligence, Plaintiff Ramsey hereto has suffered damages, losses and injuries in an amount to be determined by the jury at trial as described in ¶ 158, *Supra*.

233. Plaintiff Ramsey suffered and continues to suffer economic and non-economic damages due to the Defendants' negligent conduct towards him, including but not limited to financial losses, medical expenses, and non-economic damages for impairment of his quality of life, inconvenience, pain and suffering, and extreme emotional distress.

Plaintiff hereto are entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages.

234. Defendants conduct was attended by circumstances of malice or willful and wonton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regards to the consequences to Plaintiff Ramsey.

235. Plaintiff Ramsey reserves the right to request punitive damages after sufficient discovery has been completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment for the Plaintiff and against Defendants and asks this Court to award him all of the relief allowed by law, including, but not limited to, the following:

A. Appropriate relief at law and equity;

B. Declaratory relief and other appropriate equitable relief;

C. Economic losses on all claims allowed by law;

D. Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined by trial;

E. Punitive damages on all claims allowed by law and in an amount to be determined at trial;

F. Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

G. Pre- and post-judgment interest at the highest lawful rate;

H.  Any further relief that this Court deems just and proper, and any other relief as allowed

by law

**PLAINTIFF DEMANDS A JURY TRIAL.**

Plaintiff's Address:
Benjamin Ramsey c/o Karla Ramsey MD
15419 Guadalupe Springs Lane
Cypress, TX 77429

Dated this 26th day of March, 2020.

Respectfully Submitted:

*s/Cheryl Trine*
Cheryl Trine, #38150
Trine Law Firm LLC
155 E. Boardwalk Dr. #400
Fort Collins, CO 80525
Phone: 970-391-9442
Fax: 1-970-458-1800
Email: ctrine@trinelaw.net

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2020, a true and correct copy of the above and foregoing was electronically filed and served using the CM/ECF system to the following:

Dawn Johnson
Sr. Assistant County Attorney
Douglas County Attorney's Office
Email: djohnson@douglas.co.us
*Attorney for Defendant:*
*Board of County Commissioners of the County of Douglas, Colorado*

Sara Cook
Vaugh & DeMuro
Email: scook@vaughandemuro.com
Attorney for Defendants:
Southwest Correctional Medical Group, Inc.;
Southwest Correctional Medical Group, PLLC;
Correctional Medical Group Companies, Inc.;
Southwest Correctional Medial Group, LLC;
Colorado Correctional Medical Group, PLLC;
Jennifer Trimble
Nurse Deimys Vigil
Dr. Timothy G. Moser, M.D.
Emily Barron, RN
Lindsey Gyger, RN
Sophia Helene Nix, LPN
Tina Holland, RN
Kathryn Davidson, LPN
Joan M. Cunningham, RN
Shauri N. Kron, LPN
Daisha Wade, LPN


*/s/ Cheryl Trine*
Cheryl Trine