# Exhibit A

EXHIBIT 8

**Kennon Tubbs MD**
13584 Carolina Hills Court
Draper, Utah 84020
(801) 502-3473
jailmd@gmail.com

September 4th, 2020

**Cheryl Trine**
Trine Law Firm LLC
155 East Boardwalk Drive #400
Fort Collins, Colorado 80525
ctrine@trinelaw.net
(970)391-9442

**In regard to Ben Ramsey**

Dear Ms. Cheryl Trine:

You requested that I review Benjamin Ramsey's care and treatment at the Douglas County Jail in July of 2016 and offer my professional opinions on whether Mr. Ramsey faced a known substantial risk of serious harm. I was also asked if reasonable measures were taken to abate that risk. In addition, you requested my opinions on whether the nurses and Dr. Moser met the National Commission on Correctional Health Cares (NCCHC) standard of care, and for Dr. Moser, the standard of care for a Medical Director in a jail. At trial, I will discuss basic principles of medicine and medical care delivery in a jail setting. I will use exhibits including diagrams and illustrations to help the jury understand my opinions.

I am a family practice physician and have practiced at the Utah State Prison for 16 years. I am currently the Medical Director for ten county jails throughout Utah and Wyoming. I am a certified provider by the National Correctional Commission on Health Care (CCHC-P). I have extensive experience with providing patient care and medical supervision of nurses and mid-level providers in correctional facilities. I am familiar with the standard of care to be provided by nursing staff, mid-level providers, and physicians in the correctional setting. As part of my experience and work history, I understand and regularly apply the National Commission on Correctional Health Care standards for health services in jails.

My opinions are held to a reasonable degree of medical certainty and are based on my education, training, knowledge, experience, and skill, as well as the documents and video footage provided to me. The following documents were provided to me for Ben Ramsey's case:

1. Ramsey SWCMG jail medical records bates stamped DCDF 001-130
2. Protective order
3. Third amended complaint
4. Interrogatories
5. Nursing protocols for seizure, status epilepticus, emergency transport.
6. Heather Reck Bechert affidavit bates stamped Bechert 001-004

1

7.  Diamond pharmacy log bates stamped Diamond Pharmacy 001-005
8.  Officer activity log
9.  Douglas County discovery and objections
10. Emily Barron Deposition
11. Jennifer Trimble Cell phone records
12. Andrew Small Deposition
13. Joan Cunningham Deposition
14. Karla Ramsey and Ben Ramsey video bates stamped Douglas Video 001
15. Kevin Duffy Deposition
16. Exhibits for depositions
17. Dr. Raymond Herr Deposition for Ramsey and Hartwell
18. Nathan Finley Deposition
19. Jennifer Trimble Deposition
20. Ramsey Booking records bates stamped PD 001-018
21. Lindsey Gyger Deposition
22. Timothy Moser MD Deposition and CV
23. Tina Holland Deposition
24. Deimys Vigil Deposition
25. Kevin Hartwell medical record
26. Depositions from Kevin Hartwell case
27. Video of Kevin Hartwell seizure activity
28. EMS log of Kevin Hartwell
29. EMS records for 11/30/16 of Kevin Hartwell
30. Castle Rock Adventist Hospital 11/30/16 through 12/13/16 overall review Kevin Hartwell
31. Rocky Mountain Neurology records 09/10/13 and 1/12/17-1/20/17 Daniel Kitei, DO pertaining to Kevin Hartwell
32. Incident Reports and Special Report regarding Hartwell
33. Contract between Douglas County and SWCMG
34. Contract between SWCMG and Dr. Timothy Moser
35. Nursing time cards for July 2016
36. Timothy Moser CV and Deposition
37. AVI Hartwell 2 video 17 minutes 13 seconds, 11/29/16 a.m.
38. Douglas County surveillance video 7 hours 59 minutes, 11/29/16 p.m. to 11/30/16
39. Kennon Tubbs MD expert report of care from Kevin Hartwell
40. 1 hour phone conversation with Karla Ramsey MD.
41. Deposition Robin Pettit
42. Deposition Landon Partridge
43. DCSO 003602 Confidential medical records of an additional seizure case. Page 1-80
44. Video footage of Ramsey transport to the jail.
45. Mark Spitz MD preliminary report.
46. Medical records and incident reports of other inmates including: Deposition Exhibits 30 (bates numbers DCSO 3602-3681), 31, 39, 55, 83, 87.
47. Heather Reck Bechert's deposition transcript and exhibits.

**Summary of Conclusions**

Each of the nurses in this case failed to take reasonable measures to abate a known substantial risk of serious harm to Ben Ramsey.  Not continuing prescribed medications, including medications to prevent seizures, for a man who came to jail from the hospital following brain surgery, poses a substantial risk of serious harm including seizures, status epilepticus (continuous seizures) permanent brain damage, and death that would be obvious to a lay person and would be especially obvious to any trained medical professional including nurses. There are different kinds of seizures.  Both Ben Ramsey and Kevin Hartwell suffered from complex partial seizures.  Kevin Hartwell was in the jail four months after Ben Ramsey, and both he and Ben Ramsey were purposefully left in status epilepticus for more than seven hours. Neither man was provided his anti-epileptic medications in the jail, despite the nurses knowing that they were seizing.  In addition, the nursing protocol for status epilepticus was not followed for either man, EMS was not timely contacted, Dr. Moser was either not contacted for known seizure activity and acute neurologic changes, or when he was contacted, he was given incomplete or incorrect information, and documentation to the hospital upon transfer was incomplete or incorrect.  Many nurses over many shifts acted in a similar manner for both Ramsey and Hartwell, as well as for other inmates before and after Ben Ramsey was in the jail.

For Ben Ramsey, many nurses (Gyger, Holland, Cunningham, Vigil, and Trimble) over many shifts knew that he came from the hospital following brain surgery with a list of medications, including anti-epileptics, but they failed to start him on any of his medications, despite knowing of the substantial risk of serious harm in failing to provide seizure medications to a man with a seizure disorder. They failed to house him in medical and provide him nursing assessments despite knowing he came to jail from the hospital following brain surgery with a list of 21 different medications. When informed by a physician that Ben Ramsey was suffering continuous seizures, Vigil, Barron, and Trimble failed to follow the nursing protocol for status epilepticus, failed to contact EMS, failed to contact Dr. Moser in a timely manner, failed to perform any full nursing assessments or any assessment in a timely manner, sent Mr. Ramsey in a patrol car knowing a doctor had diagnosed continuous seizures, and failed to provide critical information about those seizures and their failure to provide him any medications to the Emergency Department.  They covered up this critical information by never documenting it, which further endangered Ramsey's life, despite the obvious risk it would delay diagnosis and treatment of his continuous seizures, and that he would suffer additional brain damage or death.

It is well-known to medical professionals that the longer a person is left continuously seizing, the harder it is to stop the seizures and the greater is the brain damage.  That is why the status epilepticus protocol requires EMS be contacted after five minutes of continuous seizures, and directs that Valium be given "IM" or intramuscularly in a first effort to stop the seizures as quickly as possible.  Not only was this protocol never followed, but none of the nurses who testified were familiar with it, which indicates either they were instructed to behave differently than required by the protocol, or there is a systemic failure to train and supervise the nurses to ensure they correctly followed the policies and protocols.  During a May 10, 2016 staff meeting (Exhibit 31, DCSO 3607), Trimble instructed the nurses that 911 was called before a good assessment was done and to call her to go through assessments; and that the signs of a "real" seizure are "incontinence, bite tongue, hit their head," none of which conforms with the seizure protocol.  There was also a systemic failure to investigate bad outcomes and improve medical

3

care to avoid future bad outcomes, which indicates to me that the actions of the nurses were acceptable or even expected by their corporate employer.

Based on medical records of other inmates, including Kevin Hartwell, there was a custom of denying inmates critical medications including seizure medications, and timely access to medical treatment for seizures including continuous seizures.  From March to May of 2016, an inmate was sent to the hospital for status epilepticus at which time she was started on seizure medications.  The intake paperwork is missing and so it is unclear if this inmate notified nurses at intake of a seizure disorder but the medications were not provided until she went into status epilepticus. However, after going into status epilepticus and being prescribed Keppra, she had seizures for which the nurses including Vigil failed to contact Dr. Moser according to their documentation. Nurse Holland decided the seizures were "pseudoseizures" which she is not qualified to do within the scope of her license, especially when a physician had diagnosed epileptic seizures and prescribed medication. (Exhibit 30).

On March 5, 2016, an inmate was documented as being sent to the hospital after suffering two seizures in a row, which was noted to be "timely," but was found to be in status epilepticus at the hospital and airlifted to a higher level of care where she was released from custody. HSA Trimble was informed by the hospital that the inmate was in status epilepticus and sent to UCH. (Exhibits 31, 83, and 87 - page 105). Similarly, EMS was told that Kevin Hartwell started seizing five minutes before EMS was called and there were no witnesses, even though he was witnessed to be seizing for over seven hours. The hospital was informed that Ben Ramsey was being transferred due to his blood pressure and follow up for brain surgery without any mention of his continuous seizures.

The March 5, 2016 transfer was submitted to NCCHC for accreditation, and it raises the question for me of whether information was falsified to obtain accreditation.  Whether there really were just two seizures before EMS was contacted, which is questionable based on the inaccurate documentation of both Ramsey and Hartwell's continuous seizures, Trimble knew this inmate was in status epilepticus and yet allowed or directed nurses not to contact EMS for Ramsey and then Hartwell four months later.  The nurses ostensibly were informed on May 10, 2016 that it was timely to contact EMS after 2 consecutive seizures, but the nurses failed to contact EMS for Ramsey's continuous seizures and for Hartwell on two occasions.  Had Vigil contacted EMS the first time Hartwell suffered two seizures in a row and then started him on seizure medications, his status epilepticus could have been prevented. She never even contacted Dr. Moser.  Four months earlier, Vigil was informed by a physician that Ramsey was continuously seizing, and she failed to contact EMS or a doctor, but was never reprimanded nor any policies and practices changed.  It appears that the way the medical care for Ramsey and Hartwell was delivered was standard operating procedure at the Douglas County Jail in 2016.

On August 13, 2016, an incident report documents that an inmate was unresponsive to sternal rubs but regained consciousness when exposed to an ammonia capsule.  Even then he could not hold his head up, but EMS was not contacted until much later, nor was Dr. Moser called.  When Dr. Moser was finally contacted, the man was sent to the ED by patrol car. (Exhibit 39).  Another inmate in August of 2016 was not given his seizure medications and was seizing when EMS was contacted. It is unknown from the documentation whether he was in status epilepticus.  (Exhibit 55).

Within three months, Kevin Hartwell was not provided his prescribed seizure medication even after he began seizing until he went into status epilepticus.  Vigil did not contact Dr. Moser

for Hartwell's seizures, and Gyger neither performed a nursing assessment nor followed the nursing protocol for status epilepticus when he was continuously seizing for over 7 hours, as captured by video.  She left the jail during her shift while Hartwell was suffering a medical emergency.  A LPN testified that HSA Trimble told her to monitor Hartell by video rather than go into his cell, and so he was left alone in status epilepticus for five hours before a sergeant demanded that something be done for him.  Only then was EMS contacted.  By the time Hartwell was sent to the hospital, he was in shock with unstable vital signs, kidney failure, and had to be intubated for many days in order to stop the seizures.  According to Dr. Spitz,  Kevin Hartwell suffered permanent brain damage as a result, as well as a stroke.  He was not provided his prescribed blood pressure medications or diabetic medications at the jail, and the nurses routinely failed to follow the nursing protocols or contact Dr. Moser.  Both Kevin Hartwell and Ben Ramsey were cut off their benzodiazepine medications without any tapering or substitution, which increases the risk of seizures.

I found the following systemic problems in the jail looking at the custom and practices during the time Ben Ramsey was in the jail as well as other inmates including Kevin Hartwell:

1. Not continuing critical medications including seizure medications at intake;
2. Not following nursing protocols, and failing to train/supervise to follow protocols including the status epilepticus protocol and hypertensive emergency protocol;
3. Not following policies, and failing to train/supervise to follow policies including the policies on continuation of medications at intake;
4. Failing to fulfill gatekeeper roles (practicing outside scope of license) by failing to contact doctor or EMS;
5. Covering up unconstitutional conduct by misrepresenting information, especially regarding hospital transfers and the reason for the transfer;

Failing to make any changes to policies and procedures after Ramsey and then Hartwell, including a failure to discipline nurses, which indicates acceptance or approval of the unconstitutional actions at the corporate level.

**Major Policy and Procedure violations and deviations**
Critical errors and failures to follow the policies and procedures set forth by SWCMG include:

- **Responsible Health Authority  SWCMG-A02** Southwest Correctional Medical Group, Raymond Herr, Timothy Moser MD
- **Administrative Meetings and Reports SWCMG-A-04**  Timothy Moser MD, Raymond Herr MD, Jennifer Trimble RN
- **Policy And Procedures SWCMG-A05**  Lindsey Gyger RN, Timothy Moser RHA/MD, Tina Holland RN, Joan Cunningham RN, Emily Barron RN, Jennifer Trimble RN/HSA
- **Quality Management Program SWCMG-A06 with Medical Peer Review**
-  Jennifer Trimble RN/HSA, Timothy Moser MD/RHA, Raymond Herr SWCMG medical director.
- **Communication on Patients Health Needs SWCMG-A08** Jennifer Trimble RN/HSA, Lindsey Gyger RN, Tina Holland RN, Deimys Vigil
- **Clinical Performance Enhancement SWCMG-C02**  Timothy Moser MD RHA, Jennifer Trimble HSA/RN
- **Staff Development and Training SWCMG-C03**  Jennifer Trimble RN HSA
- **Employee Evaluations** SWCMG-C09.1  Jennifer Trimble RN HSA
- **Prescription Medications SWCMG D01.2** Lindsey Gyger RN, Tina Holland RN, Joan Cunningham RN, Deimys Vigil RN, Jennifer Trimble RN
- **Psychotropic Medications SWCMG-D01.4** Lindsey Gyger RN, Tina Holland RN, Joan Cunningham RN, Deimys Vigil RN, Jennifer Trimble RN
- **Continuation of medications began prior to incarceration SWCMG-D02.1** Lindsey Gyger RN, Tina Holland RN, Joan Cunningham RN, Deimys Vigil RN, Jennifer Trimble RN
- **SWCMG Medical Referral Form SWCMG-D05.1** Emily Barron RN
- **Receiving/Intake Health Screening SWCMG E-02**  Lyndsey Gyger RN
- **Emergency Services SWCMG-E08** Emily Barron RN, Deimys Vigil RN, Jennifer Trimble RN
- **Inmates in isolation/Segregated Inmates SWCMG-E09** Joan Cunningham RN
- **Medical Transportation/Patient Escort SWCMG-E10**  Emily Barron RN
- **Nursing Assessment Protocols SWCMG-E11** Deimys Vigil RN, Emily Barron
- **Nursing Assessment Protocols SWCMG-E-11** (Supervision of) Jennifer Trimble RN, Dr. Timothy Moser MD.
- **Continuity and Coordination of Care During Incarceration SWCMG-E12**  Lindsey Gyger RN, Tina Holland RN, Joan Cunningham RN, Deimys Vigil RN, Jennifer Trimble RN
- **Individualized Treatment Plans SCWMG-E-12.1**  Lindsey Gyger RN, Tina Holland RN, Joan Cunningham RN, Deimys Vigil RN, Jennifer Trimble RN
- **Internal Monitoring of Services SWCMG-A06.1**  Dr. Raymond Herr MD
- **Transfer of Patients with Acute Illnesses SWCMG-E08 and E-08.1.**  Emily Barron RN, Jennifer Trimble RN
- **Continuity and coordination of care during incarceration SWCMG-E12** Lindsey Gyger RN, Tina Holland RN, Joan Cunningham RN, Deimys Vigil RN, Jennifer Trimble RN, Emily Barron RN

6

- **Chronic Care SWCMG-G01** Lindsey Gyger RN, Tina Holland, Timothy Moser MD
- **Patients with Special Health Needs SWCMG-G02** Lindsey Gyger RN, Timothy Moser MD
- **Medical Housing SWCMG-G03** Deimys Vigil RN, Jennifer Trimble RN/HSA, Timothy Moser MD/RHA
- **Health Record SWCMG-H01**  Deimys Vigil RN, Jennifer Trimble RN/HSA
- **Management of Health Records SWCMG-H03** Jennifer Trimble RN/HSA
- **Responsibilities of the On-Site Medical Director**  Timothy Moser MD
- **Responsibilities of the On-Site Health Service Administrator**  Jennifer Trimble RN
- **Responsibilities of the Registered Nurse (RN)** Lindsey Gyger RN, Deimys Vigil RN, Emily Barron RN

## Background Facts and Conclusions

Ben Ramsey suffered a traumatic brain injury in a motorcycle accident in 2012. He had been living in a group home in Colorado prior to his hospital admission, but began to suffer behavioral problems due to malfunction of his ventriculoperitoneal (VP shunt). In early July 2016, Ramsey was admitted to Parker Adventist Hospital for a ventriculoperitoneal (VP) shunt revision. After the surgery, he bit an attendant, and for that he was arrested at the hospital and sent to the Douglas County Detention Facility (Douglas County Jail).

### July 19th, 2016

Ramsey was transported to jail by Officer Nathan Finley and Finley brought the discharge paperwork with Ramsey to jail. Finley handed the discharge paperwork to Lindsey Gyger, RN, who processed Ramsey's medical paperwork and completed an intake examination at 1815 (6:15 p.m.). DCDF005-007 The initial triage assessment done by Gyger indicates that Ramsey's behavior was appropriate and he was cooperative. He was not hallucinating, he was responsive and lethargic. She reported he had normal mobility. She also reported that he was not developmentally disabled, confused, or disoriented. She documented no scars or lacerations despite having brain surgery earlier that month. However, she testified that she noticed a large scar on Ramsey's head, and his hair was shaved indicating a recent surgery. *Gyger Deposition pg 100* His blood pressure was 150/83. She noted mental illness in the past and referred Ramsey to see Heather Reck for mental health. Gyger then referred Ramsey to a "special housing unit" and referred him to see a medical provider.

Gyger then reviewed the "physician instructions" from discharging physician Dr. Margie Kubowicz. These instructions included Regular diet, normal activity, allergies to sertraline, and a problem list. The problem list included Violent behavior, Shunt malfunction, Aggressive behavior of an adult, and Cerebral ventriculomegaly. Gyger did not add the problem list to the intake form or attempt to notify the mental health team or the medical provider of the current and recently updated problem list provided by the hospital.

Gyger then reviewed a list of medications provided by Dr. Kubowicz. This was labeled, "Home medication list: Start these Medications" The list of medications included 21 medications ordered by the discharging physician, including seizure medications.DCDF014-017 Gyger evaluated the list but did not order any of the medications. Nine of them were critical medications. These included:

- Mental health medications: Haloperidol 5mg, Guanfacine 2mg, Donepezil 5mg, Lithium 900mg, Lurasidone 60 mg, Olanzapine 10mg, Temazepam 15mg
- Seizure medications: Oxcarbazepine 15mg, Clonazepam 0.5mg
- Blood pressure medication: Amiloride 5mg to decrease intracranial pressure
- Brain trauma medications: Desmopressin 0.1mg, Medroxyprogesterone 400mg
- Pain Management medications: Ibuprofen 600mg, Acetaminophen 1000mg
- Asthma medication: Albuterol Inhaler
- Lipid medication: Fenofibrate 96mg
- Diabetes medication: Metformin 500mg
- Acid reflux medication: Pantoprazole 40mg
- Skin medication: Triamcinalone 0.1% ointment
- Vitamin B 12 supplement

Gyger testified that because Ramsey was on so many different medications it would be the physician's job to determine medication interactions and if all medications were appropriate.

Gyger Deposition page 106.  However, Gyger did not attempt to contact Dr. Moser or Dr. Kubowicz to discuss this medication list.  Gyger did not attempt to contact the provider to discuss Ramsey's benzodiazepine usage of Clonazepam and Temazepam with disregard for the "Benzo warning" in the intake screening form. DCDF004.   Gyger also testified that if someone came to the facility with the medication they would not provide the patient with that medication until it was verified by a physician. Gyger deposition page 120   Officer Finley brought a bottle of Latuda from the hospital for Ramsey to take.  Gyger did not make any attempt to contact a doctor to approve this medication.  The Latuda medication was then placed in Ramsey's property but was never ordered for him to receive it.  Gyger reported she attempted to verify the medication list by faxing a ROI (request for information) to the pharmacy, nursing home, and hospital but did not contact Dr. Kubowicz or Dr. Moser. Gyger Deposition page 111  The medication list was signed and dated by a physician, Dr. Kubowicz, 7/19 at 16:45.DCDF16 Gyger did not follow the "Continuation of medications prior to incarceration" policy when verifying and ordering these medications. SWCGM-D02.1  She knew of the substantial risk of serious harm from not providing a man who came right from the hospital following brain surgery with any of his 21 different medications, including seizure medications because she testified she knew and that risk would be obvious, and yet she failed to take reasonable measures to abate the risk.  Faxing a ROI and doing nothing else was not reasonable, and did nothing to abate the risk.

Contacting Dr. Moser  would be all a reasonable nurse would need to do to verify the active prescription and get the medications started.   Gyger did not attempt to contact Dr. Moser and obtain an active order to begin the medication.  It would have been acceptable for Gyger to order the medication based on the signed prescription by Dr. Kubowicz pending a provider review of the medication the next day.  Nonetheless, no medication was ordered and no provider was contacted to notify them that medications were discontinued.  At the end of her shift on the morning of July 20th, Gyger's shift report read, "Ramsey--- Release of information sent to Parker Adventist and TBI  2 years ago.  Aurora Residential Alternatives for Meds.  MVA bit a nurse info records at assisted living."   Gyger made no notation in the shift report about the 21 medications that needed to be verified or ordered.  In addition, she failed to house Ramsey in the medical department to ensure that he would receive regular nursing assessments and medical care.   She failed to start him on a benzodiazepine withdrawal protocol.

### July 20th, 2016

The evening of July 19th, 2016 Ramsey was transferred to the K Pod segregated population observation housing unit.  Tina Holland RN was the day nurse.  She reviewed Gyger's shift report.  She testified that she was not informed of Ramsey's hospital medication list, and yet she wrote in her shift report "ver med" which means she did know about his medication list.  She testified that she did not review the chart and did not know a medication administration record (MAR) had not been set up for Ramsey by Gyger, but she had to know a MAR had not been set up if she wrote "ver med" which would be the first step to setting it up. Holland testified that it would be the intake nurses' responsibility to verify medications and implement a medication administration record.  Holland testified that Gyger did not fulfill these nursing duties as required.  Holland testified it would have been the responsibility of the night nurse to do a "24 hour chart check" during the night shift.  In other words, she testified that everyone around her should have verified and started Ramsey's medications except her, even though she was aware of the need to verify them based on what she wrote in the shift report to the next shift.

9

At the end of her shift, Holland's shift report read, "Ramsey-- ver med-TBI x 2 years ago bit nurse."  Holland testified, "I do not know what *ver med* means."  She testified that she did not verify Ramsey's medications or issue any medications to Ramsey.  Holland knew of Ramsey's recent hospitalization from Gyger's shift report and discussed Ramsey with Cunningham RN at the end of her shift. Thus, she knew of Ramsey and knew he had a chart with a medication list. Holland knew that the medications needed to be verified, or she would not have written "ver med" to the oncoming shift.  She knew of a substantial risk of serious harm in not providing a patient coming from the hospital following brain surgery with any of his medications including seizure medications because that risk would be obvious to any nurse.  She failed to take any measures to abate the risk.  "Ver med" in a shift report means either she verified Ramsey's medications or they needed to be verified. She did not verify them or start them, and so if she told Cunningham she had verified them, this falsehood put Ramsey at great risk of never receiving any medications.  If she told Cunningham that the medications needed to be verified, then she failed to do it despite knowing of the substantial risk of serious harm to Ramsey.  She failed to take reasonable measures to abate that harm.

On July 20th, 2016 Heather Reck, a Licensed Professional Counselor reported doing a mental health check on Ramsey in K pod.  She reported Ben having a hard time staying awake and "I knew something was wrong with him."  She reported to the officer, "He should not be here (K Pod)".  She discussed her concerns with medical and charted a note.  She documented concerns for Ben being housed in the nonmedical area due to his physical state, not receiving his medications, and that the lack of care was wrong.  She testified that this documentation had been subsequently removed by someone else. *Bechert 002-004*  Holland testified she did not remember speaking to Heather Reck that day about Ramsey.  Heather Reck  testified she went to the medical unit after interviewing Ramsey and reported her concerns about Ramsey.  She noted that something was wrong and he could not communicate. Holland testified that a nursing assessment would have been indicated had she known of Ramsey's condition but was not notified.  She testified that if LPN Davidson was notified by Reck of Ramsey being non communicative, then it would have been Davidson's responsibility to notify her for a nursing assessment.

At 1800 pm July 20th, 2016 Holland gave a shift report to Joan Cunninham RN, the night nurse.  Neither person remembered what was passed on verbally regarding the verification of medications for Ramsey.  The documentation of the shift report read "ver med."   Cunningham was aware of Ramsey and his condition when she came on shift and read the shift report. She knew that either his meds needed to be verified, or if they had been verified that they needed to be ordered or administered, and yet she failed to take any reasonable measures to ensure Ramsey received his medications, knowing he came from the hospital and was housed in the Special Management Unit.  She documented that she observed Ramsey at 2014 (8:14 p.m.) in a Segregated Population Log that she created and put into Ben Ramsey's chart, and thus saw his chart. She documented under general appearance that he was "watching TV." She testified that the TV was in the dayroom and most likely Ramsey was staring out the window in the door, and so she assumed he was watching TV, but she could not remember it.  She testified that she would have spoken with him through the door but he did not respond, or she would have documented it. No other nursing assessment was completed and Cunningham testified there was no need to do one. *DCDF021*  Cunninham testified that neither she nor the LPN on duty had a responsibility to evaluate Ramsey or provide medication to him during the night shift.  At no time was the

medical provider contacted to be involved in the care.  At the conclusion of the night shift, Cunningham did not include Ramsey in the shift report to the oncoming nursing staff, thus indicating that nothing further needed to be done about Ramsey.  Cunningham failed to take reasonable measures to abate the substantial risk of serious harm in not providing a patient who came from the hospital on 21 different medications including seizure medications, any of those medications.

### July 21st, 2016

On July 21st, 2016 at 9:30 am Karla Ramsey M.D. attempted to speak with her son via video conference.  Ben had difficulty hearing and communicating with Dr. Ramsey.  Dr. Ramsey and Heather Reck went to see Ben in person through a glass divider.  Dr. Ramsey immediately reported to Reck, "He is having seizures."  Upon learning this,  Reck contacted Deimys Vigil RN to come to speak with Dr. Ramsey in person in the interview room.  Dr. Ramsey then reported to Vigil that Ben was having continuous seizures.  Vigil testified that Ben was not sitting in visiting when she arrived. Vigil deposition page 88  Vigil then went to Jennifer  Glenn (now Trimble) to report Dr. Ramsey's diagnosis of continuous seizures.  Vigil testified that she was given instructions by Trimble to verify his medications.  Vigil did not assess Ramsey at the time of being notified of continuous seizure activity by Dr. Ramsey.   Neither Vigil or Trimble attempted to do a nursing assessment and evaluate Ramsey for the next five hours (approximately 11:00 a.m. to 4:00 p.m.) after hearing of the diagnosis of continuous seizures from Dr. Ramsey.  Instead, Vigil reported the complaint to Trimble and then verified the medications. By 2:00 p.m., Vigil had verified Ramsey's medications and received orders for most of them from the Nurse Practitioner.

At 12:59 p.m. (6:59 UTC),  Dr. Ramsey sent an email to Heather Reck with attachments including a letter detailing physical findings from a physician including, "mental somnolence, loss of language, continual seizures after brain surgery.  She also stated "He could worsen or die there.  The shunt could be malfunctioning." (Exhibit 9.2) Dr. Ramsy then wrote a complete medical history of Ben for the jail.  DCDF023-024  Highlights of this letter include:
- Complex partial seizure disorder
- Traumatic Brain injury
- Hydrocephalus with recent neurosurgery for VP shunt repair 7/4/16
- Severe hearing impairment
- Diffuse axonal brain injury resulting in cognitive impairment
- "Today I saw my son.  He is no longer communicative and is not understanding speech.  I observed almost continual spells of somnolence, fixed eye movements to the right followed by nystagmus.
- He has had an acute change in mental status with acute onset of almost continual complex partial seizures.
- No one knows what medications he has been given.

This email included a detailed patient past medical history, hospitalization record, concerns for medication not being administered, and detailed information regarding the continual complex partial seizures and an acute mental status changes.DCSO 000415  This document was placed into Ramsey's chart.

At 14:00 Cheryl Johnson, mental health nurse practitioner, was contacted for medication orders.  She did not evaluate Ramsey in person or by phone.  She approved and ordered medications Donepezil, Lithium, Latuda, Metformin and Trileptal.  Johnson ordered lab work,

neurologic checks every eight hours and to start on the Benzodiazepine protocol.  DCDF 026 Johnson did not order Clonazepam or Restoril.  It is unclear if Johnson was notified by Vigil at that time that Dr. Ramsey was concerned that Ben was having continuous seizures, had not had a nursing assessment, or had received any seizure medication since his arrival.

At 14:16 Jennifer Trimble, HSA, exited the main gate of the facility, and  according to proximity card entries she was not on property from that point forward.  Her phone records show that she called the nurse's station at 2:16 p.m.

At 14:52 Johnson received an email from Reck detailing her concerns for Ben and his continuous seizures.  She also reported to Johnson that she had seen him on July 20th and he was "not communicative."  This email included the medical summary from Dr. Ramsey.  Johnson was given Dr. Ramsey's phone number but did not contact her or Dr. Moser.

Between 2-3:00 p.m., Dr. Ramsey and her attorney contacted Captain Duffy.  Vigil testified that Captain Duffy  transferred the call to the medical department.  At 3:03 p.m.,Trimble called the nurse's station according to her phone records.  At 3:08 p.m., she called Ramsey's attorney.  At 3:09 p.m., she called the nurse's station again, and at 3:11 p.m. she called Captain Duffy's office and then his cell.  At 3:12 p.m., Trimble called Dr. Ramsey's attorney again.

Trimble testified that Captain Duffy called her at home; she called Dr. Ramsey and was told Ben Ramsey was seizing and what to look for with his eyes; and then she called Vigil and told her what to look for with Ramsey's eyes (T. depo page 111-125).  She told Vigil to put Ramsey in medical (T. depo page 111-112).

At 15:14, Dr. Ramsey emailed Reck, "I have spoken to the captain, he is having repetitive seizures with acute mental status changes.  How long does he have to seize? My son is at risk for irreparable harm." DCSO1214

At 15:56 Officer Pettit reported that Ramsey was moved to the medical cell 4 and vitals were obtained.

At 16:00 Vigil completed a nursing neurological assessment and benzodiazepine protocol worksheet on Ramsey .  It was noted that Ramsey had pinpoint pupils 3mm and was unable to communicate. DCDF029   This was a change in mental status from the intake examination done by Gyger on 7/19/16.  This was an acute neurologic change from the intake examination findings of "responsive and cooperative.  Vigil did not report the acute mental and neurologic change to Moser or Johnson after the nursing assessment was completed. DCDF032  Vigil testified that she requested Trimble speak with Dr. Ramsey about Ben's continuous seizures.  Even though Ramsey now had a provider order for medications at 14:00, no medication was given at that time or any time during his incarceration.  Trimble testified that Vigil called her and said Ramsey's vital signs were stable, he was answering questions appropriately and she called Karla back and so reported, but there are no phone calls in her phone records around 4:00 p.m. when the assessment was performed.  The next phone call was from Dr. Ramsey and her attorney to Trimble at 6:12 p.m., after shift change.

At 16:54 Reck received an email from Dr. Ramsey which stated, "I'm frantic about his mental somnolence, loss of language, and continual seizures.  He could worsen and die there, The shunt could be malfunctioning." Emails Reck 007  This email was placed into Ben Ramsey's chart.

At 17:21 Vigil contacted Dr. Moser for medication orders for Ramsey. Moser ordered Desmopressin, Tylenol, nebulizer as needed treatments and Prilosec. SWCMG001155 Vigil did not administer these medications at this time.

Dr. Moser approved the rest of the medications from the hospital list. Dr. Moser reported that Vigil did not notify him that Ramsey was having acute mental status changes, continuous seizures. Dr. Moser testified that no medical staff or custody staff notified him on July 21st, 2016 but should have. Moser page 226 Moser testified that he was unaware that Dr. Ramsey had contacted the jail on multiple occasions throughout the day. He did not know of Dr. Ramsey's diagnosis of continuous seizures, acute mental status changes, nystagmus, and continuous partial complex seizure activity.

Officer Robin Pettit was tasked with security evaluations and well being checks of Ramsey while housed in the infirmary.

At 17:23 Pettit reported, "Inmate just stared at the deputy and would not verbally respond."

At 17:29 Pettit reported, "Inmate has stood up to look at the dinner tray, but has yet to take it and stares at the door."

At 17:59 Pettit reported, "Ramsey is still staring at the tray, he has not had a meal since yesterday." DCSO0002991 She testified that she informed Vigil of her observations.

Vigil's end of shift report read, "Ramsey-- several med issues. TBI, recent brain surgery 7/4/14. Mom called attorney b/c pt has been here since 7/19/16. Mom is a doctor. All meds verified. Neuro checks and benzo protocol Q8 hours" (DCDF042) She failed to document that a physician diagnosed continuous seizures, or that she had observed an acute neurologic change.

At 18:00 Emily Barron RN then came on shift. At 6:12 p.m., Trimble's phone records reflect a call from Dr. Ramsey's attorney. Dr. Ramsey remembers being on the call. At 6:16 p.m., Trimble called the nurse's station. Trimble testified that after shift change, Barron called Trimble asking why Ramsey was in medical, but the phone records do not support her testimony. At 6:29 p.m., Trimble again called the nurse's station according to her phone records, and at 6:38 p.m., the nurse's station called her back. That would have been Emily Barron, RN calling Trimble back. At 6:41 p.m., Trimble called Dr. Ramsey's cell phone. At 6:44 p.m., Deputy Pettit documented Supervisors into medical.

At 18:45 a neurological assessment was done by Barron. Findings included poor speech, altered gaze, and elevated blood pressure 0f 143/100. At 6:48 p.m., Trimble again called the nurse's station according to her phone records. She testified that Barron reported seeing Ramsey's eyes doing what Dr. Ramsey reported observing. They discussed the altered gaze and poor speech. Trimble instructed Barron to send Ramsey to the hospital. EMS was not contacted and Barron allowed Ramsey to be transported in a patrol car 30 minutes after receiving the order from Trimble. Ramsey was not able to sit up right in the back of the vehicle and officers laid him across the back seat. Barron allowed officers to transport Ramsey in a patrol car.

Policy states who are unable to sit up during transport shall be transported via ambulance. SWCMG000764.

Barron filled out a "Medical referral form" dated 7/21/16 without a time noted. Barron wrote Ramsey had a history of traumatic brain injury with recent VP shunt 7-4-16, hypertension 143/100. CRAH0034 However, Barron failed to provide an appropriate emergency record form per protocol, or information regarding Ramsey's continuous seizure activity with altered gaze and witnessed seizure activity since 10:00 that day. She also failed to notify the emergency

13

department that Ramsey had not received any medication since July 19th when he was last at the hospital.

At 7:12 p.m., Trimble called Dr. Ramsey and told her they were sending her son to the hospital.  Trimble then called Captain Duffy at 7:14 p.m.  She never contacted Dr. Moser.

**Recurrent Nursing behaviors and lack of oversight.**

Dr. Timothy Moser testified that he never reviewed the nursing protocol for status epilepticus and was not familiar with the nursing protocols for hypertension emergencies.  Moser page 77  He also testified that he never completed a quality assurance investigation into any staff member as the medical director. Moser page 89  He testified that he was not familiar with the National Commission on Correctional Health Care (NCCHC) standards.  He did not know the requirements for physician oversight for accreditation with NCCHC.  Moser page 96,104  Dr. Moser testified he did not specifically discuss emergency services provided by the medical team to ensure access and timeliness.  He did not complete any investigation into emergency transports of specific patients.  Dr. Moser was unaware and unable to communicate the requirements and responsibilities of the position.  He testified that he did not attend monthly medical staff meetings or administrative meetings. He delegated all NCCHC physician administrative duties to the Health Service Administrator, (HSA) Jennifer Trimble.  He only attended a quarterly Medical Administrative Committee (MAC) meeting. Moser page 98  Moser did not participate in a continuous quality improvement (CQI) program and was not the active head of the committee. He testified that he had no involvement with CQI during his employment as the medical director.  He also testified that he never reviewed Ramsey's medical chart. Moser page 154,247  Moser testified that he should have investigated and obtained medical records in order to train the nursing staff adequately.  Moser page 241 Moser testified that everyone who had contact with Mr. Ramsey bears responsibility for what happened to Mr. Ramsey.  Moser testified that no investigation into medication verification, ordering, or administration was done. He also testified that no changes were instituted to medication verification, ordering, or administration to ensure future patient care was not compromised.
This resulted in complete disregard of his medical director responsibilities. SWCMG000853 Exhibit 5 pg 81

Lindsey Gyger RN testified that she was not trained in the pertinent protocols and intake policy and procedures by SWCMG.  She testified that no reprimand, investigation, or training resulted from her care of Ramsey or Hartwell.  She also testified that her care was appropriate and she would not change anything if another patient presented to the jail with similar complaints.  She did not receive any retraining or suggestions of quality improvement from her supervisor,  Jennifer Trimble or medical director, Dr. Moser.  She continued to complete her tasks in a similar manner to the conclusion of her employment.  She was terminated for cause not related to patient care.

Tina Holland, RN testified that she was never trained on the pertinent protocols or policy and procedures of the care for Ramsey.  She also testified that at the time of her deposition she was never trained on the pertinent protocols, policy and procedures.  She was never notified of any wrongdoing by her supervisor, Trimble.  She reported that she would continue similar care for patients in the future and did not make any mistakes related to Ramsey care.  She also testified that she did not see any problems with other nursing care in this case.

Joan Cunningham, RN testified that she was never reprimanded for her care of Ramsey. She reported that no investigation, training, or changes were made to ensure the verification of medications. She also testified there was no investigation into the continuation of medications prior to incarceration by Trimble on Ramsey's care.

Vigil testified that Jennifer Trimble instructed the nursing staff to not go looking in the chart of Ramsey at all. Vigil Deposition page 224

Jennifer Trimble testified that Gyger, Holland, and Vigil did not need to verify the medications from the hospital. Trimble page 33-35   Jennifer Trimble testified that if she was informed that a patient was suffering continuous seizures by a doctor she would be required to, "look into it" and see what was happening.   Trimble testified that she was not notified by Vigil about the visit with Dr. Ramsey or the report of continuous seizures. Trimble Page 92  Trimble testified that she spoke with Dr. Ramsey.  Trimble was notified verbally that Ben had "many" seizures and would look up to the left or right when seizing.  Dr. Ramsey instructed Trimble that Ben's gaze would go off in a different direction when having seizures. Trimble page 90  Trimble reported that she spoke with Dr. Ramsey three or four times on July 21st.  Captain Duffy contacted her and requested that she contact Dr. Ramsey around 1400.  At that time  Dr. Ramsey reported that Ben was having seizures and was not getting his medication.  Dr. Ramsey provided background information about Ben's brain injury and shunt placement.  Trimble requested that Vigil bring Ramsey down to the nursing station to assess him and start him on his medications immediately.

When Trimble was notified by Dr. Ramsey that Ben was having "continuous seizures", Trimble did not demand an immediate emergent nursing assessment, contact Dr. Moser, review Ramsey's medical chart, or request the nursing staff institute the seizure protocol.  Trimble testified that she delegated a complete nursing assessment to Vigil at around 15:00. Trimble page 88,112,120  Trimble testified that Vigil should have contacted Moser, EMS, and Trimble when she first met with Dr. Ramsey and learned of Ben's continual seizure activity. Trimble page 91 She also testified that the medications did not need to be approved by Dr. Moser because they had a list from the hospital and Vigil knew she could do that. Trimble Page 114  Trimble testified that Vigil  should have sent Ramsey to the hospital after noting the acute mental status changes of lack of verbal communication during the nursing assessment done at 16:00. She also stated that Moser should have been contacted at that time. Trimble page 123  Trimble reported that she did not know that Ramsey had been in a blank stare from 17:23-18:00 per the officer reports and was not notified by the officers of their observations.  She reported that Barron contacted her and reported Ramsey to have high blood pressure and his eyes were gazing to the side.  Trimble assumed that this was seizure activity and instructed Barron to send him to the hospital. Trimble Page 129 At 18:48 Trimble was notified by Barron of the continuous seizure activity.  Trimble did not tell Barron to begin the seizure protocol or contact EMS for transport despite thinking that Ramsey was having seizures.  Trimble knew that Ramsey was seizing for four to eight hours before she directed that he be sent to the hospital. Ramsey continued to have seizure activity without medication or emergency medical response for the next 40 minutes until arrival at the hospital.  The transport was done by patrol car without medical management inroute.

Dr. Karla Ramsey was contacted to discuss a timeline of events.  She reported that she first saw Ben at about 9:35 a.m. by telemate with Heather Reck present.  At approximately 10:00 she went with Ben and Reck for a court appearance.  At approximately 10:30 a.m. she examined

15

Ben with Reck present.  At approximately 10:40 she met with Vigil without Ben being present, and told Vigil that she was a medical doctor and had observed continuous seizures.  At approximately 11:00 she left the facility and went to lunch and drove downtown Denver to her attorney's office arriving at 13:00 and sent an email to Reck regarding continuous seizure activity.  At 13:30 she met with her arroney.  At 14:00 Karla Ramsey and the attorney contacted Captain Duffy to discuss Ben's continuous seizures.  At 14:15 Karla sent emails to Reck regarding Ben's medical history. Shortly after 15:00 (15:08 and 15:12). Ramsey's attorney had two phone conversations with Trimble.  At 18:12 Dr. Ramsey and the attorney called Trimble for an update.  At 19:12: Dr. Ramsey was contacted by Trimble and notified that Ben was having seizures and would be transported to the hospital.  Ramsey was not transported until 19:31.  At 19:40: Dr. Ramsey arrived at the emergency department to provide medical information about Ben's condition to the ER staff.

Ben Ramsey was released from the hospital after undergoing brain surgery and taken into custody at the hospital by the Parker Police Department.  He was admitted into jail and a nursing assessment and intake examination were completed by Lindsey Gyger, RN.  After the intake process was completed,  Gyger recognized the risk of having Ramsey in jail testifying, "I felt it was inappropriate for him to be in jail."  Gyger failed to institute intake triage screening per policy SWCMG E-02.  This policy states, "Arrestees with signs of head injuries, serious illness, which are identified during the completion of the medical clearance screening which necessitates, "next day" evaluation by the health service staff will be scheduled by the intake nurse. SWCMG000726  Gyger also violated policy SWCMG-E12 which states, "When a patient returns from hospitalization, the discharge is coordinated with onsite health care personnel, and discharge instructions are reviewed.  Appropriate orders are written for housing and follow-up treatment. SWCGM000768

Gyger failed to order critical medications upon Ramsey's admission at the jail.  Gyger failed to contact Dr. Moser for Ramsey's current benzodiazepine prescriptions or institute the benzodiazepine withdrawal protocol upon intake and discontinued this medication.  Gyger failed to obtain admission orders from Dr. Moser to be admitted to the medical infirmary for post-hospital observation pending a medical provider evaluation.  Gyger failed to contact the medical infirmary and allowed the officers to place Ramsey in a non-medical jail cell, K2 pod, despite the knowledge that he was inappropriate for jail and required nursing medical attention.  No further nursing assessments were ordered by Gyger or Moser and no medications were provided.  Gyger failed to follow the internal policy for "Continuation of medications began prior to incarceration".  SWCMG00710  Gyger failed to begin medication administration for 23 critical medications that were ordered by Dr. Kubowicz.

**Lindsey Gyger was deliberately indifferent to a known acute medical need when she failed to do proper intake screening of Ben Ramsey and continue his medications.  This action was the first root cause[1] of Ramsey's continuous seizure activity while incarcerated at the Douglas County Detention Center.**

Gyger and Moser failed to develop an individualized treatment plan for Ramsey.  Policy SWCMG-E-12.1 states:

Inmates returning from off-site hospitalization shall be referred for evaluation by the responsible physician who will be responsible for developing and documenting an individualized

---

[1] As Medical Director in jails, I perform root cause analyses.  I used the same methodology in this case that I use to evaluate the medical care provided to inmates in the jails in which I am the medical director.

plan of treatment.  Treatment plans shall include housing, observation monitoring, dietary, exercise, and follow up.

Gyger did not contact Dr. Moser when Ramsey returned from hospitalization and no treatment plan was ever instituted on behalf of Ramsey.  Moser did not require this of Gyger upon intake and did not investigate the root cause of Ramsey's care.

Raymond Herr M.D. was the Chief Medical Officer for Correctional Medical Group Companies, the parent company of Southwest Correctional Medical Group.  He was charged with overseeing the medical care delivered in all facilities as well as the physicians who worked as Medical Directors in those jails.  He was responsible to draft and approve policies, procedures and protocols.  He testified that the buck stopped with him with regards to medical care in Douglas County Jail. Herr, Trimble, and Moser did not provide any oversight, peer review, or quality assurance that Gyger's care of Ramsey or Hartwell was timely, accurate, and appropriate. Herr, Trimble, and Moser all testified that this failure was recognized and was a policy deviation but did not provide any direct training on continuation of medications, benzodiazepine protocols, intake screening, or policy and procedure retraining to prevent Gyger from acting in a similar manner going forward.  No disciplinary measures or corrective action was taken by Trimble, Moser, or Herr against Lindsey Gyger.

After intake, Ramsey was left unattended without medical evaluation or medications for the next 48 hours despite the known risk of having Ramsey just released from the hospital on July 19th.  Nursing staff during this period of time were aware of the medication list provided by the hospital but did not order the critical medications.  Nursing staff did not do a full nursing assessment during this timeframe and it is unknown what Ramsey's medical condition was due to lack of health care nursing assessments despite being released from the hospital into jail nursing care.

Ramsey required skilled nursing care due to his multiple medical problems including seizures, diabetes, asthma, mental illness, traumatic brain injury, recent brain surgery with shunt revision, and was a complicated medical patient.  Tina Holland and Joan Cunningham failed to follow up with Ramsey despite knowledge of his complicated medical history and requirement for critical medications.  They knew of the substantial risk of serious harm but failed to take any measures to abate that risk. They failed to order critical medications or provide any medical treatment or nursing assessments during their nursing shifts.


Deimys Vigil RN was not present when Dr. Karla Ramsey examined her son Ben Ramsey.  Dr. Ramsey diagnosed and notified the medical and mental health staff, Vigil and Heather Reck, that Ben was having continuous seizures.  Karla Ramsey MD, face to face, verbally, notified Vigil of the continuous seizures and pointed out critical objective examination findings of Ben's seizure activity on the morning of July 21st at approximately 11:30am.  Vigil failed to initiate the seizure protocol.  Vigil failed to contact Dr. Moser for further medical orders or to notify Dr. Moser of the seizure complaint.  Vigil failed to do an immediate nursing assessment upon learning of the diagnosis of acute continuous seizures and status epilepticus. Vigil did not act in an emergent manner.   Vigil did not do a nursing assessment for Ramsey for the next 4 hours and 30 minutes despite the knowledge of Ramsey's acute neurologic change and continuous seizure activity.  Vigil did not institute the seizure protocol, obtain emergency medications, or provide any type of care for the next 6 ½ hours before the end of her shift.  Upon

admission to the medical unit at 16:00, Vigil did a nursing assessment and noted acute neurological changes.  She failed to contact Dr. Moser, Dr. Ramsey, or EMS.  Trimble testified that Vigil called her to report that Ramsey's exam was normal, but Trimble's phone records reveal that there were no phone calls between 4:00 p.m. when the neurologic check was performed and 6:00 p.m. when Vigil's shift ended. The next phone call was at 6:12 p.m. and was from Dr. Ramsey and her attorney to Trimble.   Moser testified that EMS should have been contacted at 4:oo p.m.. Vigil allowed Ramsey to be housed in the medical unit with known acute neurological changes and seizure activity without medication or emergency treatment for the next 3 ½ hours until his transport at 19:20, or 19:30 depending on which record is relied upon - a nursing note or the officer activity log.

**Deimy's Vigil failure to act and deliberate indifference to a known medical emergency was the second root cause of Ramsey's poor outcome.**

Vigil testified she contacted the HSA, Jennifer Trimble after meeting with Dr. Ramsey to discuss Dr. Ramsey's diagnosis of continuous seizures.  Trimble RN did not contact Dr. Moser for further medical orders, recommend appropriate nursing protocols, or demand a complete timely nursing assessment to be completed.  Trimble did not contact EMS or request the nursing staff institute the seizure protocol. Trimble allowed Vigil to continue to ignore Dr. Ramsey's repeated warnings and not demand emergency transport for the next  6.5 hours before she left the facility, leaving Ramsey in status epilepticus with no notation that he was suffering seizures.. Trimble knew that a medical doctor found Ramsey to be continuously seizing around 11:30 a.m. according to Vigil's testimony, or by 2:00 p.m. based on her own testimony, and left him in status epilepticus until he arrived at the hospital after 7:30 p.m. Trimble did not insure quality and institute policy and procedure supervision upon knowledge that the nursing staff was not providing critical medication, appropriate medical housing, neurologic nursing assessments, following nursing protocols, or obtaining proper physician oversight into Ramsey's care.

Upon arrival at the medical infirmary, the nursing staff failed to contact Dr. Moser for admission orders.  They failed to institute the nursing protocol for seizures or provide Ramsey with any medication assistance that would have controlled his seizures.  Nursing staff withheld care by not contacting EMS for transport to the hospital.  Nursing staff withheld care by not contacting Dr. Moser in a timely manner.  Nursing staff withheld care by not appropriately assessing Ramsey's neurologic condition as pointed out by Dr. Karla Ramsey both verbally and in writing.

Finally, upon transport to the hospital, the nursing staff failed to contact the hospital to verbally inform the hospital of the actual reason for the transfer.  Barron allowed Mr. Ramsey to be transported lying down in the back seat of a patrol car while having continuous seizure activity.  Barron did not relay any information to the receiving emergency department about Mr. Ramsey's current condition, recent brain surgery, active seizure activity,  or continuous seizure activity at the jail.  In fact, the nursing assessment done prior to transport in the patrol vehicle was so egregious that elevated blood pressure was the only positive finding that Emily Barron, RN charted about Ramsey.  Barron did discuss an altered visual gaze and seizure-like activity of Ramsey with Trimble on the phone. Trimble testified this seizure-like activity was the primary reason for the transport to the hospital. Barron testified that Ramsey was not sent to the hospital for seizure activity, but rather for high blood pressure.

At the emergency department in Castle Rock Hospital, Ramsey was in continuous seizures, moved to ICU, and diagnosed with status epilepticus. Dr. Karla Ramsey arrived at the

hospital a few minutes after Ben.  She provided critical medical information about Ben Ramsey's seizure activity, lack of medication, and past medical history.  If it was not for her timely arrival at the emergency department,  critical care would have been further delayed, causing even more harm to Ramsey.

Douglas County Detention Facility Policies SWCMG E-08 and E-10 state that an onsite medical response record is completed and sent to the hospital with the patient when transported. The receiving facility shall be notified via telephone of the impending arrival and nature of the emergency, and any medical/psychiatric history.  Written medical information shall be transferred as appropriate and necessary.  SWCMG000765 Exhibit 5 pg 60

The Barron failed to notify the Castle Rock Hospital of the seizures, or the duration of Ramsey's continuous seizures.  She neglected to send appropriate information that included the medical summary written by Dr. Karla Ramsey.DCDF023-025.  This calculated deviation resulted in delays in treatment and diagnosis and impeded Ramsey's treatment at the emergency department.  **Emily Barron RN was deliberately indifferent to an acute neurologic emergency of Ramsey.  Barron did not contact EMS and failed to transport Ramsey per policy.  She failed to provide accurate information or coordinate the care with the hospital or provide life saving medications per the seizure protocol.**

The failure to send Ramsey to the emergency department for over nine hours while he was suffering continuous seizures is shocking.  The need to call 911 would have been obvious to a layperson.  However, Ramsey's medical diagnosis was made by a physician, and still, nursing staff failed to institute protocols, provide medication, transfer to a higher level of care, contact Dr. Moser or treat Ramsey in a timely manner.   **The care was egregious.** Dr. Herr, Trimble, and Dr. Moser all testified that there were multiple policy failures in Ramsey's treatment.  The failure to make any changes to policies, procedures, training, staffing, supervision, and oversight is egregious.  Dr. Raymond Herr is tasked with the medical review of off-site emergency transfers. Dr. Herr testified,"The buck stops at my desk."  Dr. Herr failed to review either Ramsey's or Hartwell's care provided by Dr. Moser, Trimble, Vigil, Gyger, and the rest of the nursing staff. Andrew Small of SWCMG testified that it was Dr. Herr's responsibility to review both Ramsey and Kevin Hartwell's medical care and off-site transportation.  Had Dr. Herr reviewed the care Ramsey received in a timely manner, it is likely he would have instituted changes that would have prevented Kevin Hartwell's seven-hour status epilepticus in the jail just 4 months later.  Dr. Timothy Moser's and Jennifer Trimble's approach to seizure management includes either purposeful misdirection or a lack of supervision of the nursing staff, directing or allowing the nursing staff to deviate from the seizure protocol, and withhold life-saving medications.  This lack of oversight and proper seizure protocol training led to the ICU admissions, hospitalizations, and brain injuries of both Ben Ramsey and Kevin Hartwell.

**Timothy Moser MD was deliberately indifferent to his responsibilities of an on-site medical director at the Douglas County jail, and he failed to act as a reasonably careful physician should under the same or similar circumstances.  He testified that he did not attend administrative meetings critical to quality improvement, participate in continuous quality improvement, peer review, nursing supervision, or nursing performance enhancement.  He deliberately failed to enact the policies of SWCMG or hold the nursing staff accountable for their unconstitutional and reckless actions, including their failure to**

19

contact him or EMS for acute neurologic changes.  He allowed nursing staff to ignore or incorrectly apply nursing protocols at their leisure with limited oversight and inadequate training.

Jennifer Trimble HSA, was deliberately indifferent to her responsibilities as an on-site health service administrator at the Douglas County jail.  She allowed Moser to not attend administrative meetings critical to quality improvement, participate in continuous quality improvement, peer review, nursing supervision, or nursing performance enhancement.  She deliberately failed to enact the policies of SWCMG or hold the nursing staff accountable for their unconstitutional and reckless actions, including their failure to timely contact Dr. Moser and EMS. She failed to investigate, improve quality, or take corrective action and discipline her nursing staff.  She directed or allowed nursing staff to ignore, or incorrectly apply nursing protocols at their leisure with limited oversight and inadequate training.   She failed to keep Ramsey's medical record secured.  Her actions were a root cause of the failure to investigate Ramsey's care, thereby causing harm to Kevin Hartwell 4 months later.

Dr. Raymond Herr failed to ensure that staff correctly implemented policies, procedures, and protocols to prevent status epilepticus or timely provide access to medical treatment, and by performing quality assurance.  He reviewed policies but made no effort to ensure nurses understood them or followed them.  He failed to provide supervision and oversight, and failed to perform morbidity investigations as part of quality assurance.  He failed to institute his own policies and perform medical reviews and peer reviews that were required of him. He failed to do weekly monitoring of services to include all acute hospital admissions and select problem cases as dictated by policy A06.1. SWCMG 000605.  He seemed far more concerned with limiting expenses than with quality of care. The medical director of SWCMG should conduct focused audits of onsite emergency response.  No monitoring of Ramsey or Hartwell's care was done.  The cases were not presented at the quarterly Quality Management Committee meetings and no corrective action was implemented despite Herr's testimony that errors and policy deviations were committed.  Herr did not incorporate continuing staff education and development activities at the facility to insure quality improvement in adherence to the seizure protocols and improve compliance to policy and procedures. SWCMG-A06.1

During the entire incarceration and medical care of Mr. Ramsey the nurses failed to institute nursing protocols for both acute and chronic care of seizure, diabetes, hypertension, and benzodiazepine withdrawal.  Lack of oversight of the nursing staff's careless attitude to follow strict policy and procedures resulted in systemic failure in the care of both Ramsey and Hartwell, as well as the medical records of the other inmates that were reviewed and discussed earlier..

**NCCHC Accreditation**
**Throughout the process of the review of Ben Ramsey and Kevin Hartwell.  As well as the depositions taken from Jennifer Glenn Trimble, Raymond Herr, and Timothy Moser it has come to light that it is more likely than not that NCCHC accreditation was obtained by withholding or falsifying information on seizure care and applying the seizure protocol. NCCHC requires the HSA and Medical Director to take specific actions which by their own admissions they were not implementing. Without good oversight and quality**

**management review policies, NCCHC accreditation is worthless.  This failure of oversight has led to multiple poor patient outcomes.  It is not within the scope of this report to discuss the numerous concerns of how NCCHC accreditation was obtained.  It is deeply concerning that accreditation was obtained and the credentialing body should review this report and allow further investigation into the process and documents submitted by Trimble, Moser, and Herr to obtain NCCHC accreditation.**

**In regard to Kevin Hartwell**

Records reviewed:

1. EMS records for 11/30/16
2. Castle Rock Adventist Hospital 11/30/16 through 12/13/16 overall review
3. Rocky Mountain Neurology records 09/10/13 and 1/12/17-1/20/17 Daniel Kitei, DO
4. Rocky Mountain Internal Medicine records 12/2/14-9/1/16
5. Health Fit Dr. Werner
6. Walgreens Pharmacy records
7. Incident Reports and Special Report regarding Hartwell
8. Contract between Douglas County and SWCMG
9. Contract between SWCMG and Dr. Moser
10. Nursing schedule for November 2016
11. Timothy Moser CV
12. AVI Hartwell 2 video 17 minutes 13 seconds, 11/29/16 a.m.
13. Douglas County surveillance video 7 hours 59 minutes, 11/29/16 p.m. to 11/30/16
14. Douglas County jail booking information
15. COR EMR medical chart notes 27 pages
16. COR EMR medication dispensary 14 pages
17. COR EMR Nursing chart notes 32 pages
18. COR EMR Nursing chart notes 49 pages
19. Deposition transcripts of  Sophia Nix LPN, Timothy Moser MD, Deimys Vigil RN, Lindsey Gyger RN, Daisha Wade LPN, Stephanie Russak RN, Jessica Isaacs RN, Jennifer Glenn/Trimble for CMGC, Cindy Watson for CMGC, Captain Duffy for Douglas County, Deputy Leinweber, Deputy Mathis, Deputy Murphy, Sargeant Mathena.
20. Deposition Exhibits to the above depositions.

<u>Summary of Conclusions for the care of Kevin Hartwell</u>

Kevin Hartwell had diagnoses of seizure disorder, hypertension, and diabetes.  At the jail, he was taken off his prescribed medications despite the obvious substantial risk that he would suffer seizures, status epilepticus, stroke, and death.  Within days, deputies and nurses documented acute neurologic changes and seizures, and yet still denied Hartwell seizure

medications and access to a doctor, even as his seizures became more severe.  Nurses commonly failed to follow protocols or call a doctor, and sent Hartwell back to his cell without treatment.  It was common for LPNs to practice medicine beyond the scope of their license by failing to contact a RN or doctor for documented acute neurologic changes, and documenting medications "per protocol" without contacting a RN or doctor, and then not providing the medications.  RNs commonly failed to perform assessments and contact the doctor.  Dr. Moser allowed nurses, including LPNs to decide whether patients needed to go to the ER.  He only evaluated inmates who had been previously scheduled during the six hours a week he was in the facility, which was understaffed during November of 2016.  Dr. Moser knew Hartwell had been suffering seizures including one the morning before he went into status epilepticus, or continuous seizures, while Moser was in the jail, and still did not order immediate transfer to the ER when Hartwell entered status epilepticus.  The Health Services Administrator prevented Hartwell from receiving medical treatment, instructing nurses not to enter his cell while he was in status epilepticus, a life-threatening emergency.  Nurse Nix then misrepresented to EMS the duration of Hartwell's continuous seizures, which interfered with his medical treatment at the hospital. The failure to send Hartwell to the ER for over seven hours while he was suffering continuous seizures is shocking.  The need to call 911 would have been obvious to a lay person.  The failure to make any changes to policies, procedures, training, staffing, supervision, and oversight is egregious.

**Background Facts**

Prior to his incarceration Mr. Hartwell was being treated by Dr. Drew Werner with multiple medications.  The medications that were prescribed to him for his seizure disorder included: Keppra 500 mg four times a day and Valium 5mg three times a day.  During the year of 2016 Hartwell was under the care of Dr. Werner and was being closely monitored for his opioid and benzodiazepine usage as well as his seizure activity.  It appears his seizures were well controlled. Hartwell did not have any seizure activity while under Dr. Werner's care at that time.  Hartwell is an alcoholic who entered into an alcohol treatment program in January of 2016, but was drinking alcohol again by October of 2016.  Dr. Werner evaluated Hartwell for a routine visit on October 27,  2016, and noted Keppra and Diazepam for his seizure disorder.

Hartwell was arrested on November 10, 2016, after punching a wall in his home.  He was taken to Castle Rock Adventist Hospital where his medications were reconciled prior to being taken directly to the Douglas County Jail.  Upon booking into Douglas County Jail,  Emily Barron RN documented the name of Hartwell's primary care physician, that he could not remember all of his medications, and he had last been hospitalized for a seizure.  She failed to contact the hospital or his physician to get a list of his medications or the hospital records.

CMGC policy requires that a doctor be contacted when a patient cannot remember their medications and dosages.  Instead, Vigil RN contacted Walgreens Pharmacy on November 11, 2016 over the phone, and obtained verbal prescription information for Insulin, Valium, Oxycontin, Reglan, Lyrica, Campral, and Tramadol. *COREMR page 10*. Hartwell did not have a prescription for Campral.  Walgreens Pharmacy had previously filled prescriptions for Keppra 500 mg quantity 120 during the months of October, August, and July 2016, and Valium 5mg quantity 90 during the months of November, October, August, and July 2016.  Valium and Keppra were being taken by Hartwell for seizure prevention and prophylaxis.  Vigil cut Hartwell off the majority of his medications, including Keppra and Valium for his seizures, and his hypertension medication.  She cut Hartwell's long-lasting insulin, Lantus, for his diabetes almost in half without a doctor's order.  His Gabapentin was cut from 1200 mg three times per day to

300 mg twice a day. Per its contract with the jail, CMGC saved money when it discontinued inmates off their medications. Vigil is the nurse that also discontinued inmate Benjamin Ramsey off his medications in July of 2016 when he came directly from the hospital to the jail, and he too suffered seizures and status epilepticus as a result.

Hartwell was a heavy user of opiates and Valium. The nursing staff documented, "Possible benzodiazepine withdrawals" as a current diagnosis into COR EMR on November 11, 2016. *COREMR pg 1.* Cutting a person off benzodiazepine without tapering or substitute poses a substantial risk of serious harm including seizures and death. An order for dependent detoxification and benzodiazepine withdrawal monitoring was obtained from Dr. Moser. The SWCMG protocol states, "The safest way to manage benzodiazepine withdrawal is to give benzodiazepines in gradually decreasing amounts." *SWCMG 001145* The protocol also states, "High risk patients should be started on Valium with particular focus on patients who were on high doses of benzodiazepines for greater than a month." Additionally, it states, "If the patient is using opioids and benzodiazepine, use the opiate withdrawal protocol and contact on-call provider to add Valium especially for high risk patients." *SWCMG 001148* #12 "Patients are considered at high risk for complicated benzodiazepine withdrawal (especially when confirmed on chronic high doses of a benzodiazepine). These patients should be considered potential candidates for hospitalization if there is a history of seizure disorder including a history of withdrawal seizures from any substance." *SWCMG 001148* #14 Despite the order from Dr. Moser to place Hartwell on the Benzodiazepine withdrawal protocol the nursing staff did not supply Valium or any seizure medications to Hartwell. The nursing staff did note the findings that would **qualify** him as a high risk patient, and thus they would be expected to know he was high risk, but deliberately ignored that information. No nursing note was placed in Hartwell's chart to indicate that he **was a high risk withdrawal patient**. Vital signs should have been taken three times a day for the first three days and then twice a day for an additional seven days as ordered by the protocol.

It was foreseeable that if Hartwell was taken off medications to control his seizures, that he would suffer seizures and potentially status epilepticus, which is a medical emergency. Status epilepticus is a seizure lasting more than 5 minutes or multiple seizures occurring back-to-back without a full return of consciousness in between. 911 must be called immediately because permanent brain damage occurs after 20 minutes.

While he was incarcerated, Hartwell suffered dangerously high hypertension and dangerous swings in his blood sugar. For example, on November 12, 2016, after his Lantus insulin was cut in half, his blood sugar went from 41 to 409, and yet no action was taken to reevaluate. Instead, Dr. Moser ordered his insulin pump to be removed on November 14, but Hartwell's blood sugar levels remained poorly controlled and were never addressed. On November 15, his blood sugar was 39, and his blood pressure was 190/110 and 180/130. He did not receive blood pressure medication. His poorly controlled blood pressure and blood sugar levels put him at an obvious substantial risk of serious injury including stroke and seizures. The only time Dr. Moser evaluated Hartwell was November 15, and then he failed to contact Dr. Werner, Hartwell's primary care physician, order seizure medications, or address his poorly controlled diabetes. He ordered follow up in 90 days despite the substantial risk of serious harm to Hartwell.

In Colorado, LPNs are trained to identify "normal" from "abnormal" and report all abnormal findings to a RN or MD for assessment. LPNs cannot perform assessments themselves

within the scope of their licenses. Acute neurologic changes such as being dizzy, having an altered mental state, and convulsing would be "abnormal" findings that would need to be reported to a RN or doctor for a full neurologic assessment.  RNs supervise LPNs and cannot delegate the responsibility to perform an assessment to them.  RNs must perform a full neurologic assessment when acute neurologic changes are observed, and report their findings to a doctor.  Nurses are not qualified to decide whether a person is faking acute neurologic changes including seizures.  RNs cannot diagnose medical illness, and cannot treat medical illness without a doctor's order.  Per CMGC policies, medications can only be ordered per nursing protocol during a medical emergency to avoid the risk of nurses practicing medicine.  Dr. Moser was the on-site Medical Director at the jail with duties that included supervision and training of nurses, quality assurance, reviewing and developing policies and procedures, and oversight of health care provided at the jail.  The HSA, Jennifer Trimble RN was responsible for, among other things,  hiring, training, scheduling, supervising and overseeing nurses to ensure medications were administered consistent with policies and procedures, and to ensure the accuracy of records. During November of 2016, there was no mid-level provider at the jail as required by contract. He never came to the jail while on call and only evaluated inmates as previously scheduled.

**Documented Acute Neurologic Changes**

On November 13th, 2016 Hartwell had his first documented acute neurologic change. Hartwell was being seen for a blood pressure check.  His blood pressure was 180/120 and his blood sugar was 532.  While on the exam table, Hartwell **swayed to the side, said nothing and had a blank stare on his face**.  Deputy Burek, who escorted Hartwell to medical, caught him so that he would not fall and called out to Isaacs RN, who was on the phone with Dr. Moser. Hartwell became **unresponsive and his body shook a few times**.  Hartwell was **unresponsive and shaking for four minutes**.  *DCSO0002118*  No medication was given to Hartwell for seizure activity.  The seizure protocol was not activated despite the function of the protocol is to: "facilitate and guide in the evaluation and treatment of convulsions or seizure disorders." *SWCMG001109*

On November 14, 2016 at 18:30 Hartwell had his second documented acute neurologic change. Deputy Colavolpe documented that Hartwell **felt dizzy and fell to the ground**.  Vigil RN responded but failed to do a full neurologic assessment, failed to follow a nursing protocol, and failed to contact Dr. Moser.  That evening Gyger RN responded to Hartwell's cell for a complaint of **dizziness** but failed to perform a full neurological assessment or contact Dr. Moser. At 19:30 Hartwell stated, "**I'm seeing spots now**." Medical did not respond to Hartwell's complaints and told the deputy, "Hartwell was already given the proper medication for his condition and they will check on him as scheduled.  *DCSO 0002115*  However, no medication was given to Hartwell for seizure activity.  No seizure protocol was instituted and no notes for withdrawal protocol were entered.

On November 16, 2016 Hartwell underwent a mental health review by Heather Reck. Hartwell disclosed that he had been drinking heavily and regularly took Valium and his prescriptions were filled at Walgreens.  He also reported "**Feeling of withdrawals and mental fogginess**" *COR EMR pg 9*  The withdrawal symptoms were reported to medical by Reck, indicating a potential for seizures.

On November 19,  2016 Jessica Isaacs RN did an initial health assessment.  Positive findings included seizure disorder, hypertension, substance abuse disorder, drug and alcohol withdrawals, heart trouble, stroke, diabetes, hand fracture, anxiety and depression. Isaacs failed

24

to obtain any information about Hartwell's seizures and seizure medication.  She documented "no significant medical issues" despite knowing Hartwell had seizures, diabetes, hypertension, and a hand fracture because she testified that otherwise Dr. Moser would have to see Hartwell sooner than the scheduled 90 days.

On November 20, 2016 Hartwell was taken off the benzodiazepine withdrawal protocol. *DCSO0002110*

On November 23rd Hartwell met with Reck for mental health evaluation.  He stated, "**I'm ready to jump out of my skin.  I have alot of fear and anxiety.  I am not taking the medications in here that I was at home.**  I would like to increase the Buspar.  I am begging you to help me some more.  I am worried that the minimum dose of Buspar is not enough." *COR EMR pg 9*  Positive objective findings by Reck were "**distracted, intense eye contact, pleading at times, thoughts were tangential and disoriented.**"  Reck declined to make any medication changes.  The diagnosis was medication seeking, depression and anxiety.  The plan included, "get out with others, go outside, read and walk."

On November 25, 2016 at 1:15 a.m., Hartwell had another documented acute neurologic event.  Hartwell stated to Deputy Yacuta, "**You have got to help me I want to live.**"  He stated he was **shaking** and could not give anymore symptoms.  He was brought to medical where his blood pressure was 189/110, his pulse was 114, he had **episodes of shaking**, was anxious, not listening to directions, and complained of shortness of breath and nausea.  Davidson LPN sent him back to his cell without contacting a RN or doctor, despite noting he continued to shake, had dry heaves, was tachycardic and had a blood pressure of 178/98.  The RN on duty, Emily Barron failed to do an assessment or call a doctor.  Later that morning, Hartwell reported to deputies that he felt his blood sugar was low, but medical refused to see him.  Around noon, he told deputies he was really having a hard time, and he just wanted to live. He was escorted to medical where he reported to Vigil RN that he felt like he was dying, was very anxious, could not breathe, and felt like he had a weight on his back.  His blood pressure was 160/90 and he requested Clonidine for his blood pressure.  Vigil sent Hartwell back to his cell without contacting a doctor.  She reported to the next shift that he was malingering and shopping for Clonidine, and refused to treat him with Clonidine or other medications.  *DCSO 0002107.*

On November 26, 2016 Hartwell had another acute neurologic event.  Deputy Irvin was notified by Inmate Williams, "Hartwell was sitting at a table when he **started to shake and fall back from the chair striking his shoulder to the floor before his head**."  Hartwell's **body appeared to be ridged with his arms tucked near his chest and he was spitting small bubbles from his lips**.  He appeared to be taking short breaths while his **eyes were rolling up and back towards the right**.  Vigil RN responded at 3:50 p.m. where she found Hartwell on the floor hyperventilating.  When she rolled him onto his side, he suffered a second seizure in front of her, with **shaking, eyes rolling, and an inability to respond**.  This was the second documented seizure on November 26 and Hartwell should have been sent to the ER but instead was kept in medical for ten minutes where he displayed an **altered mental state, trying to sit in the sink**. **He could not remember what happened**.  Vigil sent him back to his cell without contacting a doctor and without providing any medication for his seizures. *DCSO0002104*  Vigil testified that she knew Hartwell exhibited acute neurologic changes and she knew she was required to do a full neurologic assessment and contact a doctor.  Moser reported that he was never contacted about the event. *Deposition Moser pg 194 12-18*  No seizure monitoring was

25

done by nursing staff.  No seizure medications were given.  No seizure protocol was applied by the nursing staff.

For any acute neurologic change including seizures, a RN must do an assessment that includes timing and duration of seizures.  If there is continuous seizure activity without a complete return to normal consciousness in between for 5 minutes, a RN should immediately call 911.  If seizure activity stops within 5 minutes with a complete return to consciousness, a RN must call a doctor and immediately begin ordered medications and monitor the patient by performing documented full neurologic assessments.  If there is no RN on duty to monitor patients 911 should be called so the patient can be monitored by a RN and get loading doses of IV medications as needed.  If two seizures occur within a 48 hour period without a recent hospitalization for seizures or work up by a neurologist, a nurse must send the patient to the ER.

On November 26, 216, Reck documented that Hartwell was reporting high anxiety, med seeking, and faking seizures.

On November 29, 2016 at 0932 Hartwell had his fifth acute neurologic event.  Deputy Mathis reported, "Hartwell had a **blank stare on his face and was having a hard time understanding what I was saying**.  Hartwell had the phone in his hand still connected to his wife. Deputy Mathis helped Hartwell to his cell and called medical.

On November 29, 2016 at 0935 Hartwell had a sixth acute neurologic event.  He was laying on **his right side in his bed convulsing and his legs were locked in a straight position and his arms were crossed**.   He was stiff and shaking and appeared to be having a seizure. **His eyes rolled to the back of his head.  He bit his cheek or tongue and blood was coming from his mouth.  He would not verbally respond.**  Deputy Mathis had to hold him on the bed so he would not fall off.  Nurses Russak and Wikert responded and his **blood sugar was 500**.  **It took a few minutes for Hartwell to understand what was going on around him after he stopped seizing.  Nursing vital signs noted desaturation of oxygen to 77 percent.**  He was sent to medical for evaluation.  *DCSO 0002101*  Neither Russak nor Wikert who responded to Hartwell's cell did a full neurologic assessment.  Hartwell was put in observation cell 4 in medical, but only one assessment is documented (at 10:18 a.m.), and it was not a full neurologic assessment.  At approximately 1:30 p.m., Hartwell was sent back to his cell, but there is no documentation of who made the decision and why.  Russak testified that Dr. Moser was in medical when they brought Hartwell in, but Moser did not evaluate Hartwell because he only evaluates patients who were previously scheduled. Moser ordered Keppra, but the order was never entered and it was not documented that Hartwell received any Keppra.

Dr. Moser evaluated the video footage of this event and stated, "Likely,  this is more of grand mal.   Because he has the arching of the spine.  All extremities are rigid.  He's not responding to the deputy."  *Moser pg 175 3-7*  Moser then stated, "I think Keppra is appropriate after an incident like this."  *Moser pg 176 19-20*  However, EMS was not contacted and Keppra was not ordered or given.  No seizure protocol was initiated by the nursing staff.

On November 29, 2016 at 1805 Nix and Gyger came on shift and were notified at shift change by Russak that Hartwell had a seizure at 10:00 a.m. that day.  Two hours later at 20:10 Hartwell had another acute neurologic event.  Nurses Nix LPN and Gyger RN were called to Hartwell's cell because he was **acting strange**.  After some effort, Nix got Hartwell to sit up for a blood pressure check, and Hartwell went into **convulsions**.  Hartwell suffered numerous **seizures without regaining consciousness**, and yet Gyger left after four minutes without doing any assessment or contacting 911, and Nix left in the middle of a seizure.  She called Dr. Moser

who ordered Clonidine.  Nix returned to Hartwell's cell without Gyger at 8:28 p.m. where Hartwell was unconscious and seizing.  She again walked out in the middle of a seizure. At 8:31 p.m. she returned without Gyger, and performed a sternal rub with no response.   Hartwell was in such distress that Nix decided to do a sternal rub.  Nurse Nix wrote, "Once shaking subsided, exited patients cell as he is in no acute distress and unwilling to take medication."  However, video shows Nix walking out of the room while Hartwell is actively seizing.  Nix admitted when viewing the video footage that Hartwell was in acute distress when she left him in his cell for the next two hours.  She did not notify Moser that Hartwell did not respond to a sternal rub. *Deposition Nix pg 233 1-5*  Hartwell was seizing when she entered, seizing when she tried to move him to his side, and seizing when she left his cell again around 8:37 p.m.  She reported to Dr. Moser that he refused to take his medications and his behavior was not consistent with seizures.  Dr. Moser relied on the assessment of a LPN, despite knowing Hartwell had suffered a seizure that morning for which he ordered Keppra. He ordered a LPN to monitor a patient suffering continuous seizures rather than call 911.

Around shift change at 10:30 p.m., Deputy Leinweber came on duty and reported, "Hartwell **would not get up, laying on his back with a blank stare**."  He reported that Deputy Murphy (swing shift) told him that medical was down earlier to check on him and they determined he was faking.   He reported that Hartwell "continued to shake, he would not verbally respond to questioning, was drooling from his mouth onto his mattress.  He was breathing heavy." *DCSO0002098*

At 10:40 p.m. on November 29, Nix and Gyger returned to Hartwell's cell where Gyger observed Hartwell for one minute, primarily from the doorway, before leaving.  She never came back, did not do any assessment, did not begin the seizure protocol, and did not contact 911 or Dr. Moser.  At 10:53 p.m., Nix directed deputies to move Hartwell to the floor even though he was unconscious and suffering continuous seizures.  Then she left.  Nix testified that HSA Trimble told her over the phone not to go into Hartwell's cell again to monitor him because earlier in the day, he had faked a seizure.  No one entered Hartwell's cell again until 3:35 a.m. the next day.

Gyger RN did not begin the seizure protocol.  Gyger and Nix visualized Hartwell shaking his arm and leg.  Nix determined him to be shaking his extremities.  Nix reported that she asked him questions but did not remember if he responded. *Deposition Nix pg 98-100*  Nurse Nix was ordered by Dr. Moser to monitor Hartwell but chose to leave him in his cell for monitoring via camera.  She reported in her deposition that she couldn't remember how often she watched Hartwell on camera. *Depo Nix Pg 115*  She did recognize that Hartwell was having an acute neurologic change.   She did not have an RN assess Hartwell for the acute neurological event even though she did recognize that Hartwell was indeed having an acute event. *Deposition Nix pg 169*  Nix reported that she did not know what was causing Hartwell to shake and she left Hartwell's cell while he continued to shake. Nix noted in the exam portion of her note, "No acute distress."  She ignored the physical findings of arm and legs shaking and Hartwell's acute mental status changes.  Her notes do not accurately reflect what was caught on video.

During Dr. Moser's deposition while watching the video he noted that during Nurse Nix's evaluation he believed that Hartwell was experiencing seizure activity.  This would be the seventh acute neurological change noted for Hartwell with no nurse at anytime beginning the seizure protocol.

27

Nurse Gyger RN was the supervising nurse on shift during this time.  She reported that no RN assessment was done on Hartwell during her shift.  *Deposition Gyger pg 203 1-5*  She stated that it was common practice at the jail to rely on LPN's assessments even though she knew this was against the nurse practice act.  *Deposition Gyger pg 137 1-10 & pg 126 17-27*  Gyger reported that it was her responsibility to respond to "man down emergencies" but did not respond to Hartwell's man down events.  *Deposition Gyger pg 133 10-16*  Gyger also stated that it was her responsibility to make medical assessments and oversee LPN Nix while on shift with her.  *Deposition Gyger pg 132 12-15* Gyger reported that after watching the seizure event that had happened at 10:00am when she was not on shift that she would have called 911 at that time had she been the nurse on shift at that time.  *Deposition Gyger pg 168 5-10*  Gyger testified that she left her shift early at 02:00 am on November 30th for a personal medical emergency.  She reported that no RN came to the jail to relieve her of her duties and that she left LPN Nix to care for the jail alone.  She testified she notified HSA Trimble before leaving.

From a review of the cell video footage, it is clear that Hartwell was in status epilepticus from 20:12 to after 3:50 when he was transported to the ER, as acknowledged by Dr. Moser during his deposition.  At no time during this period did Hartwell stand up, communicate to officers, or respond verbally to questioning.

Nix contacted Dr. Moser and Moser reported to Nix, "Patients clinical presentation is not consistent with actual seizure activity."  In contrast, Dr. Moser testified, "I would ask the nurse, do you think he was he's having a seizure and if she said no I would go by that."  *Deposition Moser pg 101 5-9*  Moser also stated, "If you have a trusted person at the jail assessing the patient and she's my eyes and ears.  And if she said, No I don't think a seizure is going on, then unless she tells me something that contradicts what I'm hearing from her, I'm going to go with her assessment."  *Moser pg 101 15-20*  After viewing the video during the deposition, Dr. Moser agreed that EMS should have been contacted at 8:23 pm `Dr. Moser also stated, " I  don't remember her calling me that night. If she would have called and said what I have just seen, she'd have given me a good description of this, it sure sounds like a seizure.  But if  she  called  and  said,  You  know,  he's  following  instructions.   He's  making  good  eye contact.  He's changing position on command.   Well, that's not really consistent with what I  just  saw." *Deposition Moser pg 182 1-5*  Moser reported that he would have expected possible brain damage to occur after watching the video by 8:37pm.  Moser confirmed that Hartwell continuously seized until departure from the jail at 03:55 the next day.  Moser also stated, "I would expect this type of activity to be identified as abnormal by a layperson.  I think a layperson would call 911." *Deposition Moser pg 186 18-25*

Dr. Moser ordered Hartwell to be placed under medical observation because of his prior seizures.  *Moser Pg 189 18-19*  Moser told Nix to initiate the seizure protocol.  *Deposition Nix pg 214 22-24*  Dr. Moser relied on LPN Nix to institute the protocol and stated that LPN's were able to  use standing orders for protocols.  *Moser pg 133 6-7*  By doing this Dr. Moser is requiring his LPN's to work outside of their scope of practice, despite an obvious substantial risk of serious harm to patients including Hartwell.

Nix did not initiate the seizure protocol as ordered.  Nix contacted her RHA Jennifer Glenn (Trimble) RN.  Glenn (Trimble) told Nix, "**Hartwell had faked a seizure earlier that day and was angry when they wouldn't send him to the hospital**.  **She told me that I was giving him too much attention and he was feeding off of that attention.**" *Deposition Nix Pg*

*113-114*  Nix was instructed by Glenn to not move Hartwell to the medical department and to continue to monitor him via the camera.  *Depo Nix pg 114*

No medications were given.  Linsey Gyger RN did not evaluate Hartwell as required  by the seizure protocol.  Hartwell was placed on the floor for his protection as the only portion of the protocol that was implemented.  *Deposition Nix pg 215 2-4*  Moving Hartwell to the floor was not a reasonable measure to abate the substantial risk of serious harm to a man in status epilepticus.  Nix reported that she was not permitted to send people out by 911 without an order to do so.  However, Dr. Moser requested the seizure protocol be instituted at 2240.  The seizure protocol contains an order to transport to Emergency Room ASAP for continued seizure activity over 5 minutes.  This order was not followed by Nix and was cancelled by Glenn RHA.  Hartwell continued in a Status Epilepticus seizure manner for the remainder of the evening and into the next morning.

Dr. Moser reported, "If a seizure last more than five minutes, then it is probably time to take action." *Deposition Moser pg 55 17-20*

From 23:45 to 03:35 Deputy Leinweber reported that Hartwell would shake his left arm and legs, tense up, shake more each time he walked by the cell, moan and groan.  Nurse Nix again evaluated Hartwell at 03:35 and determined a man down event and called Moser and requested a transfer to the hospital.  She then applied oxygen via 2 liters.  No seizure protocol was instituted and Hartwell was not given IM Valium as ordered by the seizure protocol.  When EMS arrived Nix told EMS that Hartwell had been found seizing at 03:30 and has been unconscious and seizing off and on since that time.  She reported there were no witnesses.  However, after reviewing the video footage Moser confirmed that this statement was false and that Hartwell was in status epilepticus since 20:12  for a total time of seven and half hours.  Despite being at the jail on November 29, 2016 when Hartwell was actively seizing, Moser reported that he never evaluated Hartwell for acute neurologic findings or a seizure.  *Deposition Moser pg 177 17-21*

Hartwell was released from custody at the hospital on November 30, 2016.  No personnel from the jail attempted to follow up on Hartwell from that point.  Moser, Nix, and Vigil all confirmed that no follow up was attempted on Hartwell.  Hartwell was never discussed in staff meetings, internal investigations, continuous quality improvement, emergency transport logs or seizure logs.   No changes were made, and no additional training was provided to anyone.

**Important Information and Findings:**

A.) The Douglas County Jail seizure protocol defines a seizure as, "a sudden disruption of the brain's normal electrical activity accompanied by altered consciousness, and /or other neurological and behavioural manifestations.  If the abnormal activity remains confined to one area, the person may experience tingling or twitching of only a small area of the body, such as face or extremity.   Epilepsy is a condition characterized by recurrent seizures that may include repetitive muscle jerking called convulsions.  The seizure threshold can be altered by fatigue, lack of sleep or rest, hypertension, stress, diabetes, blood sugar imbalances, anxiety, and other factors." *SWCMG 001109*

B.) The nursing staff did not begin the man down protocol or seizure protocol as listed in the SWCMG manual for the first six acute neurological events and seven and a half hours of the seventh. The nurses did not ask about nor chart the symptoms of the seizures that was witnessed by Deputy Burek, Deputy Colavelope, Deputy Irvin,  Deputy Mathis to include these details.

They did not define the characteristics of the seizures (twitching, absent, tonic clonic) as described in the protocol.

C.)  The nursing staff did not document in their charting for several of the events the current symptoms: aura, headaches, precipitating factors, type of seizure, the last seizure: unconsciousness time frame, generalized, partial, tonic, clonic, absence.  *SWCMG 001110*  They did not document the shaking and convulsion onset and duration; sudden versus gradual.  They did not document aura prior to seizure, Deja vu, lightheadedness or dizziness, unusual emotions, intense feelings of discomfort, or foreboding.  They did not document any characteristics of symptoms to include frequency, interference of symptoms of play, daily living, intensity or duration as required by the seizure protocol.  *SWCMG 001110*

D.) In fact, prior to the final acute neurologic event that required hospitalization, Hartwell had all of the symptoms of a typical seizure that were on the protocol to alert the nursing staff that Hartwell was a high risk seizure patient and needed emergent seizure medications and management.  These included in order of presentation and symptoms onset:

1. Severe alcohol addiction.
2. Was ordered seizure medications Valium and Keppra by his prior physician.
3. Abrupt discontinuation and withdrawal from Valium.
4. Active diagnoses of seizure, hypertension, diabetes, alcoholism and anxiety disorder.
5. Symptoms of "swayed to the side, said nothing, had a blank stare on his face".
6. Became unresponsive and his body shook a few times.
7. Became unresponsive and shaking for four minutes.
8. Reported "I feel dizzy and fell to the ground."
9. Reported "I'm seeing spots now."
10. Reported feelings of withdrawal and mental fogginess
11. Reported, "I'm ready to jump out of my skin.  I have alot of fear and anxiety.  I am not taking the medications in here that I was at home."
12. Observed as being distracted, intense eye contact, pleading at times, thoughts were tangential and disoriented
13. Reported unusual emotions like, "You have got to help me I want to live."
14. Witnessed shaking and fell back from the chair striking his shoulder to the floor before his head.
15. Observed symptoms of body appeared to be ridged with his arms tucked near his chest and he was spitting small bubbles from his lips and his eyes were rolling up and back towards the right.
16.  Blood sugar 500
17. Observed symptoms of a blank stare on his face and was having a hard time understanding what I was saying.
18. Observed seizure on camera his right side in his bed convulsing and his legs were locked in a straight position and his arms were crossed.
19. Observed symptoms of his eyes rolled to the back of his head.
20. Physical findings of bit his cheek or tongue and blood was coming from his mouth.
21. Vital signs of desaturation of oxygen to 77 percent.
22. Inability to respond verbally.

23. Post ictal symptoms such as it took a few minutes for Hartwell to understand what was going on around him.

E.) The nursing staff did not obtain a past medical history as instructed in the seizure protocol.  The past medical history did not include a history of seizures with a specific diagnosis, when diagnosed, tests, treatment, name of doctor, or facility at which patient was treated.  They did not obtain a release of information or attempt to obtain hospital medical records from where Hartwell was treated or medical records from his prescribing physician Dr. Drew Warner.  They did not note his chronic diseases as they pertain to Hartwell's seizure disorder.  These included hypertension, anxiety, alcoholism and diabetes. They did not document his alcohol quantity of use or his past treatments, prescriptions and OTC medications.  *SWCMG 001110*

F.) Objective testing was not completed by the nursing staff as required by the seizure protocol.  This testing should have included chart notes on Hartwell's orientation, level of consciousness, eye exam, gait, coordination, grips, strength and sensation.  The nursing staff did not document any post ictal state.   The nursing staff recognized that Hartwell did in fact have a seizure and contacted Dr. Moser for medication orders.  The nursing staff charted,"the patient had seizure-like activity for two minutes.  Patient then opened his eyes and looked at the nurse.

G.) Dr. Moser did not order the nursing staff to begin the seizure protocol or any type of monitoring of Hartwell prior to 10:10 am on November 29th.  At that time Dr. Moser ordered Keppra medication for seizures 500 mg twice a day to begin immediately and continue to monitor.  This medication order was noted by nursing staff but Hartwell never received any seizure medication as ordered.   The nursing staff failed to provide Hartwell with vital medication that had an active order, was onsite, just footsteps from his cell at 10:10am.  No staff investigation was done as to why.

H.) The nurses were able to give a variety of seizure medications per the seizure protocol.  The protocol states, "for severe seizure activity, may give Valium 10 mg IM x 1.  If not previously on Dilantin give loading dose of 500 mg tablet PO then Dilantin 300 mg PO daily for seven days.  Or continue current verified prescription.  *SWCMG001111*  The nursing staff failed to provide any medication for Hartwell's seizures.

I.) **The seizure protocol states that the patient should be admitted to the medical housing unit but Hartwell was returned to his housing unit after all six acute neurological events without further monitoring.**  Dr. Moser requested that the nursing staff monitor Hartwell, which would infer medical housing, but the nursing staff ignored this order and returned Hartwell to the housing unit to be monitored via camera by the officers and an LPN Nurse Nix.   There was no video footage of Hartwell from 11am to 8pm on November 29, available for review.   It is possible this video was suppressed or destroyed by the county.  Hartwell was not housed in the medical unit at this time for seizure monitoring as described in the seizure protocol for monitoring.

**Seizure treatment and standard of care by the American Academy of Family Physicians.**

Seizure is a common presentation in the correctional setting and new-onset epilepsy is the most common cause of unprovoked seizures. The patient history and physical examination should direct the type and timing of laboratory and imaging studies. No single sign, symptom, or test clearly differentiates a seizure from a non seizure event (e.g., syncope, pseudoseizure). Electroencephalography is recommended for patients presenting with a first seizure and

neuroimaging is recommended for adults.  Historic features suggestive of seizure include tongue biting, presence of an aura, sensation of epigastric fullness, post-ictal confusion and focal neurologic signs.  Tongue biting, especially lateral, is highly specific but not sensitive for generalized seizures.[2]

Status epilepticus is a relatively common medical and neurologic emergency that requires prompt evaluation and treatment. Status epilepticus manifests as many different syndromes, each defined by distinctive clinical features and EEG findings. Causes, prognoses, and treatments differ, and optimal evaluation and treatment requires an understanding of both the type of status epilepticus and the underlying cause. Some forms of status epilepticus have an excellent prognosis, whereas others are associated with major morbidity or even mortality.

All patients with generalized convulsive status epilepticus (GCSE) require rapid evaluation and treatment. GCSE is operationally defined as ≥5 minutes of continuous seizure activity, or more than one seizure without recovery in between.

The approach outlined below is generally consistent with consensus-based guidelines published by the Neurocritical Care Society.  Initial management is divided into three phases: assessment and supportive treatment; initial pharmacologic therapy with a benzodiazepine; and urgent therapy that achieves long-term control using a nonbenzodiazepine antiseizure drug such as Fosphenytoin.  Despite initial treatment, approximately 20 percent of patients develop refractory status epilepticus and require additional therapy.

**Rapid assessment and support** — A rapid neurologic examination should be performed to determine of the type of status epilepticus and, if possible, its etiology. A focused general medical evaluation should assess respiratory and circulatory status. Attention to airway, breathing, and circulation is urgent, as in other medical emergencies. Supportive therapy (eg, oxygen, mechanical ventilation) should be instituted as necessary. Measurement of arterial blood gases is often valuable, as most patients with GCSE who do not respond rapidly to initial treatment require intubation and mechanical ventilation.

**Benzodiazepines** — Benzodiazepines are the first-line treatment for convulsive status epilepticus because they control seizures rapidly.  The American Epilepsy Society recommendations: Give Diazepam 0.15 to 0.2 mg/kg (maximum dose: 10 mg); may repeat once as initial treatment for seizures.  The Neurocritical Care Society recommendations: Diazepam 0.15 mg/kg (maximum dose: 10 mg) given at a rate of ≤5 mg/minute; may repeat in 5 minutes as primary initial treatment for seizure activity.  This medication should be given intravenously, rectally, or intramuscularly.

**Fosphenytoin and phenytoin** - Seizure control ranging from 56 to 84 percent when phenytoin is used as initial therapy in combination with benzodiazepines and should be started as a loading dose and then continuous maintenance for long term management.

The efficacy of levetiracetam relative to other agents has not been well studied prospectively, and the available data are somewhat mixed.

**REFRACTORY STATUS EPILEPTICUS** — Refractory status epilepticus is defined as ongoing convulsive or nonconvulsive seizures following administration of an initial benzodiazepine and a nonbenzodiazepine antiseizure drug, given in appropriate doses. Refractory status occurs in approximately 20 percent of patients with status epilepticus.[3]

---

[2] First Seizure AFP May 1, 2007 Volume 75, Number 9
[3] UpToDate 2018 Status Epilepticus

**Douglas County Jail Standard-** The CMGC Seizure Disorder protocol defines the standard of care for the county correctional facilities. The protocol is in agreement with the standard of care set forth by the Neurocritical care society. The protocol highlights the emergent need of Valium medication to control seizure activity and Dilantin loading dose as well as continuing the current verified prescription. It also highlights the need for hospitalization, continuous monitoring, post seizure blood laboratory evaluation, and ongoing nursing evaluation for competency annually.

**Facility Management, supervision and accreditation**

The National Commission on Correctional Health Care, NCCHC, is the accreditation body for certifying jails that meet the national standard of care. NCCHC requires specific compliance indicators to receive accreditation. During the care of Hartwell, Douglas County Jail and SWCMG were not in compliance with the following essential standards.

The Responsible Health Authority, RHA, is tasked with supervision and application of policies and procedures within the jail. Jennifer Glenn Trimble held this position in 2016. Her duties would include supervision of nursing staff and coordination of treatment for patients. Specifically she would need to insure that:

1. Final clinical judgements rest with a single, designated, licensed responsible physician. J-A-02 (4)
2. The RHA functions to ensure that health services are organized, adequate, and efficient. J-A-02
3. Health staff meetings occur at least monthly and minutes are retained for reference. J-A-04 (3) This **meeting should include a monthly review of Emergency services provided**, access, timeliness of health services and follow up. The minutes should include problems identified, corrective actions initiated and problems with corrective action. Other staff members should attend when issues directly relating to their area of responsibility will be discussed. Dr. Moser should have attended monthly staff meetings. The inadequacy of care for Hartwell and the inappropriate use of the seizure protocol should have been discussed.
4. Statistical reports of health services are made monthly. They are provided to a correctional administrator to monitor trends in the delivery of health care. J-A-04 (4) This should include all emergency transports and follow ups to care. Hartwell was not included in these reports and these reports were not submitted for review.
5. Ensure that the health care policies and procedures are developed, documented and readily available to staff. J-A-05
6. Health staff review policies and procedures annually.
7. A continuous quality improvement (CQI) program monitors and improves health care delivered in the facility. J-A-06
   a. RHA establishes a CQI program that meets no less than quarterly.
   b. Identifies aspects of health care to be monitored and establishes thresholds.
   c. Analyzes the results for factors that may have contributed to below threshold performance.
   d. Designs and implements improvement strategies to correct the identified health concern. CQI minutes or summaries are made and retained for reference and copies are available and reviewed by all personnel.

    e.   When a committee member identifies a site specific concern, an outcome quality improvement study is completed.  The RHA is tasked with developing and implementing a corrective action plan.

    f.   Outcome quality improvement studies examine whether a expected outcomes of patient care were achieved by **identifying patient clinical care problems and developing a clinical corrective action plan**.

    g.   CQI reviews should assess all of the following.

         i.    Accessibility

        ii.    Appropriateness of clinical decision making

       iii.    Continuity

       iv.    Timeliness

        v.    Effectiveness (outcomes)

       vi.    Efficiency

      vii.    Prescriber -patient interaction

     viii.    Safety

8.  Having effective health record reviews to audit specific elements in patient care when poor outcomes have occurred. J-A-06

9.  **The responsible physician, Dr. Moser, is involved in and guides the CQI reviews.**

**CQI of Hartwell's Seizure Care.**

It is my opinion that Jennifer Trimble was in direct violation of all standards of care in her supervision and treatment of care for Hartwell.  Trimble ordered Gyger and Nix over the phone to leave Hartwell alone in his cell.  It was this decision by Trimble to cancel Dr. Moser's order to begin the seizure protocol and continue to monitor Hartwell that delayed his access to medical treatment and led to the worsening of Hartwell's condition.  Trimble then failed to perform any type of investigation, quality assurance review, record review by Dr. Moser, file a report with administration cataloging the event or add Hartwell to the statistical reports as required by NCCHC.

      A proper CQI review of Hartwell would have focused on the eight quality performance measures as outlined in the NCCHC rules for CQI evaluation.  I found the following:

**Accessibility**:  Hartwell accessibility to healthcare was inhibited by his acute mental status changes and his inability to communicate his medical needs due to his seizure activity and post ictal phase.  He relied on other inmates, nursing staff, and officers to identify his acute seizure episodes.  He was unable to completely communicate his medical needs by making statements like, "I don't want to die", "I am not taking the medications I was on at home and I need my medications.","I am ready to jump out of my skin.", "I feel dizzy and fell to the ground" and "I am seeing spots now."  His access was hindered by multiple staff members reporting that Hartwell was faking seizures.  These staff members specifically included: Nix, Vigil, Reck, Murphy, and Trimble, but the rumor of Hartwell's "faking seizures" spread throughout the facility and greatly inhibited his access to care.

**Appropriateness of clinical decision making:**

Seizure activity requires a complete workup and diagnostic evaluation emergently.  The differential diagnosis of causes of seizure are complex and cannot only be attributed to a chronic seizure condition.  At no time did a diagnostic workup to determine the cause of Hartwell's acute neurologic changes occur.  Dr. Moser was not asked to see Hartwell during any of the seven

episodes of noted acute neurologic change despite being at the facility during an active seizure that was recognized by the staff as ongoing.  Nursing staff did not adequately triage the seizure and acute neurologic changes as an emergent need.  Monitoring of the seizure activity was insufficient.  Documentation was inadequate and inaccurate as to the facts.  The seizure protocol was not initiated at any point in the care and no medications were given to alter the ongoing seizure activity.   The protocol requires acute medication treatment with Valium emergently and EMS transport for continued behaviour.

**Continuity**

Hartwell's seizure activity was not passed on from shift to shift, even though his seizure activity was documented in the chart and officer logs as far back as November 13th.  This was not conveyed to oncoming nursing staff at shift change.  His seizure diagnosis was not clearly defined as a major priority on his chart and medications were not ordered in a timely manner.  Mental health did not adequately notify medical staff of their concerns for altered mental status.  When medication Keppra was finally ordered no follow through was completed to insure that medication was dispensed.

**Timeliness**

Hartwell's seizure activity did not meet the timeliness guidelines for treatment expected for the seizure protocol.  His medications were discontinued upon entering the jail and never restarted.  This brought on his first seizure on November 13th that went untreated.  Further seizure activity followed and no medications were ordered.  Seizures occurred on November 13, 26, 29, 30, 2016.  No seizure protocol was initiated or medications given.  Dr. Moser ordered Keppra to begin the morning of November 29th and this order was never entered or documented as administered.  He ordered the seizure protocol to begin at 10 pm, November 29th and this order was rescinded by Gyger, Nix and Glenn(Trimble) without notification or clarification of Moser.  Hartwell was monitored via camera with no treatment for a medical emergency for over seven hours.  By all standards of care status epilepticus is an emergency and seizure activity that lasts longer than 5 minutes must be immediately transferred to the hospital.


**Effectiveness**

Hartwell's care resulted in subsequent recurrent seizures and his seizure activity continued during his entire incarceration.  It culminated in over seven hours of status epilepticus resulting in hospitalization and permanent brain damage.  Significant morbidity occurred from the lack of care received.  The care rendered by the jail medical staff had no effectiveness on his underlying epilepsy and resulted in the worst possible outcome.

**Prescriber-Patient interaction**

Moser did see Hartwell in chronic care clinic for hypertension, but did not provide any chronic care evaluation of his diabetes and seizure disorder.  He failed to review the chart that included information on the seizure that occurred on November 13th, while the nurse was speaking with him on the phone.  He failed to verify or order Valium and Keppra that were integral in the chronic care of Hartwell's seizure diagnosis.  No chronic care track was created for seizure activity or diagnosis for Hartwell as required by NCCHC guidelines.  When Hartwell had his fourth seizure event and subsequent status epilepticus,  Moser was not emergently contacted and was seemingly unaware of the activity on November 13th and 26th.  Furthermore, he did not see Hartwell when he was actively seizing on November 29th even though Moser was at the jail

conducting clinic.  Moser ordered medication, Keppra, for Hartwell without a clinical visit or interaction.  When Dr. Moser ordered the nursing staff to monitor Hartwell, he did not properly admit Hartwell to the infirmary or give nursing staff direction as to what they were monitoring for and the requirements of discharge thus allowing the nursing staff to discharge Hartwell from the infirmary within hours of his seizure activity.   There was no medical provider interaction prior to discharge from the infirmary and no definitive diagnosis was made due to the lack of this interaction.  Moser relied on an LPN for medical assessments despite knowing she lacked the training or licensure to make these critical medical assessments.  Moser allowed nursing staff to discharge Hartwell from the infirmary without a physician order.

**Safety**

Hartwell was placed on the floor of his cell and then left unattended during a medical emergency.  Dr. Moser reported that he would expect even a layman to call 911 based on Hartwell's seizure activity starting at 2012 on November 29th.  However, custody staff was instructed by medical that the seizure activity was "not consistent with seizure".  Custody staff should have required infirmary monitoring for the housing of Hartwell while seizure activity was ongoing.   Medical staff failed to contact the hospital or Dr. Moser to ensure the safety of Hartwell by moving him to a medical setting where his seizures could be treated within a five minute time frame as required by the seizure protocol.

**Management and oversight**

Glenn(Trimble) and Moser are both ultimately responsible for oversight of care.  Glenn(Trimble) admitted to reviewing Hartwell's medical record.  *Trimble deposition pg 33 (22-24)*  Both knew that Hartwell never received any medication for his seizures and both knew that Moser's order to start the seizure protocol was canceled by Glenn(Trimble). *Trimble deposition Pg 31 (1-21)*  Neither Moser or Trimble did any investigation into Hartwell's care.  *Trimble deposition pg 16 (15-16)*  Glenn(Trimble) reported that Dr. Moser does not investigate anything.  *Trimble pg (36 11-12)*  Glenn(Trimble) reported that she discusses in staff meetings verbally about how to handle seizures but did not discuss Hartwell's care.  *Trimble deposition pg 17 (19-22)*  Glenn(Trimble) did not document these trainings in the minutes of meetings as required by NCCHC standards.  She did not feel it necessary to retrain the nursing staff on the seizure protocol.  *Trimble deposition pg 19 (17-18)*  Glenn(Trimble) did not retrain staff as to the transfers of inmates having seizures.  *Trimble deposition pg 39 (2-8)*  Hartwell's care was not discussed with custody staff, medical department, nursing staff or at the corporate level.  Glenn(Trimble) did not file monthly staff minutes or allow the entire staff to be appraised of the staff meeting minutes as required by NCCHC.  *Trimble deposition pg 27 (2-4)*  Glenn(Trimble) did not require Moser's presence at staff meeting to discuss Hartwell's care for guidance and input on how improvements could be made.  Moser's presence is a requirement of NCCHC CQI rules requiring the physician and RHA to: "be involved in the CQI process and identify certain events, such as acute hospital admissions, medical emergencies, and deaths, that must be reviewed routinely."  NCCHC J-A-06   It is clear that Glenn (Trimble) omitted Hartwell's seizure activity, EMS man down emergency, emergency visit, and hospitalization from the NCCHC log so that a review would not be done by NCCHC.

Moser's physician duties included monitoring weekly services provided by non-physician providers within the jail to include: reviewing and co-signing records of patients treated by RN's working under standardized procedures.  Participation in quality management and peer review activities and meetings.  *Trimble deposition pg 79 (1-24)* Moser did not participate in NCCHC

required staff meetings, training of nursing staff, or quality improvement.  Moser allowed LPN's to do assessments that required a RN level of expertise then relied heavily on these assessments to make medical decisions of monitoring, medications, and treatment plans.

*CONCLUSIONS*

I.    **Each of the nurses and Dr. Moser knew of a substantial risk of serious injury but failed to take reasonable measures to abate the risk including failing to fulfill a known gatekeeper role.  Their actions and inactions fell below the standard of care.**

A.    **Sophia Nix** knew that as a LPN, she could not perform an assessment and could not determine if a patient is faking seizures.  She knew that a RN must perform an assessment.  She knew that Hartwell had a seizure the morning of November 29, 2016, because that information was passed on to her at shift change. She knew that he could be having continuous seizures, which poses a substantial risk of serious injury, and that she was not qualified to determine whether seizures are real or fake.  Nonetheless, she decided he was faking his seizures and so informed deputies and Dr. Moser in order to deny Hartwell medical treatment. The need to call 911 is obvious to a lay person, but she refused to contact 911 for over seven hours, and then she passed on misinformation to EMS and Hartwell's doctors at the hospital, which further delayed and interfered with his medical treatment. She failed to take reasonable measures to abate the known risk that Hartwell was suffering continuous seizures and her actions fell well below the standard of care.

B.    **Stevie Russak** did not contact 911 for transport to the hospital when treating Hartwell for definite seizure activity.  When Keppra was prescribed by Dr. Moser she did not enter the order or document dispensing the medication.  She did not properly monitor Hartwell after he had a defined seizure and then sent him back to his cell where he would not be monitored.  She did not require Dr. Moser to evaluate Hartwell when Dr. Moser was available for this assessment. She knew the risk that Hartwell would continue to suffer seizures that would not be monitored or treated, and she failed to take reasonable measures to abate the risk including sending Hartwell to the ER, keeping him in medical for monitoring, performing adequate neurological assessments within the standard of care that are documented, insisting Moser evaluate Hartwell, and passing on adequate information about Keppra and Hartwell's seizures to the next shift if Hartwell was not sent to the ER.

C.    **Lindsey Gyger** was the RN on shift during Hartwell's status epilepticus event. She was informed that Hartwell had a seizure event that day and that close monitoring was needed.  Gyger did not perform any assessment of Hartwell's condition, did not follow the seizure or man-down protocol, and did not call 911. She spent just minutes in Hartwell's cell, and failed to take any steps to protect him.  She allowed Nix to practice outside of her scope of practice without proper RN supervision in the care of Hartwell.  She did not respond to the man down event as required by the protocols for that type of event.  She did not assure that Hartwell received his Keppra PM medication as prescribed by Moser earlier that day.  She did not monitor Hartwell for seizure activity as instructed by the seizure

protocol.  She left her shift early and did not hand over care of Hartwell to another RN as would be required when monitoring a seizure patient. The substantial risk of serious injury from continuous seizures was obvious, and Gyger failed to take any reasonable measures to abate the risk.  Her actions and inactions fell well below the standard of care.

D. **Jessica Isaacs** observed Hartwell slump over and shake with altered consciousness while he was in medical on November 13, 2016.  She then performed an initial health assessment of Hartwell on November 19, 2016, in which she noted that he had seizures, diabetes, and hypertension but chose to document "no significant medical issues" in order to prevent Hartwell from receiving medical care from Dr. Moser for these conditions.  She knew of the risk of untreated seizures and knew that Hartwell had seizure-like activity six days earlier, but failed to ask any questions about Hartwell's seizure disorder or contact his physician, knowing that Dr. Moser would not evaluate Hartwell for 90 days and knowing that Hartwell was not receiving any medications for seizures.  She knew that the initial health assessment was supposed to be the safety net to catch things like unmedicated seizure disorders, and she purposefully disregarded the risk that Hartwell would suffer seizures and status epilepticus.  She failed to fulfill her gatekeeper role and contact Dr. Moser with her positive findings.

E. **Deimys Vigil** contacted Walgreens rather than Hartwell's prescribing physician or the hospital to find out which medications had been prescribed for him.  She knew of the substantial risk of serious injury in discontinuing prescribed medications for hypertension, seizures, and diabetes, but nonetheless, she failed to contact Hartwell's physician or the hospital and then cut Hartwell off most of his medications including Keppra and Diazepam.  She cut his Lantus insulin by almost half, and did not provide him medications for his hypertension. She knew from his intake that he had last been hospitalized for seizures, and she knew that in July of 2016, when she failed to document inmate Ben Ramsey's seizure medications, he suffered status epilepticus.  She disregarded the risk to Hartwell.  Vigil later observed Hartwell experiencing acute neurologic changes and seizures, but failed to perform an acute neurologic assessment, follow nursing protocols, or contact a doctor.  On November 25, 2016, Hartwell complained of a weight on his back, that he could not breath and was dying, and she sent him back to his cell without contacting a doctor. She told him to contact mental health and wrote in a shift change report that he was malingering.  On November 26, 2016, she responded to a documented seizure and then observed a second seizure, but failed to accurately document the information, perform a neurologic assessment, utilize nursing protocols, or contact 911.  She failed to contact any physician.  She brought Hartwell to medical for ten minutes where she testified he was exhibiting altered consciousness and loss of memory, which she testified she knew are acute neurologic changes that must be reported to a doctor, but she failed to do so. Hartwell had a heart rate of 122 and blood pressure of 192/112, and she sent him back to his cell without contacting a doctor.  She should have called 911 when she observed the second seizure.  She knew of the risk that Hartwell was suffering

acute neurologic changes including seizures that were not medicated, and she
failed to take any measures to abate the risk.

F.   **Daisha Wade LPN,** used nursing protocols despite being a LPN on November 13
and November 26, without contacting a RN or doctor to do an assessment.  On
November 26, Hartwell complained he felt like he was dying, complained of
shortness of breath and had a blood pressure of 192/112 and a heart rate of 122,
but LPN Wade failed to contact a RN or doctor, and used nursing protocols to
allegedly provide a blood pressure medication.  However, she failed to enter an
order for the medication or administer the medication.  Hartwell was sent back to
his cell without treatment despite the known substantial risk of serious harm
including stroke and myocardial infarction.

G.   **Kathryn Davidson LPN,** similarly failed to fulfill a gatekeeper role on 11/25/16
when hartwell had a blood pressure of 189/110, pulse of 114, shaking nausea, and
dry heaves.  She failed to contact a RN or doctor, and sent Hartwell back to his
cell without treatment.

H.   **Emily Barron** was the RN supervising LPN Wade and LPN Davidson, and she
failed to do an assessment, instead allowing LPNs to practice outside the scope of
their licenses.

I.   **Jennifer Glenn(Trimble)** directed or allowed nurses to practice outside the scope
of their licenses, to deny inmates medications and access to medical care, to fail to
follow nursing protocols, and to have LPNs doing assessments.  She instructed
nurses to contact her before calling 911.  She knew of the substantial risk of
serious harm when she ordered Nix not to enter Hartwell's cell while he was
suffering continuous seizures, and instead to leave him unattended because that
risk is obvious even to a lay person.  She contradicted Dr. Moser's order to
monitor Hartwell and follow the nurse protocols.  She failed to take any
reasonable measures to address the known problems in the care provided to
Hartwell by failing to perform quality assurance, additional training, and make
changes to prevent future injuries.  She failed to be critical of the care and
reprimand nursing staff.  Glenn(Trimble) failed to do an outcome quality
improvement evaluation to prevent future cases of acute neurologic changes,
status epilepticus and seizure activity from being ignored.  She failed to report this
case as a man down event or emergency care statistic to prevent further
investigation from Dr. Herr or CMGC that would shine light on her gross neglect.
Glenn(Trimble) failed to include Hartwell's care on any accreditation materials to
avoid the review process of NCCHC.

J.   **Dr. Timothy Moser** failed to continue medications that were critical for seizure
prevention to include Valium and Keppra upon entry into the facility.  He failed to
personally contact or order his nursing staff to obtain records from Hartwell's
primary care physician who ordered these critical medications or the hospital
from which Hartwell was transferred.  He failed to provide Hartwell
comprehensive chronic care for his seizure disorder, hypertension, and diabetes,
and the evaluation he provided on November 15, fell below the standard of care
and was not a reasonable measure to abate the known risk to Hartwell from poorly
controlled diabetes, hypertension, and documented seizures.  He failed to address

the seizure activity that Hartwell displayed just 2 days earlier and did not take reasonable measures to ensure that Harwell would not seize again.  He failed to evaluate Hartwell when he had acute neurologic changes and seizures or order his transfer to the hospital, and he failed to timely medicate Hartwell's seizures, or control his hypertension and diabetes.  He failed to promptly and accurately diagnose Hartwell's acute neurological changes as seizure activity and failed to order the nursing staff to transport Hartwell to a hospital facility that could adequately diagnose and treat Hartwell's seizures.  Moser failed to train his nursing staff as to the process in which the seizure protocol should be instituted and failed to ensure that the nursing staff could apply the seizure protocol in an effective and emergent manner when needed.  He knowly allowed and required LPNs to work outside of their scope of practice and relied solely on Nix's LPN assessment of Hartwell's acute medical condition without requiring further evaluation by a RN or immediate transfer to the ER, despite the obvious substantial risk of serious harm from continuous seizures.  Moser allowed the nursing staff to "monitor via video camera" a medical emergency.  He failed to take any reasonable measures to abate the risk from Hartwell's seizures and then status epilepticus.  Moser allowed Trimble to cancel his order to discontinue the seizure protocol without further discussion with a provider or follow up nursing assessment.  Moser then endorsed the lack of care received by Hartwell.  Moser refused to interview, investigate, reprimand, audit, or participate in an outcome quality improvement study as demanded by NCCHC for the care Hartwell received.   Dr. Moser did not view the video of Hartwell until after a lawsuit was filed and he was deposed.  Still no investigation has been done to inform the nursing staff of changes that need to be made for quality improvement.   Moser did not make any recommendations to Glenn(Trimble) as to the need for further training yet his deposition stated that, "a layman should have diagnosed this as a seizure."  In fact, many laymen did recognize Hartwell's acute neurological changes.  Inmate Williams, Deputies Burek, Colavolpe, Yacuta, Irvin, Mathis, Leinweber, and Murphy all entered security notes pertaining to neurological findings that were consistent with seizure activity.  All were ignored by medical staff under the direction and care of Dr. Moser. His actions and inactions fell well below the standard of care for a reasonably careful and prudent physician under the same or similar circumstance.

K. **CMGC purposefully ignored known systemic deficiencies.**  CMGC either purposefully established unconstitutional policies, procedures, or customs, or it deliberately allowed them to continue.   J-A-06 1. C.  Requires facilities to analyze the results for factors that may have contributed to below threshold performance.  J-A-06 1.e. Standard requires that facilities monitor the performance after implementation of the improvement strategies.  Douglas County Jail had a patient in July of 2016, who was denied seizure medications, entered status epilepticus, and was not timely sent to the ER.  The systemic problem of stopping physician ordered seizure medications that caused Ramsy's injuries in July of 2016 were purposefully not addressed and no changes made prior to the same systemic deficiencies resulting in Hartwell's severe injuries.

CMGC continues to endorse this care as they have not requested an external or internal investigation into the care provided by Moser and nurses including Trimble, Gyger, Nix, Isaacs, Russak, Davidson, and Vigil. Despite being the responsible nurse on shift at that time, Gyger reported that she was never asked about the care Hartwell received by Glenn, a supervisor, investigator, or the Douglas County Sheriff's Department. *Deposition Gyger pg 12 12-18.*

L. **Douglas County Sheriff Department** Deputies did an excellent job of documenting the neurological events in Hartwell's care.  In fact the documentation of the officers is superior and more accurate than the medical staff, when comparing video record to the written record.  Deputies recognized the acute neurological changes that Hartwell was exhibiting, and activated a man down response and contacted medical in a timely manner, but failed to contact EMS, instead deferring to the medical department.  Multiple officers walked by the cell while Hartwell was actively seizing.  I agree with Dr. Moser's statement that, "I would expect a layman to recognized this as a seizure."   No officer attempted to speak to Hartwell or showed concern for his acute neurologic changes.   When EMS arrived the officers allowed medical to give a false report to EMS that Hartwell had only been seizing since 03:30 on November 30th.  Glenn(Trimble) reported that all investigations are initiated by custody and that the medical department was not involved with investigations.   On December 1, 2016 Captain Kevin Duffy sent an email to Sergeant Keith Mathena stating, "I just need to confirm a few details that caused a lot of alarm with the third floor.  I pulled all the medical records and charting done by the nurse for that day and night and the details don't match what was written in the special and the special does not match what I saw in the videos regarding the nurses checking on the IM.  Just need to clarify a few areas." *DCSO 000036*  No minutes from this meeting were available for review, and no report issued.  The County approved the care provided.

**Conclusion for Hartwell**

The video evidence is very clear.  Hartwell was seizing for a tedious and protracted amount of time.  The officers and medical staff knew that Hartwell was continuously seizing, but failed to take reasonable measures to abate the substantial risk of serious harm, which would have been obvious to any lay person.  Medical staff knew of the risk prior to Hartwell entering status epilepticus and had many opportunities to prevent it, but failed to take any reasonable measures to abate the risk.  Trimble and CMGC have not made any changes despite the obvious risk inmates will continue to be seriously harmed.

Sincerely:

Kennon Tubbs MD