# Exhibit C

```
 1                    UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF COLORADO

 3   Civil Action No. 1:18-cv-01845-WJM-KLM

 4   BENJAMIN RAMSEY, by and through his guardian
     and next friend, Karla Ramsey MD,
 5
          Plaintiff,
 6
     vs.
 7
     SOUTHWEST CORRECTIONAL MEDICAL GROUP, INC.;
 8   BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF
     DOUGLAS, COLORADO;
 9   SOUTHWEST CORRECTIONAL MEDICAL GROUP, PLLC;
     CORRECTIONAL MEDICAL GROUP COMPANIES, INC.;
10   SOUTHWEST CORRECTIONAL MEDICAL GROUP, LLC;
     COLORADO CORRECTIONAL MEDICAL GROUP, PLLC;
11   JENNIFER TRIMBLE, formerly GLENN, RN, HSA, in her
     individual capacity;
12   NURSE DEIMYS VIGIL, RN, in her individual capacity;
     TIMOTHY G. MOSER, M.D., in his individual capacity;
13   EMILY BARRON, RN, in her individual capacity;
     LINDSEY GYGER, RN, in her individual capacity;
14   SOPHIA HELENE NIX, LPN, in her individual capacity;
     TINA HOLLAND, RN, in her individual capacity;
15   JOAN M. CUNNINGHAM, RN, in her individual capacity;
     KATHRYN DAVIDSON, LPN, in her individual capacity;
16   SHAURI N. KRON, LPN, in her individual capacity;
     DAISHA WADE, LPN, in her individual capacity,
17
          Defendants.
18   ------------------------------------------------------

19

20                   VIDEOTAPED DEPOSITION OF

21               KENNON CHRISTOPHER TUBBS, M.D.

22                     TEMPEST REPORTING

23                   SALT LAKE CITY, UTAH

24                   NOVEMBER 18, 2020

25
```

1    standard of care is what I'm asking.

2        A.   I would define reasonable standard of care to

3    include what is consistent with what other physicians, the

4    Academy of Family Physicians, the Academy of Neurology as

5    well as Up To Date and other peer-review articles would say

6    the standard of care is for a particular diagnosis.

7        Q.   Okay.  And how do you define, again, generally,

8    not specific to this case, reasonable degree of medical

9    certainty?

10        A.   If you look at the literature and the data on a

11    specific illness, it is reasonable that your diagnosis and

12    treatments are in line or consistent with the science and

13    the literature behind that diagnosis.

14        Q.   Now, Dr. Tubbs, do you agree with me that a breach

15    of the standard of care can occur and no injury may result

16    from that breach?

17        A.   Yes, that's reasonable.  That does happen.

18        Q.   Yes.  So you can, um, you can be negligent in a

19    certain way, but not injure a patient with your negligence;

20    correct?

21        A.   Correct.

22        Q.   Okay.  So there's a difference between saying that

23    somebody breached the standard of care and saying that

24    somebody's conduct actually harmed somebody; correct?

25        A.   Correct.

1     **Q.    Okay.  So those diagnoses -- so I guess -- I guess**

2     **what I'm asking is if you -- what is the purpose of**

3     **obtaining a history if you are going to defer to the**

4     **diagnoses that the hospital has already provided to you, for**

5     **example, as what occurred in the case of Benjamin Ramsey?**

6          A.    Well, the purpose in obtaining a history is that

7     now you're this patient's primary care physician.  And once

8     you're this patient's primary care physician, he's going to

9     be asking you to modify his medications, change his

10    medications, new medications, and you're now fully

11    responsible for that patient and you need to know that

12    history so that you can take care of them appropriately.

13         **Q.    Okay.  You said earlier that once an inmate comes**

14    **to the jail, they're your patient?**

15         A.    That's correct.  No other physician is responsible

16    for that patient other than the medical director or the

17    providers that are staffed by the jail.

18         **Q.    And so do you have a physician-patient**

19    **relationship with all inmates at all the jails that you**

20    **serve as medical director at?**

21         A.    So there's a difference between a doctor-patient

22    relationship and a duty to provide care.  So I have a duty

23    to provide care to all the patients when they're

24    incarcerated.  I don't necessarily have a patient --

25    doctor-patient relationship, meaning I haven't spoken to

1   them, talked to them, or seen them, but I still have a duty

2   to provide care for them.

3           So regardless of whether or not Dr. Moser saw

4   Mr. Ramsey, which he did not, he had a duty to provide care

5   for him which is why the nurses were calling him for

6   medication orders because the nurses knew that Dr. Moser had

7   a duty to provide this care.  And they wouldn't have called

8   Dr. Moser for medication orders if the nurses didn't know

9   that Dr. Moser had a duty to provide care to Mr. Ramsey.

**10      Q.   Based on the information provided to Mr. Ramsey --**

**11  provided to Dr. Moser, were the medication orders**

**12  appropriate?**

13      MS. TRINE:  I didn't hear you.  Would you say that

14  again.

**15      Q.   (BY MS. HERZOG) Based on the information provided**

**16  to Dr. Moser by Nurse Vigil, were Dr. Moser's medication**

**17  orders appropriate?**

18      A.   Can you --

19      MS. TRINE:  Object to form.

20      THE WITNESS:  I would like to reread the deposition

21  from Dr. Moser of the information that was actually provided

22  from Nurse Vigil to Dr. Moser word for word before I answer

23  that question.

**24      Q.   (BY MS. HERZOG) Okay.  So you mentioned your duty**

**25  to provide care to all -- to all inmates at the jails that**

1  says implementation and adherence to protocols.  So it's his

2  responsibility to make sure that the nurses are adequately

3  trained on the protocols, that they adhere to the protocols,

4  and that they implement them as written.  And if they don't,

5  they should be reprimanded.  None of these things happened.

6       **Q.   Okay.  So, um, so adherence to protocol.  Do**

7  **policy and procedures define the standard of care?**

8       MS. TRINE:  Object to form.

9       THE WITNESS:  Well, they -- they -- yes and no.  Some

10  policies are policies regarding conduct of certain

11  behavioral conducts and how -- how to administer things, and

12  it's not -- it doesn't have anything to do with standard of

13  care at all.  And other policies and procedures are directly

14  relevant to the standard of care such as when to provide a

15  patient medication when they're seizing.  How to transport a

16  patient when they're seizing.

17       So those do define standard of care or are written

18  in conjunction with consideration of the standard of care.

19       **Q.   (BY MS. HERZOG) Okay.  So we both agree that**

20  **protocol can be consistent with the standard of care and**

21  **protocols can be relevant to the standard of care.  Is it**

22  **your testimony that this protocol defined the standard of**

23  **care for Mr. Ramsey?**

24       MS. TRINE:  Object to form.  Which protocol are you

25  talking about?

1   opinion, did Dr. Moser have a physician-patient relationship

2   with Mr. Ramsey on July 19th and July 20th?

3        A.   The patient was not known to Dr. Moser on the 19th

4   or the 20th.  He was known to Dr. Moser on the 21st which

5   did have a patient -- a physician-patient relationship

6   starting on the 21st.  He had a duty to provide care for him

7   on the 19th.

8        Q.   So the answer to the question of did Dr. Moser

9   have a physician-patient relationship with Mr. Ramsey on

10  July 19th and July 20th is no; correct?

11       A.   That's correct.  On those two dates.

12       Q.   Okay.  And the order of medications that

13  Dr. Ramsey approved Mr. Ramsey receiving those

14  prescriptions, that was not a breach of the standard of

15  care; correct?

16       MS. TRINE:  Object to form.

17       THE WITNESS:  Your question asked if Dr. Ramsey ordered

18  the medicine.  Dr. Ramsey did not order the medication.

19       Q.   (BY MS. HERZOG) Oh, I apologize.  I apologize.

20  Let me put it this way.  You don't have any criticism of the

21  prescription that the hospital provided to Mr. Ramsey;

22  correct?

23       A.   You're speaking of Dr. Kuboweiz?

24       Q.   I'm speaking specifically, just to narrow the

25  scope of the case, that you do not have any criticism of the

1    Clyde?

2        A.   So you have to understand that Duchesne County is

3    not an NCCHC accredited facility.  We discussed this earlier

4    in the deposition that is a facility required to be NCCHC

5    certified, and the answer was no.  Duchesne County is not

6    NCCHC certified and we do not do formal training there.

7    However, Utah County is NCCHC certified and if you are NCCHC

8    certified, you're required to do formal training.

9        Q.   So, Dr. Tubbs, you'd agree with me that the

10   requirement for NCCHC accreditation is distinct from the

11   standard of care for a medical director; correct?

12       A.   Correct.

13       MS. TRINE:  Objection, form.

14       Q.   (BY MS. HERZOG) Okay.  So are you telling me

15   that -- so I'm confused when I ask was it within the

16   standard of care for you not to provide formal training to

17   Nurse Clyde.  And I believe your answer was it wasn't

18   required by the NCHHC.  Am I restating your testimony

19   accurately?

20       A.   No.  It wasn't required by Duchesne County Jail

21   that I provide -- Duchesne County Jail did not provide --

22   require that I provide formal training to Nurse Clyde.

23       Q.   Is it your opinion that the standard of care is

24   defined by the contract between a medical provider and a

25   jail?

1       MS. TRINE:  Object to form.

2       THE WITNESS:  Standard of care and duty are two

3    different things.  It's my opinion that the duty of the

4    physician is whatever he signed up for, and in this case my

5    duty at Duchesne County Jail did not include formal training

6    of the nurses.  I was not contracted to do that.

7           However, in the Benjamin Ramsey case, Dr. Moser

8    was contracted to provide medical director duties of that

9    sort that were consistent with NCCHC policies as well as

10   their own internal policies.

**11       Q.   (BY MS. HERZOG) Okay.  And so it's your opinion**

**12   that he breached the duties that he had agreed to with**

**13   Douglas County?**

14       A.   That's my opinion.

**15       Q.   Okay.  So are you offering opinions on breaches of**

**16   duties, not on the standard of care?**

17       MS. TRINE:  Object to form.

18       THE WITNESS:  I'm offering opinions on both.

19   Standard --

20       MS. HERZOG:  Okay.

21       THE WITNESS:  Standard of care as to the treatment of

22   Ben Ramsey and duties of a responsible physician.  I'm

23   offering opinions as to did Dr. Moser complete his duties as

24   medical director and I'm also offering opinions did Benjamin

25   Ramsey receive the standard of care that would be expected

1          If you look at their policy where it says "Acute

2    hospital admissions and selected problem cases as dictated

3    by Policy A061," it says that in their policy that they are

4    supposed to review all hospitalizations.  This isn't only my

5    standard of care.  This is the standard of care of SWCMG.

6          **Q.   (BY MS. HERZOG) Okay.  So is it, um, is it your**

7    **opinion that a different standard of care applies to two**

8    **jails of the same size depending on what the jails' internal**

9    **policies and procedures say?**

10         MS. TRINE:  Object to form.

11         THE WITNESS:  Well, the answer is yes.  Meaning that I

12   cover jails of the same size and the sheriffs want different

13   types of medical care.  For instance, in Evanston, Wyoming,

14   I have been asking them for several years to hire a nurse,

15   and they don't have a nurse at the jail, and that is the

16   sheriff's decision, not mine.  That is a different -- and

17   other jails of the same size as Evanston do have nurses such

18   as Park City Jail.

19         So the sheriff makes that determination as to the

20   type of care or level of care that he wants to provide in

21   the jail and then the physician is contracted to provide

22   that level of care.

23         **Q.   (BY MS. HERZOG) Okay.  So the standard of care is**

24   **not uniform with respect to similarly sized jails?**

25         MS. TRINE:  Object to form.

1      THE WITNESS:  So some sheriffs departments, such as

2   Douglas County Sheriffs Department, has elected to be NCCHC

3   certified.  Now, when you're -- when the sheriff has elected

4   to be a jail that is NCCHC certified such as Douglas County

5   and Utah County Jail, then you're expected to provide that

6   level of service consistent with NCCHC.  That's the level of

7   care that you're expected to provide.

8      MS. HERZOG:  Okay.  So if -- sorry.

9      THE WITNESS:  Southwest, SWCMG, agreed to provide the

10  level of care for, um, as dictated by NCCHC and their

11  policies and procedures that I reviewed are consistent with

12  NCCHC policy.  They have good policies.  I'm not disputing

13  that.

14      **Q.   (BY MS. HERZOG) So when a facility chooses to have**

15  **itself accredited under the NCCHC, a higher standard of care**

16  **is required?**

17      MS. TRINE:  Object to form.

18      THE WITNESS:  Yes.  NCCHC is a higher standard of care.

19      MS. TRINE:  So, counsel, it is like a quarter 'til 2:00

20  and I believe we've been going for at least four hours.  Is

21  that your understanding as well?

22      MS. HERZOG:  We've been going for about four hours.

23  That's -- yeah, sure.

24      MS. TRINE:  So I'm wondering how much longer you plan

25  to go.