IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 18-cv-1845-WJM-KLM

BENJAMIN RAMSEY, by and through his guardian and next friend, Karla Ramsey M.D.,

    Plaintiff,

v.

SOUTHWEST CORRECTIONAL MEDICAL GROUP, INC., *et al.*,

    Defendants.

## ORDER GRANTING DEFENDANT TIMOTHY G. MOSER, M.D.'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Timothy G. Moser, M.D.'s ("Dr. Moser") Motion for Summary Judgment ("Motion"). (ECF No. 269.) For the following reasons, the Motion is granted.

### I. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and

all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. BACKGROUND

### A.   Material Facts[1]

This action arises out of Plaintiff Benjamin Ramsey's detention at the Douglas County Detention Facility ("DCDF") from July 19–21, 2016. (ECF No. 269 at 2 ¶ 1.) Appearing through his mother in her role as legal guardian and next friend, Ramsey alleges that the acts and omissions of numerous parties (collectively, "Defendants") led to him being denied necessary medications while in pretrial detention at the DCDF, in turn leading to seizures and permanent brain damage. (ECF No. 228 at 2.) He alleges, among other things, violations of his Fourteenth Amendment right to adequate medical care in pretrial detention. (ECF No. 229.)

Dr. Moser is a physician who is board certified in family medicine. (ECF No. 279 at 12 ¶ 26; ECF No. 285 at 6 ¶ 26.) On March 1, 2016, Dr. Moser entered into a contract with Colorado Correctional Medical Group, PLLC ("CCMG") to provide various physician services, including to act as the on-site medical director at DCDF. (ECF No. 285 at 2 ¶ 2.) Dr. Moser worked six hours per week at DCDF and was on call the rest of the week, 24 hours per day. (ECF No. 279 at 7 ¶ 1; ECF No. 285 at 2 ¶ 1.) He was the

---

[1] The following factual summary is based predominantly on the parties' briefs on the Motion and documents submitted in support thereof. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

only physician at DCDF, and it was his responsibility to sign off on all of the patients' charts during the six hours he was at the facility each week. (ECF No. 279 at 8 ¶ 6; ECF No. 285 at 3 ¶ 6.)

On July 21, 2021, Nurse Deimys Vigil spoke to Dr. Moser on the phone to order medications for Ramsey; this was the first time Dr. Moser learned about Ramsey's detention at DCDF. (ECF No. 269 at 2 ¶ 4; ECF No. 279 at 4 ¶ 4.) Dr. Moser never saw or spoke to Ramsey. (ECF No. 269 at 3 ¶ 6; ECF No. 279 at 4 ¶ 6.) Two hours after Vigil contacted Dr. Moser regarding Ramsey's medications, Ramsey was transferred to the Emergency Department. (ECF No. 269 at 3 ¶ 5; ECF No. 279 at 4 ¶ 5.)

**B.     Procedural History**

On July 19, 2018, Ramsey filed a Complaint against numerous Defendants, including Dr. Moser. (ECF No. 1.) On January 11, 2019, Ramsey filed a Second Amended Complaint ("SAC"). (ECF No. 92.) On July 19, 2019, the Court dismissed a number of claims from the SAC, some with prejudice and some without. (ECF No. 149.) On March 25, 2020, the Court entered an Order granting in part and denying in part Ramsey's motion to amend the SAC. (ECF No. 228.) In relevant part, the Court noted that Dr. Moser "remains a defendant as to Ramsey's common-law medical malpractice claim." (*Id.* at 13.) Accordingly, in the Third Amended Complaint, Ramsey asserts only one claim for medical negligence against Dr. Moser in his individual capacity.[2] (ECF No. 229 at 41; ECF No. 269 at 2 ¶ 2.) As a result of his injuries, Ramsey alleges that, among other things, he suffered permanent injuries including brain damage and

---

[2] The parties do not dispute that Colorado law governs the medical negligence claim.

3

ongoing seizures. (ECF No. 229 at 29.)

On January 19, 2021, Dr. Moser filed the Motion, arguing that the opinions of Ramsey's retained correctional medicine expert, Kennon Tubbs, M.D. ("Dr. Tubbs"), do not fulfill Ramsey's obligation to present competent expert testimony under Federal Rule of Evidence 702, and thus Ramsey's medical negligence claim against Dr. Moser fails as a matter of law. (ECF No. 269 at 2.) On February 19, 2021, Ramsey filed a response in opposition (ECF No. 279), to which Dr. Moser replied (ECF No. 285).

### III. LEGAL STANDARDS

**A.     Federal Rule of Evidence 702**

A district court must act as a "gatekeeper" in admitting or excluding expert testimony. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2005). Expert opinion testimony is admissible if it is relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 594–95 (1993). The opinions are relevant if they would "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. They are reliable if (1) the expert is qualified "by knowledge, skill, experience, training, or education," (2) his opinions are "based upon sufficient facts or data," and (3) they are "the product of reliable principles and methods." *Id.* The proponent of expert testimony has the burden to show that the testimony is admissible. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

In addition to assessing whether expert opinions are reliable, the Court must also ensure that the proffered testimony will assist a trier of fact. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999). "Relevant expert testimony must logically advance[ ] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia*, 635 F.3d

4

472, 476 (10th Cir. 2011) (internal quotation marks and citations omitted). Moreover, an expert witness's testimony may not usurp the jury's fact-finding function. *See Specht v. Jensen*, 853 F.2d 805, 809–10 (10th Cir. 1988). The line between what is helpful to the jury and what intrudes on the jury's role as the finder of fact is not always clear, but it is well-settled that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. Nonetheless, "[t]here is a significant difference between an attorney who states his belief of what law should govern the case and any other expert witness. While other experts may aid a jury by rendering opinions on ultimate issues, our system reserves to the trial judge the role of adjudicating the law for the benefit of the jury." *Specht*, 853 F.2d at 808–09.

**B.     Medical Negligence**

To establish a *prima facie* case for negligence, a plaintiff must show a legal duty of care on the defendant's part, breach of that duty, injury to the plaintiff, and causation, *i.e.*, that the defendant's breach caused the plaintiff's injury. *Greenberg v. Perkins*, 845 P.2d 530, 533 (Colo. 1993) (citations omitted). A negligence action will fail therefore if it is based on circumstances for which the law imposes no duty of care upon the defendant for the plaintiff's benefit. *Id.* (citing *Perreira v. State of Colorado*, 768 P.2d 1198, 1208 (Colo. 1989)). Thus, the initial question in any negligence action is whether the defendant owed a legal duty to protect the plaintiff against injury. *HealthONE v. Rodriguez*, 50 P.3d 879, 888 (Colo. 2002). The question of whether a defendant owes a plaintiff a duty to act to avoid injury is a question of law to be determined by the court. *Id.*

Medical malpractice is a particular type of negligence action. *Greenberg*, 845 P.2d at 534 (citing *Melville v. Southward*, 791 P.2d 383, 387 (Colo. 1990)). "The duty of

5

care on which a medical malpractice action is predicated arises out of the professional relationship between physician and patient." *Id.* The duty arises when a physician "undertakes to treat or otherwise provide medical care to another." *Id.* Once a physician engages in such an undertaking, "a physician-patient relationship exists, and the physician's contractual obligations create the matrix from which an independent tort obligation arises." *Id.* "The standard of care against which the physician's conduct will be measured is 'whether a reasonably careful physician of the same school of medicine as the [physician] would have acted in the same manner as did the [physician] in treating and caring for the [patient].'" *Id.* (quoting *Melville*, 791 P.2d at 387). "This same standard, however, will not necessarily extend to a physician who undertakes a professional responsibility not involving medical care and treatment incident to a physician-patient relationship." *Id.* (citation omitted).

To prove the first two elements in the medical negligence context, a plaintiff must establish that the defendant medical treatment provider's care fell "below the degree of knowledge, skill, and care used by other physicians practicing the same specialty." *Gorab v. Zook*, 943 P.2d 423, 427 (Colo. 1997). To meet this burden, a plaintiff generally must present expert testimony that explains what the "degree of knowledge, skill, and care used by other physicians in the same specialty" actually is, as well as how the defendant failed to meet the standard. *See id.* ("[E]xpert medical testimony is necessary" both "to determine the standards of professional care and competence which define the concept of reasonableness" and "to establish . . . the failure to meet such standards."). "The reason for the requirement of expert opinion testimony in most medical malpractice cases is obvious: matters relating to medical diagnosis and

6

treatment ordinarily involve a level of technical knowledge and skill beyond the realm of lay knowledge and experience." *Gallardo v. United States*, 752 F.3d 865, 871 (10th Cir. 2014) (quoting *Melville*, 791 P.2d at 387).

## IV. ANALYSIS

### A. Dr. Tubbs's Opinions Regarding Dr. Moser's Duty of Care

Ramsey retained Dr. Tubbs, who is a family practice physician and the medical director for ten county jails throughout Utah and Wyoming, to review Ramsey's care and treatment at the DCDF in July 2016 and offer expert opinions regarding whether Ramsey faced a known substantial risk of serious harm. (ECF No. 269-1 at 2.) Dr. Tubbs also offers opinions about whether the nurses and Dr. Moser met the National Commission on Correctional Health Care ("NCCHC") standard of care, and regarding Dr. Moser, the standard of care for a medical director in a jail. (*Id.*) At his deposition, Dr. Tubbs testified that a correctional medicine physician like Dr. Moser owes a duty to provide care to all inmates:

> Q: And so do you have a physician-patient relationship with all inmates at all the jails that you serve as medical director at?
>
> A: So there's a difference between a doctor-patient relationship and a duty to provide care. So I have a duty to provide care to all the patients when they're incarcerated. I don't necessarily have a patient -- doctor-patient relationship, meaning I haven't spoken to them, talked to them, or seen them, but I still have a duty to provide care for them.
>
> So regardless of whether or not Dr. Moser saw Mr. Ramsey, which he did not, he had a duty to provide care for him which is why the nurses were calling him for medication orders because the nurses knew that Dr. Moser had a duty to provide this care. And they wouldn't have called Dr. Moser for medication orders if the nurses didn't know that Dr. Moser had a duty to provide care to Mr. Ramsey.

7

(ECF No. 269-3 at 4–5.)  Dr. Tubbs also testified that although Ramsey "was not known to Dr. Moser on the 19th or the 20th [of July 2016]," "[h]e was known to Dr. Moser on the 21st [of July 2016] which did have a patient -- a physician-patient relationship starting on the 21st.  He had a duty to provide care for him on the 19th." (*Id.* at 7.)  Dr. Tubbs further testified that Dr. Moser did not have a physician-patient relationship with Ramsey on July 19 and 20, 2016.  (*Id.* at 7.)  Further, in his rebuttal expert report, Dr. Tubbs opines that "Dr. Moser has a physician-patient relationship and duty to care for all patients in the custody of DCDF regardless if they are known to Moser or not."  (ECF No. 269-2 at 2.)

In the Motion, Dr. Moser argues that Dr. Tubbs's opinions as to when a physician's duty of care arises are inconsistent with a fundamental aspect of Colorado medical malpractice law: that a duty of care in a medical malpractice action "will not necessarily extend to a physician who undertakes a professional responsibility not involving medical care and treatment incident to a physician-patient relationship."[3] (ECF No. 269 at 7 (citing *Greenberg*, 845 P.2d at 534).)  According to Dr. Moser, Dr. Tubbs's misunderstanding of when a physician's duty arises is "critical," because Ramsey received care at DCDF for two days (on July 19 and 20, 2016) *before* Dr. Moser was notified about Ramsey (on July 21, 2016).  (*Id.* at 9.)  The parties do not dispute that Dr. Moser never saw or spoke to Ramsey, or that Dr. Moser did not learn of Ramsey's existence until shortly before Ramsey was transported to the hospital on July

---

[3] In addition, Dr. Moser points out that these opinions violate the fundamental principle that a duty requires foreseeability.  (ECF No. 269 at 8 (citing *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46 (Colo. 1987) (duty is a question of law based on a variety of factors, including foreseeability)).)

21, 2016. Nonetheless, Dr. Tubbs opines that Dr. Moser is liable for the care Ramsey received throughout the entire time at DCDF. (ECF No. 269-2 at 3.) According to Dr. Moser, Dr. Tubbs's opinions essentially seek to impose strict liability on Dr. Moser. (ECF No. 269 at 9.)

In response, Ramsey argues that: (1) Dr. Moser had a physician-patient relationship because he provided Ramsey treatment when he ordered his medications and later spoke to a nurse on the phone about Ramsey before his transport to the hospital; (2) Dr. Moser had a physician-patient relationship with Ramsey based on his contract with Southwest Correctional Medical Group ("SWCMG"); and (3) Dr. Moser had a common law duty to protect Ramsey from foreseeable harm as the medical director at DCDF. (ECF No. 279 at 17.) For the following reasons, the Court finds Ramsey's arguments unavailing.

First, Ramsey's claim against Dr. Moser is for medical negligence, which the Colorado Supreme Court teaches is a particular kind of negligence action based on a specific legal duty that arises when a physician undertakes to treat or provide medical care to a patient. *See Greenberg*, 845 P.2d at 534. In his response, Ramsey states that Dr. Moser formed a physician-patient relationship with Ramsey when he ordered medications on July 21, 2016. (ECF No. 279 at 19.) Dr. Tubbs, too, testified that Dr. Moser did not have a physician-patient relationship with Ramsey until July 21, 2016, when he ordered Ramsey's medication and transportation to the hospital. That Dr. Tubbs still opines that Dr. Moser is liable for medical negligence based on the care Ramsey received throughout the entire period of his incarceration—including July 19 and 20, 2016—demonstrates that his opinion conflicts with Colorado law governing the

9

physician-patient relationship and when a physician's duty of care arises.

Second, Ramsey states that there is an express contract between Dr. Moser and SWCMG to provide medical care to inmates, including Ramsey.[4] (*Id.* at 18.) Thus, Ramsey argues that a physician-patient relationship existed between Dr. Moser and all inmates at DCDF because SWCMG hired Dr. Moser to act as medical director and provide medical care to all inmates. (*Id.*) For support, Ramsey avers that "[m]any jurisdictions have recognized that a physician's contract with a hospital or company through which the physician agrees to provide medical care creates a tort duty to patients." (*Id.*) However, Ramsey cites only one Tenth Circuit case for support, *Talavera ex rel. Gonzalez v. Wiley*, 725 F.3d 1262, 1270 (10th Cir. 2013), but *Talavera* applied Kansas law, not Colorado law, and did not reach the issue of whether a contract between the physician and the institution gives rise to a legal duty – under Kansas or Colorado law. *Id.* at 1270–71 ("But we need not resolve any questions about the existence or scope of a contract-based theory of duty in medical malpractice cases brought under Kansas law."). Similarly, all of the other cases Ramsey cites are from outside the Tenth Circuit and do not apply Colorado law. Thus, Ramsey has provided no support based in Colorado law that the contract between Dr. Moser and SWCMG created a physician-patient relationship between Ramsey and Dr. Moser.

Finally, Ramsey argues that a "physician-patient relationship is not required for a doctor to have a duty to exercise professional skill for which he can be held liable." (ECF No. 279 at 19.) However, Ramsey ignores that he has only brought a medical

---

[4] Although Ramsey states that Dr. Moser's contract was with SWCMG (ECF No. 279 at 17), the contract Ramsey attaches to his response states that the agreement is "between Colorado Correctional Medical Group, PLLC . . . and Timothy G. Moser, MD . . ." (ECF No. 279-4 at 1).

10

negligence claim against Dr. Moser, which requires a physician-patient relationship which gives rise to a duty of care; he did not assert claims for ordinary negligence, negligent training, or negligent supervision against Dr. Moser. (*See* ECF No. 229.) As Dr. Moser points out, unlike here, the Colorado cases on which Ramsey relies alleged claims of ordinary negligence. (ECF No. 285 at 10–11 (citing *HealthONE*, 50 P.3d at 883; *Greenberg*, 845 P.2d at 532 n.5).) Ramsey's cases on this point are therefore inapposite.

Ramsey also relies on *Kellner v. Schultz*, 937 F. Supp. 2d 1319, 1325 (D. Colo. 2013), in which the court denied a defendant physician's motion for summary judgment. In *Kellner*, the court concluded that the physician had neither a contractual duty nor a duty arising out of a physician-patient relationship to the plaintiff. *Id.* Nonetheless, the court determined that a dispute as to material fact existed requiring a trial bearing upon whether a common law duty of care should be recognized outside the physician-patient relationship under the particular circumstances in that case. *Id.* It appears as though *Kellner*, like this case, involved only medical negligence claims and not ordinary negligence claims. However, despite the conclusion reached in *Kellner*, it is non-binding authority, and given the apparent lack of Colorado cases reaching a similar conclusion, the Court is not persuaded that its reasoning is applicable here.

Based on the foregoing, the Court finds that Dr. Tubbs's opinion that Dr. Moser breached the duty of care and is liable for treatment Ramsey received before Dr. Moser knew about Ramsey and became involved with his treatment is inconsistent with Colorado law and cannot support Ramsey's medical negligence claim.

**B.      Dr. Tubbs's Opinions Regarding the Applicable Standard of Care**

Under Colorado law, in a medical negligence case, "[t]he standard of care

11

against which the physician's conduct will be measured is 'whether a reasonably careful physician of the same school of medicine as the [physician] would have acted in the same manner as did the [physician] in treating and caring for the [patient].'" *Greenberg*, 845 P.2d at 534 (quoting *Melville*, 791 P.2d at 387).

However, Dr. Tubbs opines that numerous definitions or explanations of the standard of care apply here. For instance, at his deposition, Dr. Tubbs testified that he "would define reasonable standard of care to include what is consistent with what other physicians, the Academy of Family Physicians, the Academy of Neurology as well as Up To Date and other peer-review articles would say the standard of care is for a particular diagnosis." (ECF No. 269-3 at 3.) He also testified, somewhat confusingly, that some DCDF policies and procedures "do define standard of care or are written in conjunction with consideration of the standard of care." (*Id.* at 6.) When asked whether it is his "opinion that a different standard of care applies to two jails of the same size depending on what the jails' internal policies and procedures say," Dr. Tubbs stated "yes." (*Id.* at 10.) He explained that the "sheriff makes that determination as to the type of care or level of care that he wants to provide in the jail and then the physician is contracted to provide that level of care." (*Id.*) Finally, Dr. Tubbs testified that when a facility chooses to have itself accredited under the NCCHC, a "higher standard of care" is required. (*Id.* at 11.)

In the Motion, Dr. Moser argues that Dr. Tubbs "does not know what standard of care governed Dr. Moser's actions once a duty to provide care arose." (ECF No. 269 at 9.) Specifically, Dr. Moser contends that Dr. Tubbs's opinions regarding the standard of care for a physician in Dr. Moser's role, explained above, are "inconsistent with each

12

other and Colorado law." (*Id.* at 10.) Moreover, Dr. Moser points out that Colorado law does not support Dr. Tubbs's opinion that the accreditation of the facility plays any role in the standard against which a physician's conduct is measured; in fact, such a rule would "punish" physicians who practice at a voluntarily accredited facility. (*Id.* at 10–11.)

In response, Ramsey argues that policies, procedures, industry standards, contracts, and medical literature are all sources of information that can be relevant to the standard of care. (ECF No. 279 at 24.) Further, Ramsey emphasizes that such materials may form part of the basis of an expert's opinions. (*Id.*) Regarding the definition of the standard of care, Ramsey admits that "Dr. Tubbs testified he inadvertently used the words 'standard of care' and 'level of care' interchangeably," though Ramsey states that Dr. Tubbs later "clarified" his opinions. (*Id.* at 6.) According to Ramsey, "even if Dr. Tubbs did incorrectly state the standard of care during his deposition, he corrected himself." (*Id.* at 26.) In the response, Ramsey states that "Dr. Tubbs is not going to testify that the standard of care for Dr. Moser is the NCCHC standards, or the facility policies, or Dr. Moser's contract in and of themselves." (*Id.* at 27.) Rather, Ramsey promises that "Dr. Tubbs will testify that the standard of care is whether Dr. Moser acted as a reasonably careful physician would have acted under the same or similar circumstances, including his role as medical director at the Jail." (*Id.* at 27–28.)

Ramsey's arguments miss the mark. While Dr. Moser does not dispute that the aforementioned materials may be admissible as evidence of the standard of care, the problem is that Dr. Tubbs uses various sources to define the standard of care.

13

Moreover, while the Court will not reiterate Dr. Tubbs's deposition testimony in full, a review of some of his testimony demonstrates its shifting nature, as well as Dr. Tubbs's inability to consistently articulate a uniform standard of care that applied to Dr. Moser. For example, Ramsey argues in his response that at his deposition, Dr. Tubbs corrected his conflicting positions on the standard of care. However, following a discussion with Ramsey's counsel during a break at the deposition, Dr. Tubbs testified as follows:

> Q: Now, Dr. Tubbs, you just took a break. Did you speak to anyone over the break?
>
> A. Yes.
>
> Q. Who did you speak to?
>
> A. Ms. Trine [counsel for Ramsey].
>
> Q. And what did you two discuss?
>
> A. We discussed standard of care issues.
>
> Q. And what standard of care issues did you discuss?
>
> A. The -- the point that standard of care -- there's a minimum standard of care and an elevated standard of care where a patient -- where some facilities try and provide even more services than the baseline minimum, and what is the baseline minimum standard of care that we're addressing in this lawsuit.
>
> Q. And have you provided opinions to me based on the baseline minimum standard of care?
>
> A. Well, I can give you my opinion now if you'd like.
>
> Q. Wait. Is it your -- my question's a little different. We spent over four and a half hours going over your opinions in this case. Has your testimony so far been on the baseline minimum standard of care or the elevated standard of care?
>
> A. On both.

(ECF No. 285-6 at 4.) This testimony demonstrates that Dr. Tubbs's opinions are based on at least two different standards of care: a baseline minimum standard of care and an elevated standard of care. Moreover, Dr. Moser points out that even after Dr. Tubbs's conversation with Ramsey's counsel about the standard of care, Dr. Tubbs did not correct his testimony that an elevated standard of care governs NCCHC-accredited facilities. (ECF No. 285 at 12.) Rather, Dr. Tubbs reiterated his previous testimony that an elevated standard of care applies to physicians working at NCCHC-accredited facilities:

> Q. But a similarly-sized jail the standard of care will depend upon the policies and procedures that those jails have implemented for themselves. Is that your testimony?
>
> . . .
>
> A: So NCCHC sets the standards for all large facilities across the nation. If you choose to adopt those -- those standards, which Douglas County did choose to adopt those standards, that is the standard of care they are accepting as the standard of care for their facility. And so I'm holding them to that standard of care that they accepted when they signed on for the contract.

(ECF No. 285-6 at 5–6.) Later in his deposition, Dr. Tubbs also testified that SWCMG's policies "define the standard of care." (*Id.* at 8.)

> Q. (BY MS. HERZOG [counsel for Dr. Moser]) Okay. So the policies set forth, um, interesting. So --
>
> A. They're consistent with the standard of care.
>
> Q. Do they define the standard of care for purposes of your opinions in this case?
>
> A. Yes.

(*Id.*)

Based on Dr. Tubbs's testimony, the Court agrees with Dr. Moser's characterization of Dr. Tubbs's opinions: the "problem is that Dr. Tubbs turns to numerous different sources to define a standard of care and does not seem to know where to land." (ECF No. 285 at 12.) Dr. Tubbs's opinions that the NCCHC accreditation subjects physicians at accredited facilities to a higher level of care and that SWCMG's policies also define the standard of care are as a consequence unreliable and unsupported, and thus fail to pass Rule 702 muster.

The Court's findings regarding Dr. Tubbs's opinions leave Ramsey without competent expert testimony regarding the duty of care and the standard of care applicable to Dr. Moser's care and treatment of him in this case. As such, he has failed to create a genuine issue of fact for trial on his medical negligence claim, and the Court will grant summary judgment in favor of Dr. Moser. *See Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1216 (10th Cir. 2004) (finding district court did not abuse its discretion in excluding expert testimony under Rule 702 based on an insufficiently reliable theory and did not err in granting summary judgment because without the theory, the plaintiff could not produce evidence that would allow a rational trier of fact to find in plaintiff's favor on the claim).

## V. CONCLUSION

For the foregoing reasons, the Court ORDERS:

1. Defendant Timothy G. Moser, M.D.'s Motion for Summary Judgment (ECF No. 269) is GRANTED;
2. At the time the Clerk enters final judgment on all claims and as to all parties, he shall enter judgment in favor of Defendant Timothy G. Moser, M.D. and against

Plaintiff Benjamin Ramsey, by and through his guardian and next friend, Karla Ramsey M.D.; and

3. At the time of entry of final judgment in this action, Defendant Moser shall have his costs reasonably incurred in this action upon compliance with D.C.COLO.LCivR 54.1.

Dated this 12th day of July, 2021.

BY THE COURT:

William J. Martinez
United States District Judge